1  Maria C. Rodríguez (SBN 194201)
   SEYFARTH, SHAW LLP
2  One Century Plaza, Suite 330
   2029 Century Park East
3  Los Angeles, California 90067-3063
4  Telephone:  (310) 277-7200
   Facsimile:   (310) 201-5219
5  Email: mrodriguez@seyfarth.com

6  Robert L. Zisk (SBN 07147)
7  Eric L. Yaffe (SBN 439750)
   Jeffrey L. Karlin (SBN 144488)
8  GRAY, PLANT, MOOTY, MOOTY
    & BENNETT, P.A.
9  The Watergate
   2600 Virginia Avenue, N.W.
10 Suite 1111
   Washington, D.C.  20037-1905
11 Telephone:  (202) 295-2200
12 Facsimile:   (202) 295-2250
   Email: Robert.Zisk@gpmlaw.com
13 Email: Eric.Yaffe@gpmlaw.com
   Email: Jeffrey.Karlin@gpmlaw.com
14

15

16                    UNITED STATES DISTRICT COURT

17          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

18

| | |
|---|---|
| 19  BASKIN-ROBBINS FRANCHISED SHOPS LLC and BR IP HOLDER | )  Case No. C07-02441-PJH |
| 20          Plaintiffs, | )  NOTICE AND POINTS AND AUTHORITIES IN SUPPORT OF BASKIN-ROBBINS'S MOTION FOR PRELIMINARY INJUNCTION |
| 21       v. | ) |
| 22  SUKPRAN GILL and GURMEET GILL, | )  Date: July 25, 2007 |
| 23 | )  Time: 9:00 a.m. |
| 24          Defendants. | )  Judge: Hon. Phyllis J. Hamilton Place: Courtroom 3, 17th Floor San Francisco Federal Building |

25

26

27

28

LA1 6637294.1

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ........................................................................... ii

NOTICE ...................................................................................................... 1

RELIEF REQUESTED ................................................................................ 1

I.    INTRODUCTION .............................................................................. 1

II.   STATEMENT OF ISSUES ................................................................ 4

III.  FACTS ............................................................................................... 4

IV.   ARGUMENT ...................................................................................... 13

    I.    BASKIN-ROBBINS IS LIKELY TO SUCCEED ON THE
        MERITS BECAUSE DEFENDANTS' FRANCHISE
        AGREEMENTS WERE PROPERLY TERMINATED AND
        THEY HAVE NO RIGHT TO USE BASKIN-ROBBINS'S
        PROPRIETARY MARKS. ................................................................. 14

        A.    The Breach of the In-Term Covenants Not to Compete
            Warrants Termination of the Franchise Agreements. .............. 14

        B.    Defendants' Unauthorized Use of Baskin-Robbins's
            Trademarks Constitutes Trademark Infringement. .................. 19

        C.    Baskin-Robbins Is Likely to Succeed on Its Trade Dress
            And Unfair Competition Claims. ............................................. 22

    II.   BASKIN-ROBBINS IS BEING IRREPARABLY HARMED BY
        DEFENDANTS' UNLICENSED USE OF ITS REGISTERED
        MARKS. .......................................................................................... 24

    III.  THE BALANCE OF HARMS WEIGHS IN BASKIN-
        ROBBINS'S FAVOR. ..................................................................... 26

    IV.   THE PUBLIC INTEREST WILL BE ADVANCED BY
        ISSUANCE OF A PRELIMINARY INJUNCTION. ........................ 27

    V.    NO BOND SHOULD BE REQUIRED. ........................................... 27

CONCLUSION ........................................................................................... 28

LA1 6637294.1

# <u>TABLE OF AUTHORITIES</u>

## <u>Federal Cases</u>

*American Home Prods. Corp. v. Johnson Chem. Co.,*
  589 F.2d 103 (2d Cir. 1978) ........................................................................ 26

*AMF, Inc. v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir 1979) ........................................................................ 21

*Barahona-Gomez v. Reno,*
  167 F.3d 1228 (9th Cir. 1999) ..................................................................... 28

*Baskin-Robbins, Inc. v. Taj California, Inc.,*
  2003 WL 22768662 (C.D. Cal. Oct. 21, 2003) ........................................... 23

*Brock v. Baskin-Robbins, Inc.,*
  113 F. Supp.2d 1078 (E.D. Tex. 2000) ........................................................ 16

*Burger King Corp. v. Hall,*
  770 F. Supp. 633 (S.D. Fla. 1991) ............................................................... 21

*Burger King Corp. v. Majeed,*
  805 F. Supp. 994 (S.D. Fla. 1992) ..................................................... 20-22, 26

*Century 21 Real Estate Corporation, Inc. v. Sandlin,*
  846 F.2d 1175 (9th Cir. 1988) ..................................................................... 22

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,*
  794 F.2d 38 (2d Cir. 1986) .......................................................................... 27

*Clicks Billiards, Inc. v. Sixshooters, Inc.,*
  251 F.3d 1252 (9th Cir. 2001) ..................................................................... 22

*Day Cos. v. Patat,*
  440 F.2d 1343 (5th Cir. 1971) ..................................................................... 19

*Diet Ctr., Inc. v. Day,*
  Bus. Franchise Guide (CCH) ¶ 9651 (D. Mass. Mar. 19, 1990) ................. 18

ii

*Deutchland Enters., Ltd. v. Burger King Corp.*,
    957 F.2d 449 (7th Cir. 1992) ................................................................ 14-15

*Department of Parks & Recreation v. Bazaar El Mundo, Inc.*,
    448 F.3d 1118 (9th Cir. 2006) ............................................................... 20

*Doctor's Associates, Inc. v. Stuart*,
    11 F. Supp.2d 221 (D. Conn. 1998)................................................. 19, 28

*Economou v. Physicians Weight Loss Centers*,
    756 F. Supp. 1024 (N.D. Ohio 1991) ..................................................... 15

*Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*,
    875 F. Supp. 966 (E.D.N.Y. 1994) ........................................................ 20

*Great Frame Up Systems, Inc. v. Jazayeri Enterprises, Inc.*,
    789 F. Supp. 253 (N.D. Ill. 1992)........................................................... 17

*Keating v. Baskin-Robbins USA, Co.*,
    2001 WL 407017 (E.D.N.C. March 27, 2001) .................................. 16-17

*Laboratorios Roldan v. Tex Int'l., Inc.*,
    902 F. Supp. 1555 (S.D. Fla. 1995) ....................................................... 27

*Long John Silver's, Inc. v. Washington Franchise, Inc.*,
    1980 U.S. Dist LEXIS 16635, No. 80-540-A (E.D. Va. June 24, 1980) ..... 25

*Los Angeles Memorial Coliseum Commission v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980) ............................................................... 13

*McCart v. H&R Block, Inc.*,
    470 N.E.2d 756 (Ind. Ct. App. 1985) .................................................... 19

*McDonald's Systems, Inc. v. Sandy's Inc.*,
    195 N.E.2d 22 (Ill. App. Ct. 1963) ........................................................ 15

*Merry Maids Limited Partnership v. Kamara*, No. Y-98-3564,
    1998 U.S. Dist. LEXIS 19059 (D. Md. December 10, 1998) ...................... 25

iii

*Nabisco Brands, Inc. v. Conusa Corp.,*
    722 F. Supp. 1287, 1290 (4th Cir. 1989) ........................................ 24

*Opticians Ass'n v. Independent Opticians,*
    920 F.2d 187 (3d Cir. 1990) ................................................ 20

*In re Ward,*
    194 B.R. 703 (Bankr. D. Mass. 1996) ........................................ 18

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.,*
    698 F.2d 862 (7th Cir. 1983) ............................................... 26

*S & R Corp. v. Jiffy Lube Int'l, Inc.,*
    968 F.2d 371 (3d Cir. 1992) .......................................... 18, 20, 25

*Tanel Corp. v. Reebok Int'l, Ltd.,*
    774 F. Supp. 49 (D. Mass. 1990) ............................................. 26

## State Cases

*Boulanger v. Dunkin' Donuts, Inc.,*
    815 N.E.2d 572 (Mass. 2004) ............................................. 17-18

*Dayton Time Lock Service, Inc. v. Silent Watchman Corp.,*
    52 Cal. App. 3d 1 (1975) .................................................. 16

## Miscellaneous

McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25.07[1] ......... 21

LA1 6637294.1

## NOTICE

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 11, 2007 at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 3, 17th Floor, San Francisco Federal Building, 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Baskin-Robbins Franchised Restaurants LLC and BR IP Holder LLC (collectively referred to hereafter as "Baskin-Robbins") will move the Court to enter a preliminary injunction against Defendants Sukpran Gill and Gurmeet Gill.

## RELIEF REQUESTED

Pursuant to Federal Rule of Civil Procedure 65(a), Baskin-Robbins asks this Court to enter a preliminary injunction enjoining Defendants Sukpran Gill and Gurmeet Gill from operating both the two Baskin-Robbins stores they still have open despite the fact that Baskin-Robbins has terminated their Franchise Agreements and the additional nearby competing ice cream store they have assisted in opening.

## POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendants, Baskin-Robbins franchisees with locations in Concord and Pittsburg, California, have opened an ice cream store under a different brand name only a few miles away from their existing locations and less than a mile away from the nearest Baskin-Robbins store.  This action breaches clear and unambiguous

1

LA1 6637294.1

provisions of their Franchise Agreements with Baskin-Robbins that specifically prohibited them from owning or becoming actively involved in the operations of a competing ice cream store.    Accordingly, Baskin-Robbins has terminated Defendants' Franchise Agreements.    Nonetheless, Defendants continue to operate their stores as Baskin-Robbins franchises in violation of their post-termination obligations under the Franchise Agreements and in contravention of federal trademark statutes.    Baskin-Robbins seeks a preliminary injunction to bring to a halt Defendants' unauthorized use of its trademarks and trade dress at their stores and to enforce the termination of their Franchise Agreements.

Defendants' impending actions exceed the minimum conditions for preliminary injunctive relief.

- <u>Likelihood That Baskin-Robbins's Claims Will Succeed</u>: Defendants have breached unambiguous provisions of their Franchise Agreements that specifically prohibit them from taking any actions that would assist a competing ice cream business, much less open one up and operate it with impunity.    Defendants' use of Baskin-Robbins's proprietary marks after termination constitutes trademark infringement under the Lanham Act.

- <u>Irreparable Injury to Baskin-Robbins Without a Preliminary Injunction</u>: Because Baskin-Robbins is likely to succeed on its claim

2

LAI 6637294.1

that Defendants' status as holdover franchisees constitutes a likelihood of confusion, it "necessarily follows" that Baskin-Robbins is suffering irreparable harm. A franchisor, like any trademark owner, has the right to license others to use its trademarks only in the manner that it prescribes. The unauthorized or unlicensed use of those marks creates a situation where the franchisor no longer can control the reputation and goodwill of its trademark.

- **Balance of Hardships From a Preliminary Injunction**: The harm to Baskin-Robbins from the unlicensed use of its marks is substantial. Defendants, on the other hand, will suffer no harm because their right to use the marks and trade dress has already been properly terminated. Any self-inflicted harm to Defendants is insignificant when balanced against the irreparable injury to the goodwill that Baskin-Robbins has created through the expenditure of hundreds of millions of dollars in advertising and promoting its marks for decades.

- **Public Interest In A Preliminary Injunction**: The requested preliminary injunction here will serve the public interest by preventing Defendants from continuing to confuse the consuming public as to the origin of its products.

3

LA1 6637294.1

Therefore, the Court should issue a preliminary injunction to bar defendants from operating the Baskin-Robbins franchises in question and the competing ice cream store they assisted in opening. No bond, or nominal bond, should be required because an injunction would not financially harm the Labor Commissioner.

## II.    STATEMENT OF ISSUES

1.    Is Baskin-Robbins likely to succeed on the merits of its claims against Defendants given that the Franchise Agreements were properly terminated and Defendants have no further right to use Baskin-Robbins' trademarks?

2.    Has Baskin-Robbins been irreparably harmed by Defendants' unlicensed use of its registered trademarks?

3.    Does the balance of hardships in granting a preliminary injunction weigh in Baskin-Robbins' favor?

4.    Will the public interest be advanced by issuance of a preliminary injunction in these circumstances?

## III.    FACTS

1.    Plaintiff Baskin-Robbins Franchised Shops LLC, successor-in-interest to Baskin-Robbins USA Co., is a Massachusetts Limited Liability Company with its principal place of business in Canton, Massachusetts (hereinafter referred to as "Baskin-Robbins"). Laudermilk Certif., ¶ 3. Baskin-Robbins is engaged in the

4

business of franchising independent businesspersons to operate Baskin-Robbins stores throughout the United States and is the franchisor of the Baskin-Robbins system. *Id.* ¶ 4.

2.    Defendants Sukpran Gill and Gurmeet Gill were the owners and operators of a Baskin-Robbin ice cream store located at 4493 Century Boulevard, Pittsburg, California (the "Pittsburg Store"). *Id.* ¶ 11. They were also parties to a Franchise Agreement dated October 26, 1996 ("the Pittsburg Franchise Agreement"), which licensed them to use the Baskin-Robbins trademarks, trade names and trade dress. *Id.*

3.    In addition, Sukpran Gill was the owner and operator of another Baskin-Robbins store located at 1924 Grant Street, Suite #2, Concord, California (the "Concord Store"). *Id.* ¶ 12. He was a party to a Franchise Agreement dated April 22, 2004 (the "Concord Franchise Agreement"), which licensed him to use the Baskin-Robbins trademarks, trade names and trade dress. *Id.*

4.    The Pittsburg Franchise Agreement contains a covenant by which the franchisees acknowledged that they had received "specialized training and trade secrets" from Baskin-Robbins, including confidential information concerning the "operational, sales, promotional and marketing methods and techniques of Baskin-Robbins and the [Baskin-Robbins] System." Laudermilk Cert. Ex. A, ¶ 15.2.

5

5.    Both the Pittsburg and Concord Franchise Agreements contain covenants that prohibit Baskin-Robbins franchisees from owning, operating or in any way assisting in the running of a competing retail ice cream shop during the term of the contracts. *Id.* ¶¶ 13, 14.

6.    For example, the in–term covenant not to compete in the Pittsburg Franchise Agreement provides as follows:

> Paragraph 15.2.    FRANCHISEE shall not, during the term of this Agreement, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership or corporation:

> Paragraph 15.2.1.    divert or attempt to divert any business or customer of the Retail Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Names and Marks or the System;

> Paragraph 15.2.3.    own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Retail Unit.  Same or similar shall mean more than five percent (5%) of the gross revenue is derived from the sale of frozen dairy desserts.

Laudermilk Cert. Ex. A, ¶¶ 15.2, 15.2.1, 15.2.3.

7.    The in-term covenant not to compete in the Concord Franchise Agreement contains virtually identical provisions:

> Paragraph 8.0.    During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be shall:

> Paragraph 8.0.1.    Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect

6

inducement or otherwise, or do or perform, directly or indirectly any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

Paragraph 8.0.3.    [O]wn, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR.

Laudermilk Cert. Ex. B, ¶¶ 8.0, 8.0.1, 8.0.3.

8.    As a general business practice, Baskin-Robbins works with its franchisees to build up their Baskin-Robbins franchise by providing training, business and marketing assistance, advertising, and other support. Baskin-Robbins has a continuing interest in the value it builds at its store locations, including Defendants' and the covenant not to compete is important to protect that interest and to discourage franchisees from breaching their franchise agreements and breaking away from the Baskin-Robbins system while retaining Baskin-Robbins' goodwill. *Id.* ¶ 15.

9.    In direct violation of these covenants, during March and April of 2007, Defendant Sukpran Gill took steps to open, engage in and/or operate a retail ice cream store under the name "Country Creamery" in American Canyon, California. William Gault Cert., ¶ 4. The Country Creamery Store is located less than a mile from the nearest Baskin-Robbins location. *Id.* ¶ 5.

7

10.   Sukpran Gill took the following actions with respect to the Country Creamery Store, all of which he did without ever informing Baskin-Robbins or seeking its approval to do so:

a.   entered into or assisted others in entering into a commercial lease for a property located at 101 W. American Canyon Road, #512, American Canyon, California. *Id.* ¶ 6(a);

b.   applied or assisted in the application for a business license for the Country Creamery Store with the City of American Canyon under the name Isher Gill, while identifying Sukpran Gill's home address and telephone number as the owner's contact information. *Id.* ¶ 6(b);

c.   purchased three ice cream dipping cabinets and an ice maker from other Baskin-Robbins franchises and provided to the Country Creamery Store — while misrepresenting the nature of the purchase to Baskin-Robbins by claiming the equipment was intended as back-up for the Pittsburg and Concord Stores. *Id.* ¶ 6(c);

d.   participated in advertising and marketing for the Country Creamery Store.  For example, Gill was observed directing one of the store's employees to stand beside a busy freeway off-ramp with a sign promoting the business and provided hand-outs for the Country Creamery Store employees to provide to potential customers. *Id.* ¶ 6(d);

8

e.     helped to prepare the premises of the Country Creamery store to open for business, including preparing menu boards for display.   Michael Ridd Cert., ¶ 3;

f.     identified himself as the owner of the Country Creamery Store and stated that it was a new business for him, that he intended to offer low cost ice cream to the public in addition to shakes, sundaes and fruit smoothie-types – the same kind of products available at Baskin-Robbins stores.  *Id.*  ¶ 4;

g.     provided an application to be given to someone he believed was a prospective employees and involved himself in the interview process.   For example, Gill handed an application to a Baskin-Robbins employee who introduced himself to Gill as a customer and wrote his name down as the person who should be contacted to set up an interview.  *Id.* ¶ 5.

11.     Upon information and belief, the Country Creamery Store opened for business in April 2007 and currently sells ice cream on a retail basis to the general public.

12.     The Pittsburg Franchise Agreement gives Baskin-Robbins the right to terminate the contract, without the opportunity to cure, if the franchisees breaches its in-term covenant not to compete. (Laudermilk Cert. Ex. A, ¶¶ 16.3, 16.3.8.)

13.     The Concord Franchise Agreement gives Baskin-Robbins the right to terminate the agreement if the franchisee fails to "perform, observe or comply"

9

LA1 6637294.1

with any of the franchisee's duties or obligations – including the in-term covenant not to compete. *Id.*, Ex. B ¶ 9.0.5.

14.    In addition, the Concord Franchise Agreement gives Baskin-Robbins the right to terminate that contract, without the opportunity to for the franchisee to cure, if "any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder." *Id.*, Ex. B, ¶¶ 9.0, 9.0.4, 9.1.4.

15.    On April 30, 2007, Baskin-Robbins sent Defendants a Notice of Default and Termination, terminating both the Pittsburg and Concord Franchise Agreements based on Defendants' involvement with the Country Creamery store. *Id.*, Ex. C.

16.    The Notice of Termination demands that Defendants cease using Baskin-Robbins's trade names and proprietary marks immediately upon the effective date of termination, and thereafter comply with their post-termination obligations set forth by the Pittsburg Franchise Agreement and Concord Franchise Agreement, as detailed below. *Id.*

17.    BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks. BR IP Holder LLC owns numerous federal registrations for the mark "Baskin-Robbins" or derivations thereof, as well as related marks. Each of these registrations is in full force and

10

LA1 6637294.1

effect, and most of them are incontestable pursuant to 15 U.S.C. § 1065. Laudermilk Cert., ¶ 7.

18. Baskin-Robbins has the exclusive license to use these marks and trade names and has used them continuously since approximately 1947 to identify its ice cream stores, and the ice cream and other products associated with those stores. *Id.* ¶ 8. The Baskin-Robbins marks have been very widely advertised and promoted by Baskin-Robbins over the years and the Baskin-Robbins marks have become famous throughout the United States. *Id.*

19. Baskin-Robbins and its franchisees currently operate approximately 2,200 stores in the United States and 2,600 stores outside of the United States. In the fifty years since the Baskin-Robbins System began, millions of consumers have been served in Baskin-Robbins stores. *Id.* ¶ 9.

20. As a result of the extensive sales, advertising, and promotion of items identified by the Baskin-Robbins marks, the public has come to know and recognize the Baskin-Robbins marks, and to associate them exclusively with products and services offered by Baskin-Robbins and its franchisees. *Id.* ¶ 10. The Baskin-Robbins marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Baskin-Robbins, representing and embodying Baskin-Robbins' goodwill and favorable reputation. *Id.*

11

LAI 6637294.1

21.    Both the Concord and Pittsburg Franchise Agreements include acknowledgements by the franchisee that their failure to comply with the restrictions on the use of Baskin-Robbins's proprietary information would 1) result in Baskin-Robbins's seeking a injunction to enforce these restrictions; 2) cause Baskin-Robbins irreparable harm; and 3) not require the posting of a bond on the part of the franchisor.  Laudermilk Cert. Ex. A, ¶ 11.3; Laudermilk Cert. Ex. B, ¶ 9.6.

22.    Defendants' post-termination obligations under the Pittsburg Franchise Agreement require them to stop using Baskin-Robbins' trademarks.  The contract provides, for example, that the franchisees must, upon receipt of the termination notice, "immediately cease to operate the Retail Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Baskin-Robbins."  The agreement also provides that, once a termination notice is issued, the franchisees must "permanently cease to use, in any manner whatsoever . . . all Proprietary Names and Marks and distinctive forms, slogans, symbols and devices associated with the System or the Products . . . ." Laudermilk Cert., Ex. A, ¶¶ 17.1.2, 17.1.3.

23.    The Concord Franchise Agreement requires Sukpran Gill to cease using Baskin-Robbins's marks and any methods associated with the name "Baskin-Robbins" after the termination of the contract.  Moreover, the agreement contains

12

Gill's acknowledgement that any unauthorized or continued use of the marks after termination constitutes irreparable harm subject to injunctive relief. *Id.*, Ex. B, ¶¶ 9.4.2, 9.4.3.

24.    Both the Pittsburg and Concord Franchise Agreements include acknowledgements by the Gills that their failure to comply with the restrictions on the use of Baskin-Robbins's proprietary information would not require the posting of a bond on the part of the franchisor.    (Laudermilk Cert. Ex. A, ¶ 11.3; Laudermilk Cert. Ex. B, ¶ 9.6.)

25.    As of May 87, 2007, Defendants continue to operate the Pittsburg Store and the Concord Store, using Baskin-Robbins's trademarks.    (Laudermilk Cert., ¶ 17.)

## IV.    ARGUMENT

The grant or denial of a preliminary injunction rests in the sound discretion of the Court.    The following factors are considered:    (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury in the absence of the injunction; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction, if issued, advances the public interest (in certain cases). *Los Angeles Memorial Coliseum Commission v. Nat'l Football League,* 634 F.2d 1197, 1201 (9th Cir. 1980).    An examination of these factors shows that Baskin-Robbins is entitled to a preliminary injunction.

13

**I.     BASKIN-ROBBINS IS LIKELY TO SUCCEED ON THE MERITS BECAUSE DEFENDANTS' FRANCHISE AGREEMENTS WERE PROPERLY TERMINATED AND THEY HAVE NO RIGHT TO USE BASKIN-ROBBINS'S PROPRIETARY MARKS.**

**A.     The Breach of the In-Term Covenants Not to Compete Warrants Termination of the Franchise Agreements.**

As the above facts demonstrate, Defendants' Franchise Agreements were properly terminated and, therefore, they are no longer licensed to use Baskin-Robbins's trademarks. Defendants directly assisted with the opening and/or are the owners of the Country Creamery store. Sukpran Gill was involved in virtually all aspects of the establishment of the Country Creamery store, including the leasing of commercial space, obtaining a business license to setting up the location, hiring employees, preparing the premises and promoting its operations. These are precisely the kind of activities to which the broadly-written in-term covenants not to compete contained in both the Pittsburg and Concord Franchise Agreements were meant to apply.

The rationale behind enforcing in-term covenants like the ones at issue here is based on the recognition that such restrictions are necessary to protect the investment (in terms of money and other resources) that franchise companies have made to establish and maintain their systems. For instance, the court in *Deutchland Enters., Ltd. v. Burger King Corp.*, 957 F.2d 449, 451-53 (7th Cir. 1992) explained it is "essential and reasonable . . . for a fast food chain to prohibit

14

LA1 6637294.1

franchisees from operating its restaurants and those of its competitors." *Id.* at 451-53. Reasoning that franchisees "have advance notice of the franchisor's marketing strategies," the ability to misappropriate the franchisor's "operating methods and policies," and a contractual obligation to devote "full-time and best efforts" to the operation of their franchises, the *Deutchland* court enforced a nationwide in-term covenant against Burger King franchisees who had simultaneously sought to operate under a different brand name. *Id.*

The same approach has been used in many other cases. *See, e.g., Economou v. Physicians Weight Loss Centers*, 756 F. Supp. 1024, 1032 (N.D. Ohio 1991) (allowing franchisees to use the knowledge and experience they have gained to serve former or potential customers of the franchisor would "work a hardship and prejudice to the latter") and *McDonald's Systems, Inc. v. Sandy's Inc.*, 195 N.E.2d 22, 31 (Ill. App. Ct. 1963) (enforcing the termination of the Franchise Agreement because the franchisees violated the in-term covenant by operating a similar shop regardless of its geographic scope).

Courts applying California and Massachusetts law have also consistently upheld covenants not to compete in the same circumstances. While the Concord Franchise Agreement clearly establishes Massachusetts as the source of law for the interpretation of the contract, it is an open question as to whether California or

15