Massachusetts law applies to the Pittsburg Franchise Agreement.[1]  However, it is well settled that the violation of an in-term covenant not to compete constitutes good cause for the termination of a franchise agreement, regardless of which state's law applies.

Courts interpreting California law, for example, have consistently recognized that in-term covenants not to compete are enforceable. *Dayton Time Lock Service, Inc. v. Silent Watchman Corp.*, 52 Cal. App. 3d 1, 124 Cal. Rptr. 678, 681-82 (1975) (limitation against competing against franchisor valid during the life of the franchise); *Great Frame Up Systems, Inc. v. Jazayeri Enterprises, Inc.*, 789 F. Supp. 253, 256 (N.D. Ill. 1992) (in-term covenants valid under California law).  For example, in a case interpreting the same contractual provision at issue in the present case, a federal district court in North Carolina upheld the termination of a Baskin-Robbins franchise agreement under California law based on the franchisee's violation of the in-term covenant not to compete. *Keating v. Baskin-Robbins USA, Co.*, 2001 WL 407017 (E.D.N.C. March 27, 2001).  In

---

[1]    The Concord Franchise Agreement states that Massachusetts law governs its construction. Laudermilk Cert., Ex. B, ¶ 17.0.  The Pittsburg Franchise Agreement, however, states that it will be interpreted under the law of the state in which Baskin-Robbins "has its principal place of business." *Id.*, A, ¶ 25.1.  Baskin-Robbins' principal place of business is now located in Canton, Massachusetts.  At the time the Franchise Agreement was executed, Baskin-Robbins's offices were located in Glendale, California. *Id.* ¶ 18.  It has been held, however, that the "plain meaning" of a similarly written clause in the Baskin-Robbins Franchise Agreement is that place where it has its principal place of business at the time the case is filed controls. *Brock v. Baskin-Robbins, Inc.*, 113 F. Supp.2d 1078, 1089 (E.D. Tex. 2000).

LA1 6637294.1

*Keating*, the franchisees had effectively ceased doing business as a Baskin-Robbins franchise during the term of their franchise agreement and had begun to sell another brand of ice cream at their store. *Id.* at *2. After Baskin-Robbins discovered the franchisees' activities, it terminated the franchise agreement and sought an order stating that the termination was proper. *Id.* at *13. The court upheld the termination, commenting that it was "beyond cavil that an ice cream franchise may reasonably require a franchisee not to operate a competing ice cream store during the term of its franchise agreement." *Id.* at *14. While recognizing that some post-termination covenants have not been enforced in California, the court in *Keating* held that the cases "clearly established" that in-term covenants did not violate California law. *Id.* As such, the court concluded that the franchisees in *Keating* had breached the in-term covenant and that the "termination of the franchise agreement was warranted." *Id.*

Massachusetts follows the same path. In fact, the Massachusetts Supreme Judicial Court expressly upheld the enforcement of the same restrictive covenant at issue here. The provision in question in *Boulanger v. Dunkin' Donuts, Inc.*, 815 N.E.2d 572 (Mass. 2004), prohibited a franchisee in the Dunkin' Donuts franchise system (one of Baskin-Robbins's sister brands) from engaging in a business that sells the "same or substantially similar products" – the exact language contained in Concord Franchise Agreement. After thoroughly reviewing the contractual

17

LAI 6637294.1

language and policy considerations underlying the application of covenants not to compete, the *Boulanger* court held that the in-term clause was fair, reasonable, and consistent with Massachusetts public policy. *Id.* at 645-46.

The *Boulanger* decision is fully consistent with the decisions of other courts interpreting Massachusetts law that have upheld covenants with a much broader scope than the one at issue here. The court in *In re Ward*, 194 B.R. 703 (Bankr. D. Mass. 1996), for example, enforced a covenant prohibiting a franchisee from competing for two years within a 50-mile radius of any existing franchise and recognized the legitimacy of protecting the franchisor's other franchisees from competition. The same conclusion was reached in *Diet Ctr., Inc. v. Day*, Bus. Franchise Guide (CCH) ¶ 9651 (D. Mass. Mar. 19, 1990), which upheld a restrictive covenant prohibiting a franchisee from competing within a 30-mile radius of his former territory, selling products "of the kind sold" by franchisor.

Baskin-Robbins is therefore likely to succeed on the merits of its breach of contract claim based on Defendants' violation of the in-term covenants and the remedy it seeks in the enforcement of the termination of the Franchise Agreements. Consequently, Defendants are no longer licensed to use Baskin-Robbin's trademarks – which, in turn, means that their continued use violated federal trademark statutes. *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375-76 (3d

18

Cir. 1992) (use of the franchisor's trademarks after termination constitutes trademark infringement).

Defendants will contend that their involvement with the Country Creamery store was in support of Sukpran Gill's parents who, they claim, are the true owners of this business. However, franchisees cannot use the fact that they are working with family members as a defense to a claim that they have violated a covenant not to compete. *McCart v. H&R Block, Inc.,* 470 N.E.2d 756, 762 (Ind. Ct. App. 1985) (husband's actions in knowingly assisting his wife, a former franchisee, in violating the noncompete provisions of the franchise agreement, amounted to a "mere subterfuge" designed to avoid application of the covenant); *Doctor's Associates, Inc. v. Stuart,* 11 F. Supp.2d 221 (D. Conn. 1998) (same); *Day Cos. v. Patat,* 440 F.2d 1343 (5th Cir. 1971) (preliminary injunction proper where the third party conspired with the covenantor to violate the covenant not to compete). The same principles apply here.

### B.    Defendants' Unauthorized Use of Baskin-Robbins's Trademarks Constitutes Trademark Infringement.

Defendants' use of Baskin-Robbins's proprietary marks after termination constitutes trademark infringement under the Lanham Act. To prevail on this claim, Baskin-Robbins must establish: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause

19

consumer confusion. *Department of Parks & Recreation v. Bazaar El Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).

Applying these elements in this case, it should first be noted that Baskin-Robbins's marks have been properly registered in accordance with the Lanham Act and are thus valid and legally protectable. Stat. of Facts ¶ 15; *see also Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*, 875 F. Supp. 966, 975 (E.D.N.Y. 1994) ("The existence of a trademark registration is prima facie evidence of a valid trademark"). In addition, Defendants have used and continue to use these marks. Stat. of Facts ¶¶ 2, 3, 24.

Second, it is widely recognized that there is a high risk of consumer confusion when a terminated franchisee continues to use the former franchisor's trademarks. *See S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992). In such cases, a federal appellate court explained, the "likelihood of confusion is inevitable." *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 195 (3d Cir. 1990). As a leading treatise on trademark law has commented, cases where a defendant uses an identical mark on competitive goods *are* "open and shut." *Id.* (quoting 2 *McCarthy, Trademarks and Unfair Competition*, § 23:3) (emphasis added).

Indeed, Defendants' status as "holdover" franchisees is *dispositive* of the trademark infringement issue. *Burger King Corp. v. Majeed*, 805 F. Supp. 994,

LA1 6637294.1

1002 (S.D. Fla. 1992) (terminated franchisee's continued use of its former franchisor's trademarks constitutes trademark infringement); *see also* McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25.07[1] ("Once a license contract is terminated, there is no doubt that the ex-licensee has no authorization or consent to continue use of the mark.").

Defendants' Franchise Agreements have been validly terminated and thus they are operating as holdover franchisees. This is dispositive of the issue of infringement and therefore there is no need to conduct the Ninth Circuit's test for determining likelihood of confusion. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-349 (9th Cir 1979). However, likelihood of confusion would be found under such an analysis.[2]

---

[2] (1) Strength of mark: Baskin-Robbins' marks are registered under the Lanham Act and backed by millions of dollars in advertising; (2) Degree of similarity of the marks: the marks in question are the same because Defendants continue to use the Baskin-Robbins marks; (3) Similarity of products: the products are identical because Defendants continue to operate their store as if they were *bona fide* Baskin-Robbins franchisees; (4) Similarity of the retail facilities: the facilities are the same; (5) Similarity of the advertising: Defendants continue to benefit from Baskin-Robbins's advertising of licensed Baskin-Robbins franchisees; (6) Defendants' intent: Defendants intend to pass off their store as an authorized Baskin-Robbins store despite the knowledge that their Franchise Agreements have been terminated; (7) Actual confusion: Defendant's unauthorized use of Baskin-Robbins' marks can have no result other than to cause actual confusion because customers cannot possibly know that Defendants are not licensed Baskin-Robbins franchisees; (8) Proximity of the products as they are sold: Defendants are selling products through identical retail outlets as if they were licensed Baskin-Robbins franchisees; (9) Bridging the gap: Baskin-Robbins already offers its products through identical retail outlets to the same customers; (10) Quality of the respective goods: even if Defendants are selling quality products, that would only heighten the confusion to customers; and, (11) Sophistication of prospective purchasers: Baskin-Robbins' sales are frequently impulse sales and thus not subject to a high degree of scrutiny. *See Majeed*, 805 F. Supp. at 1002-03 and *Burger*
Continued...

21

Thus, Defendants are no longer licensed to use the Baskin-Robbins trademarks and trade name.  Their status as "holdover franchisees" establishes the likelihood of confusion as a matter of law.  Baskin-Robbins is thus likely to succeed on the merits of its claim for trademark infringement based on Defendants' continued unlicensed use of the Baskin-Robbins trademarks and trade names.

### C.    Baskin-Robbins Is Likely to Succeed on Its Trade Dress And Unfair Competition Claims.

The same conclusion should be reached with respect to Baskin-Robbins's counts for trade dress infringement and unfair competition.  In order prove these claims, Baskin-Robbins must show:  (1) that its trade dress is inherently distinctive or has acquired secondary meaning; (2) that its trade dress is primarily non-functional; and (3) that Defendants' trade dress is confusingly similar.  *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001).

With respect to unfair competition, the "critical question" is "whether there is a likelihood of confusion, mistake, or deception between the registered mark and the allegedly infringing mark."  *Majeed*, 805 F. Supp. at 1001 (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir. 1983)); *see also Century 21 Real Estate Corporation, Inc. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir.

---

*King Corp. v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991) (conducting similar analysis for holdover franchisees).

22

1988) (use of the word "Century" by a former Century 21 real estate franchisee operating as a realtor and in same location as his former franchisor created likelihood of confusion and thus constituted trademark infringement and unfair competition under federal law); *Baskin-Robbins, Inc. v. Taj California, Inc.*, 2003 WL 22768662, *1 (C.D. Cal. Oct. 21, 2003) (holding that a Baskin-Robbins franchisees' "continued use of [Baskin-Robbins's] trademarks, trade dress, and trade name after termination of the Franchise Agreements constitutes trademark infringement, trade dress infringement, and unfair competition in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114 and § 43 of the Lanham Act 15 U.S.C. § 1125 (a).").

Baskin-Robbins has made the requisite showing here and is thus likely to succeed on the merits. Defendants are operating under the same trademarks, in the same locations and offering the same products as they were prior to the date upon which the franchise agreements at issue were terminated. The likelihood of confusion, the key factor in this analysis, is self-evident. Defendants' use of Baskin-Robbins's trademarks, trade name and trade dress after termination of the Franchise Agreements thus demonstrates Baskin-Robbins' likelihood of success on its trade dress and unfair competition claims.

LA1 6637294.1

## II. BASKIN-ROBBINS IS BEING IRREPARABLY HARMED BY DEFENDANTS' UNLICENSED USE OF ITS REGISTERED MARKS.

As noted above, Defendants acknowledged in both the Pittsburg and Concord Franchise Agreements that their breach of the restrictions on the use of Baskin-Robbins proprietary marks and trade secrets would cause irreparable harm to Baskin-Robbins. Laudermilk Cert. Ex. A, ¶ 11.3; Laudermilk Cert. Ex. B, ¶ 9.6. These covenants, in and of themselves, are dispositive of the question of whether Baskin-Robbins has incurred such harm. However, even if such acknowledgments were not set forth in the Franchise Agreements, it is widely acknowledged that such harm is created in circumstances like the ones present in this case.

It is well settled that, in a trademark case, irreparable harm "necessarily follows from establishment of a likelihood of confusion among consumers." *Nabisco Brands, Inc. v. Conusa Corp.*, 722 F. Supp. 1287, 1290, *aff'd*, 892 F.2d 74 (4th Cir. 1989). Because Baskin-Robbins is likely to succeed on its claim that Defendants' status as holdover franchisees constitutes a likelihood of confusion, it "necessarily follows" that Baskin-Robbins is suffering irreparable harm. This presumption is based on the notion that a franchisor, like any trademark owner, has the right to license others to use its trademarks only in the manner that it prescribes. The unauthorized or unlicensed use of those marks creates a situation

24

where the franchisor no longer can control the reputation and goodwill of its trademark.

Courts have consistently held that the lack of control amounts to irreparable injury warranting an injunction. *Long John Silver's, Inc. v. Washington Franchise, Inc.*, 1980 U.S. Dist LEXIS 16635, at *12 No. 80-540-A (E.D. Va. June 24, 1980) ("infringement is difficult to quantify and thus lends itself to injunctive relief, . . . ."); *Merry Maids Limited Partnership v. Kamara*, No. Y-98-3564, 1998 U.S. Dist. LEXIS 19059, at *3-4 (D. Md. December 10, 1998) (quoting *Long John Silver's,* 1980 U.S. Dist LEXIS 16635). Similarly, the Third Circuit in *Jiffy Lube, supra*, held that "once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act." 968 F.2d at 375.

Baskin-Robbins has invested a tremendous amount of resources over the years in building the considerable goodwill associated with its marks. Plaintiffs' conduct in continuing to operate the Pittsburg and Concord Stores after termination of the Franchise Agreements interferes with Baskin-Robbins's ability to control the quality of the goods and services which Defendants continue to provide under the Baskin-Robbins marks. Consequently, Baskin-Robbins has suffered and continues to suffer irreparable harm.

25

### III. THE BALANCE OF HARMS WEIGHS IN BASKIN-ROBBINS'S FAVOR.

The harm to Baskin-Robbins from the unlicensed use of its marks is substantial. Defendants, on the other hand, will suffer no harm because their right to use the marks and trade dress has been properly terminated. "One who adopts the mark of another for similar goods acts at his own peril," because he has no claim to the profits or advantages thereby derived. *American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir. 1978); *see also Majeed*, 805 F. Supp. at 1006 ("Defendants simply have no equitable standing to complain of injury should their infringements be preliminarily enjoined.").

Moreover, any self-inflicted harm to Defendants is insignificant when balanced against the irreparable injury to the goodwill that Baskin-Robbins has created through the expenditure of hundreds of millions of dollars in advertising and promoting its marks for decades. *Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F. Supp. 49, 51 (D. Mass. 1990) (plaintiff's expenditures on four years worth of advertising and promotion outweighed harm to infringers). In any event, "'because Defendant[s] knowingly adopted Plaintiff's trademarks and trade dress, it cannot now complain that having to mend its ways will be too expensive.'" *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983). The balance of harms weighs in favor of Baskin-Robbins.

26

LA1 6637294.1

## IV.  THE PUBLIC INTEREST WILL BE ADVANCED BY ISSUANCE OF A PRELIMINARY INJUNCTION.

It is well settled in the realm of trademark law that the paramount interest of the courts is to ensure that the public is "free from confusion." *Laboratorios Roldan v. Tex Int'l., Inc.,* 902 F. Supp. 1555, 1571 (S.D. Fla. 1995).  Thus, injunctive relief acts to "serve the public interest by immediately stopping Defendants' deception of consumers." *Id.*; *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) ("The public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion."). The requested preliminary injunction here will serve the public interest by preventing Defendants from continuing to confuse the consuming public as to the origin of its products.

## V.  NO BOND SHOULD BE REQUIRED.

Federal Rule of Civil Procedure 65(c) provides that "[n]o . . . preliminary injunction shall issue except upon the giving of security by the applicant, *in such sum as the court deems proper*, for the payment of such *costs and damages as may be incurred or suffered by any party* who is found to have been wrongfully enjoined . . . ." Fed.R.Civ.P. 65(c) (emphasis added).  The Ninth Circuit follows the Second and other Circuits in holding that the phrase "in such sum as the court deems proper" invests the district courts with the authority to dispense with a bond,

27

or to set it at a nominal amount. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (citing *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). As noted above, both the Concord and Pittsburg Franchise Agreements include acknowledgements by the Gills that their failure to comply with the restrictions on the use of Baskin-Robbins's proprietary information would not require the posting of a bond on the part of the franchisor. Laudermilk Cert. Ex. A, ¶ 11.3; Laudermilk Cert. Ex. B, ¶ 9.6. Therefore, no bond should be required here.

## CONCLUSION

For the foregoing reasons, Baskin-Robbins respectfully requests that its Motion for a Preliminary Injunction be granted.

DATED: June 12, 2007

MARIA RODRIGUEZ
SEYFARTH SHAW LLP

ROBERT L. ZISK
ERIC L. YAFFE
JEFFREY L. KARLIN

By
    Maria Rodriguez
Attorneys for Plaintiffs
BASKIN-ROBBINS FRANCHISED
RESTAURANTS LLC AND BR IP
HOLDER LLC.

28

**DECLARATION OF
J. LAUDERMILK**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**


BASKIN-ROBBINS FRANCHISED SHOPS LLC,    )
AND BR IP HOLDER LLC,                   )
                                        )
          Plaintiffs,                   )
                                        )
    v.                                  )    Case No.
                                        )
SUKPRAN GILL and GURMEET GILL,          )
                                        )
          Defendants.                   )
_____ )

## CERTIFICATION OF JACK LAUDERMILK

1.   My name is Jack Laudermilk.   I am a citizen and resident of the Commonwealth of Massachusetts, and I make this Certification based on personal knowledge and in support of Plaintiffs' Memorandum in Support of its Motion for a Preliminary Injunction.

2.   I am Associate General Counsel for Baskin-Robbins Franchise Shops LLC and BR IP Holder LLC (unless otherwise specified, Baskin-Robbins Franchise Shops LLC and BR IP Holder LLC and BR IP Holder LLC are collectively referred to hereinafter as "Baskin-Robbins"). As Associate General Counsel, I am the custodian of and have access to executed copies of all Baskin-Robbins franchise agreements, leases, correspondence, and other related documents and records concerning each Baskin-Robbins franchise.   This includes the documents and records

1

relating to the Baskin-Robbins franchises owned by Defendants in this case. The documents attached hereto are kept in the course of Baskin-Robbins' regularly conducted business activities, and it is Baskin-Robbins' normal practice to make and keep these documents. My job responsibilities include being familiar with the business of Baskin-Robbins generally, including having knowledge regarding the resources Baskin-Robbins has dedicated toward its intellectual property and the relationship between franchisees' operations and the goodwill associated with Baskin-Robbins' marks.

3.  Baskin-Robbins Franchised Shops LLC, successor-in-interest to Baskin-Robbins USA Co., is a Massachusetts Limited Liability Company with its principal place of business in Canton, Massachusetts.

4.  Baskin-Robbins is engaged in the business of franchising independent business persons to operate Baskin-Robbins stores throughout the United States. Baskin-Robbins franchisees are licensed to use the trade names, service marks, and trademarks of Baskin-Robbins and to operate under the Baskin-Robbins system, which involves the production, merchandising, and sale of ice cream and related products utilizing special equipment, equipment layouts, interior and exterior accessories, identification schemes, products,

1  management  programs,  standards,  specifications,  proprietary

2  marks, and information.

3      5.   Baskin-Robbins is the franchisor of the Baskin-Robbins

4  franchise system.

5      6.   BR  IP  Holder  LLC  is  the  owner  of  the  trademark,

6  service mark, and trade name "Baskin-Robbins" and related marks.

7  Baskin-Robbins Incorporated has the exclusive license to use and

8  license others to use these marks and trade names and has used

9  them  continuously  since  approximately  1947  to  identify  its  ice

10  cream  stores,  and  the  ice  cream  and  other  products  associated

11  with those stores.

12      7.   BR  IP  Holder  LLC  is  the  owner  of  the  trademark,

13  service mark, and trade name "Baskin-Robbins" and related marks.

14  BR  IP  Holder  LLC  owns  numerous  federal  registrations  for  the

15  mark "Baskin-Robbins" or derivations thereof, as well as related

16  marks.  Each of these registrations is in full force and effect,

17  and most of them are incontestable pursuant to 15 U.S.C. § 1065.

18      8.   Baskin-Robbins  has  the  exclusive  license  to  use  the

19  Baskin-Robbins  marks  and  trade  names  and  has  used  them

20  continuously since approximately 1947 to identify its ice cream

21  stores,  and  the  ice  cream  and  other  products  associated  with

22  those  stores.   The  Baskin-Robbins  marks  have  been  very  widely

23  advertised and promoted by Baskin-Robbins over the years.   As a

24  result,  the  Baskin-Robbins  marks  have  become  famous  throughout

3

1  the United States.

2      9.   Baskin-Robbins and its franchisees currently operate

3
approximately 2,200 stores in the United States and 2,600 stores
4
5  outside of the United States.   In the fifty years since the

6  Baskin-Robbins System began, millions of consumers have been

7  served in Baskin-Robbins stores.

8      10.  As a result of the extensive sales, advertising, and

9
promotion of items identified by the Baskin-Robbins marks, the
10
11  public has come to know and recognize the Baskin-Robbins marks,

12  and to associate them exclusively with products and services

13  offered by Baskin-Robbins and its franchisees.   The Baskin-

14  Robbins marks are among the best and most widely known

15
trademarks in the United States today, and are assets of
16
17  inestimable value to Baskin-Robbins, representing and embodying

18  Baskin-Robbins' goodwill and favorable reputation.

19      11.  Defendants Sukpran Gill and Gurmeet Gill were the

20  owners and operators of a Baskin-Robbins retail ice cream store

21
located at 4493 Century Boulevard, Pittsburg, California (the
22
23  "Pittsburg Store").   They were also parties to a Franchise

24  Agreement dated October 26, 1996 ("the Pittsburg Franchise

25  Agreement"), which licensed them to use the Baskin-Robbins

26  trademarks, trade names and trade dress at the Pittsburg Store.

27
A true and correct copy of the Pittsburg Franchise Agreement is
28
attached hereto as Exhibit A.

4

CERTIFICATION OF JACK LAUDERMILK IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

12.    In addition, Sukpran Gill was the owner and operator of another Baskin-Robbins store located at 1924 Grant Street, Suite #2, Concord, California (the "Concord Store").    He was a party to a Franchise Agreement dated April 22, 2004 (the "Concord Franchise Agreement"), which licensed him to use the Baskin-Robbins trademarks, trade names and trade dress at the Concord Store.    A true and correct copy of the Concord Franchise Agreement is attached hereto as Exhibit B.

13.    The Pittsburg Franchise Agreement contains a covenant that prohibits Defendants, during the term of the Pittsburg Franchise Agreement, from owning, maintaining, operating, engaging in, or having any interest in any business which is the same as or similar to the Pittsburg Store.

14.    The Concord Franchise Agreement contains a covenant that prohibits Defendant Sukpran Gill, during the term of the Concord Franchise Agreement, from owning, maintaining, engaging in, being employed by, or having any interest in any other business which sells or offers to sell the same or substantially similar products to the type Baskin-Robbins requires to be offered at the Concord Store.

15.    As a general business practice, Baskin-Robbins works with its franchisees to build up their Baskin-Robbins franchise by providing training, business and marketing assistance, advertising, and other support.    Baskin-Robbins has a continuing

5

1  interest in the value it builds at its store locations,

2  including Defendant's, and the covenant not to compete is

3  important to protect that interest and to discourage franchisees

4  from breaching their franchise agreements and breaking away from

5

6  the Baskin-Robbins system while retaining Baskin-Robbins'

7  goodwill.

8      16.  By letter dated April 30, 2007, Baskin-Robbins

9  informed Defendants that Pittsburg and Concord Franchise

10 Agreements had been terminated as a result of breaches of the

11

12 in-term covenant not to compete related to their involvement in

13 the opening of a retail ice cream store in American Canyon,

14 California under the trade name "Country Creamery."  A true and

15 correct copy of the April 30, 2007 is attached hereto as Exhibit

16 C.

17

18     17.  As of the date of this certification, Defendants

19 continue to operate the Pittsburg store and the Concord Store,

20 using Baskin-Robbins's trademarks.

21

22

23

24

25

26

27

28

CERTIFICATION OF JACK LAUDERMILK IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

18.   Baskin-Robbins' principal place of business is now located in Canton, Massachusetts.   At the time the Pittsburg Franchise Agreement was executed,   Baskin-Robbins's offices were located in Glendale, California.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on this _24th_ day of May, 2007.


Jack Laudermilk

CERTIFICATION OF JACK LAUDERMILK IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION