**SHOPPING CENTER LEASE**
**NAME OF CENTER: CENTURY PLAZA**

1. **PARTIES.** This lease, dated for reference purposes only, November 20, 1996 is made by and between Century Plaza Corporation (herein called "Landlord") and Sukpran and Gurmeet Gill d.b.a. Baskin Robbins (herein called "Tenant").

2. **PREMISES.** Landlord does hereby lease to Tenant and Tenant hereby leases from Landlord that certain space (herein called "Premises"), having containing approximately 1000 square feet of floor area. The location and dimensions of said Premises are delineated on Exhibit "A" attached hereto incorporated by reference herein. Said Premises are located at 4493 Century Blvd. in the City of Pittsburg, County of Contra Costa, and State of California.

Said Lease is subject to the terms, covenants, and conditions herein set forth and the Tenant covenants as a material part of the consideration for this Lease to keep and perform each and all of said terms, covenants, and conditions by it to be kept and performed.

3. **USE.** The leased Premises shall be used and occupied only for the display and sale at retail of ice cream, yogurt, sherbets, soda fountain items, baked goods, pastries, snacks, confectionery products, frozen desserts, beverages, for consumption or use on or off the Premises, for operation of a soda fountain, and selling or serving similar or related goods, as typically found in Baskin-Robbins stores. Landlord shall not lease to another tenant, excluding existing tenants and subsequent assignees or subletees, who will sell machine dispensed or hand packed ice cream, sherberts, frozen custards, yogurt, ice milk, frozen desserts, and soda fountain items, (excluding soft drinks) and excluding a grocery store, restaurants, and coffee shops. This exclusive use clause shall terminate in the event Tenant changes its use to a different kind of business. Tenant's use shall not conflict with any existing tenants' exclusive or restriction per Exhibit "D" attached.

4. **TERM.** Lease term shall be for a period of five (5) years. The term of this Lease shall commence on delivery of Premises by Landlord and shall continue thereafter during the Lease Term specified hereinabove, unless sooner terminated as hereinafter provided in this Lease.

Landlord agrees to deliver to the Tenant, and the Tenant agrees to accept from the Landlord, possession of the Premises in "AS IS" CONDITION forthwith upon the Term Commencement Date.

~~Landlord agrees that it will, at its sole cost and expense as soon as is reasonably possible after the execution of this Lease, commence and pursue to completion the improvements to be erected by Landlord to the extent shown on attached Exhibit "B" labeled "Landlord's Improvements".~~

~~The term "substantial completion of the Premises" is defined as the date on which Landlord or its Project Architect notifies Tenant in writing that the Premises are substantially complete to the extent of Landlord's Improvements specified in Exhibit "B" hereto, with the exception of such work as Landlord cannot complete until Tenant performs necessary portions of its work. Tenant shall commence the installation of fixtures, equipment, and any of Tenant's Improvements as set forth in said Exhibit "B", promptly upon substantial completion of Landlord's Improvements in the Premises and shall diligently prosecute such installation to completion, and shall open the Premises for business not later than the date specified for commencement of Minimum Rent in Article 5 hereof.~~

**OPTION TO RENEW.** Provided Tenant shall have faithfully performed all of the terms, covenants, and conditions hereof, Tenant shall have the option to extend the terms of this Lease for one (1), five (5) year period upon terms and conditions to be decided at that time based upon market conditions. Said option shall be exercised by written notice to Landlord six (6) months prior to the expiration of the original term hereof.

63

5.  MINIMUM RENT.

A.    Tenant agrees to pay to Landlord as Minimum Rent, without notice or demand, the monthly sum of Two Thousand Twenty and 00/100 Dollars ($2,220.00), commencing on the Term Commencement Date, and a like sum, in advance, on or before the first day of each and every successive calendar month thereafter during the term hereof, except that the first month's rent shall be paid upon the execution hereof. Landlord will be entitled to retain said funds upon
default by Tenant. Rent for any period during the term hereof which is for less then one (1) month shall be a prorated portion of the monthly installment herein, based upon a thirty (30) day month. Said rental shall be paid to Landlord, without deduction or offset, in lawful money of the United States of America, at such place as Landlord may from time to time designate in writing.

~~B.   In addition, the Minimum Rent as set forth in 5A above shall be subject to being increased annually by the percentage of increase, if any, in the Consumer Price Index - U.S. Average - All Items, as published by the United States Department of Labor's Bureau of Labor Statistics. The base period, for purposes of such adjustment, shall be September of the year in which this Lease is executed. Each September following the commencement of rentals shall then be used for comparison purposes with any adjustment in Minimum Rent to be effective as of the next succeeding January 1. In no event shall the Minimum Rent be less than the sum or sums as specified in 5A above. Should the aforementioned Index be discontinued, the parties shall select another similar index which reflects consumer prices.~~

~~(By way of illustration only, if the September figure in which this Lease is executed is 120 and the September figure following commencement of rentals is 125, then the Minimum Rent for the ensuing calendar year shall be increased by 4.17%).~~

6.   SECURITY DEPOSIT.   Tenant has deposited with Landlord the sum of Two Thousand Twenty and 00/100 Dollars ($2,220.00). Said sum shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants, and conditions of this Lease to be kept and performed by Tenant during the term hereof. If Tenant defaults with respect to any provision of this Lease, including, but not limited to, the provisions relating to the payment of rent, Landlord may (but shall not be required to) use, apply, or retain all or any part of this security deposit for the payment of any rent or any other sum in default, or for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of said deposit is so used or applied, Tenant shall, within five (5) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount, and Tenant's failure to do so shall be a default under this Lease. Landlord shall not be required to keep this security deposit separate from its general funds, and Tenant shall not be entitled to interest on such deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the security deposit or any balance thereof shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder within ten (10) days following expiration of the Lease Term. In the event of termination of Landlord's interest in this Lease, Landlord shall transfer said deposit to Landlord's successor in interest.

7.   PERCENTAGE RENT AND ADDITIONAL RENTS.

A.    Percentage Rent

I.  In addition to the Minimum Rent to be paid by Tenant pursuant to Article 5, Tenant shall pay to Landlord at the time and in the manner herein specified additional rent in an amount equal to four percent (4%) of the amount that Tenant's gross sales exceeds Fifteen Thousand Dollars ($15,000) per month, made in, upon, or from the Premises during each calendar year of the Lease term, less the aggregate amount of the Minimum Rent previously paid by Tenant for said calendar year.

II.   Within thirty (30) days after the end of each calendar month of the Lease term, commencing with the thirtieth (30th) day of the month following the commencement of rentals (as hereinabove provided), and ending with the thirtieth (30th) day of the month next succeeding the last month of the Lease term, Tenant shall furnish to Landlord a statement in

2

64

1    writing, certified by Tenant to be correct, showing the total gross sales made in, upon, or from
2    the Premises during the preceding calendar month, and shall accompany each such statement
3    with a payment to Landlord equal to said hereinabove stated percentage of the total monthly
4    gross sales made in, upon, or from the Premises during each calendar month, less the
5    Minimum Rent for each such calendar month, if previously paid. Said statement and payment
6    shall be made with the succeeding month's regular monthly rental payment. Within thirty (30)
7    days after the end of each calendar year of the term hereof, Tenant shall furnish to Landlord a
8    statement in writing, certified by Tenant to be correct, showing the total gross sales by months
9    made in, upon, or from the Premises during the preceding calendar year, at which time an
10   adjustment shall be made between Landlord and Tenant to the end that the total percentage
11   rent paid for each such calendar year shall be a sum equal to said hereinabove stated
12   percentage of the total gross sales made in, upon, or from the Premises during each calendar
13   year of the term hereof, less previously paid, so that the percentage rent, although payable
14   monthly shall be computed and adjusted on an annual basis.

15

16          III.    The term "gross sales" as used in this Lease shall include the entire gross
17   receipts of every kind and nature from sales and services made in, upon, or from the Premises,
18   whether upon credit or for cash in every department operating in the Premises, whether
19   operated by the Tenant or by a subtenant or subtenants, or by a concessionaire or
20   concessionaires, excepting therefrom any rebates and/or refunds to customers and the amount
21   of all sales tax receipts which has to be accounted for by Tenant to any government, or any
22   governmental agency. Sales upon credit shall be deemed cash sales and shall be included in
23   the gross sales for the period which the merchandise is delivered to the customer, whether or
24   not title to the merchandise passes with delivery.

25

26          IV.    The Tenant shall keep full, complete and proper books, records, and
27   accounts of its daily gross sales, both for cash and on credit, of each separate department,
28   subtenant, and concessionaire at any time operating in the Premises. The Landlord and its
29   agents and employees shall have the right at any and all times, during the regular business
30   hours, to examine and inspect all of the books and records of the Tenant, including any sales
31   tax reports pertaining to the business of the Tenant conducted in, upon, or from the Premises,
32   for the purpose of investigating and verifying the accuracy of any statement of gross sales.
33   The Landlord may once in any calendar year cause an audit of the business of Tenant to be
34   made by an accountant of Landlord's selection and if the statement of gross sales previously
35   made to Landlord shall be found to be inaccurate, then and in that event, there shall be an
36   adjustment and one party shall pay to the other on demand such sums as may be necessary to
37   settle in full the accurate amount of said percentage rent that should have been paid to
38   Landlord for the period or periods covered by such inaccurate statement or statements.
39   Tenant shall keep all said records for three (3) years. If said audit shall disclose an inaccuracy
40   of greater than two (2%) percent error with respect to the amount of gross sales reported by
41   Tenant for the period of said report, then the Tenant shall immediately pay to Landlord the
42   cost of such audit; otherwise, the cost of such audit shall be paid by Landlord. If such audit
43   shall disclose any willful or substantial inaccuracies, this Lease may thereupon be canceled and
44   terminated, at the option of Landlord.

45

46   B.   Additional Rent

47

48          I.    In addition to the Minimum Rent provided in Article 5 hereinabove and
49   commencing at the same time as Minimum Rent commences, Tenant shall pay to Landlord the
50   following items, herein called Additional Rents:

51

52          (a)   All real estate taxes and insurance premiums on the Premises, including
53   land, building, and improvements thereon. Said real estate taxes shall include all real estate
54   taxes and assessments that are levied upon and/or assessed against the Premises. Said
55   insurance shall include all insurance premiums for fire, extended coverage, business income,
56   liability, and any other insurance that Landlord deems necessary on the Premises, including as
57   part of such cost, losses within the deductibles and/or self-insured retentions of such public
58   liability insurance and property insurance policies. Said taxes and insurance premiums for
59   purpose of this provision shall be reasonably apportioned in accordance with the total floor
60   area of the Premises as it relates to the total, rentable floor area of the buildings within the
61   Shopping Center (provided, however, that if any tenants in said buildings pay taxes directly to
62   any taxing authority or carry their own insurance, as may be provided in their leases, their
63   square footage shall not be deemed a part of the total floor area).

3

65

1
2             (b) That percent of the total cost of the following items as Tenant's total
3  floor area bears to the total floor area of the Shopping Center which is from time to time
4  completed as of the first day of each calendar quarter. If any other tenant or separate legal
5  parcel owner is maintaining their separate common areas, then Tenant's proportionate share of
6  the costs to maintain the common areas will be the ground floor square area of Tenant's
7  building (numerator) and the denominator will be the total ground floor square area of all
8  buildings constructed upon the lands that Landlord is responsible for common area
9  maintenance.
10
11            (i) All Real Estate Taxes including assessments, all insurance costs,
12  and all costs to maintain, repair, and replace common areas, parking lots, sidewalks,
13  driveways, and other areas used in common by the Tenants of the Shopping Center.
14
15            (ii) All costs to supervise and administer said common area,
16  parking lots, sidewalks, driveways, and other areas used in common by the Tenants or
17  occupants of the Shopping Center. Said costs shall include such fees as may be paid to a third
18  party in connection with same and shall in any event include a fee to Landlord to supervise
19  and administer same in an amount equal to ten (10%) percent of the total costs of (i) above.
20
21            (iii) Any parking charges, utilities surcharges, or any other costs
22  levied, assessed or imposed by, or at the direction of, or resulting from statutes or regulations,
23  or interpretations thereof, promulgated by any governmental authority in connection with the
24  use or occupancy of the Premises or the parking facilities serving the Premises.
25
26          II. Upon the commencement of rental, Landlord shall submit to Tenant a
27  statement of the anticipated monthly Adjustments for the period between such commencement
28  and the following January, and Tenant shall pay same and all subsequent monthly payments
29  concurrently with the payment until notified by Landlord of a change thereof. By March 31 of
30  each year, Landlord shall endeavor to give Tenant a statement showing the total Adjustments
31  for the Shopping Center for the prior calendar year and Tenant's allocable share thereof,
32  prorated from the commencement of rental. In the event the total of the monthly payments
33  which Tenant has made for the prior calendar year be less than the Tenant's actual share of
34  such Adjustments then the Tenant shall pay the difference in a lump sum within ten (10) days
35  after receipt of such statement from Landlord and shall concurrently pay the difference in
36  monthly payments which are then calculated as monthly Adjustments based on the prior year's
37  experience. Any overpayment by Tenant shall be credited towards the monthly Adjustments
38  next coming due. The actual Adjustments for the prior year shall be used for purposes of
39  calculating the anticipated monthly Adjustments for the then current year with actual
40  determination of such Adjustments after each calendar year as above provided; excepting that
41  in any year in which resurfacing is contemplated, Landlord shall be permitted to include the
42  anticipated cost of same as part of the estimated monthly Adjustments. Even though the term
43  has expired and Tenant has vacated the Premises, when the final determination is made of
44  Tenant's share of said Adjustments for the year in which this Lease terminated, Tenant shall
45  immediately pay any increase due over the estimated Adjustments previously paid and,
46  conversely, any overpayment made shall be immediately rebated by Landlord to Tenant.
47
48  8.  __USES PROHIBITED.__ Tenant shall not do or permit anything to be done in or about the
49  Premises nor bring or keep anything therein which will in any way increase the existing rate of
50  or affect any fire or other insurance upon the Building or any of its contents, or cause a
51  cancellation of any insurance policy covering said Building or any part thereof or any of its
52  contents. Tenant shall not do or permit anything to be done in or about the Premises which
53  will in any way obstruct or interfere with the rights of other Tenants or occupants of the
54  building or injure or annoy them or use or allow the Premises to be used for any improper,
55  immoral, unlawful, or objectionable purpose, nor shall Tenant cause, maintain, or permit any
56  nuisance in, on, or about the Premises. Tenant shall not commit or allow to be committed any
57  waste in or upon the Premises.
58
59  9.  __COMPLIANCE WITH LAW.__ Tenant shall not use the Premises, or permit anything to be
60  done in or about the Premises, which will in any way conflict with any law, statute, ordinance
61  or governmental rule or regulation now in force, or which may hereafter be enacted or
62  promulgated. Tenant shall, at its sole cost and expense, promptly comply with all laws,
63

4

1  statutes, ordinances and governmental rules, regulations or requirements now in force or
2  which may hereafter be in force, and with the requirements of any board of fire underwriters
3  or other similar bodies now or hereafter constituted relating to or affecting the condition, use,
4  or occupancy of the Premises, excluding structural changes not related to or affected by
5  Tenant's improvements or acts. The judgment of any court of competent jurisdiction or the
6  admission of Tenant in any action against Tenant, whether Landlord be a part thereto or not,
7  that Tenant has violated any law, statute, ordinance or governmental rule, regulation or
8  requirement, shall be conclusive of that fact as between the Landlord and Tenant.
9  10. ALTERATIONS AND ADDITIONS.  Tenant shall not make or allow to be made any
10  alterations, additions, or improvements to or of the Premises or any part thereof without the
11  written consent of Landlord first had and obtained and any alterations, additions, or
12  improvements to or of said Premises, including, but not limited to, wall covering, paneling and
13  built-in cabinet work, but excepting movable furniture and trade fixtures, shall at once become
14  a part of the realty and at the election of Landlord shall belong to and shall be surrendered
15  with the Premises.  In the event Landlord consents to the making of any alterations, additions,
16  or improvements to the Premises by Tenant, the same shall be made by Tenant at Tenant's sole
17  cost and expense.  Tenant shall fully and completely indemnify Landlord against any
18  mechanic's or other liens or claims in connection with the making of any such alterations,
19  improvements, or changes and shall provide Landlord with unconditional, final lien releases
20  issued in favor of Landlord, as Owner of the Premises.  Upon the expiration or earlier
21  termination of the Lease term hereof, in the event Landlord elects to have the alterations
22  and/or additions to the Premises removed, Tenant shall, within thirty (30) days after written
23  demand by Landlord, remove said alterations and/or additions, at Tenant's sole cost and
24  expense, and shall forthwith and with all due diligence, repair any and all damage to the
25  Premises caused by removal of any such alterations and/or additions.  **The tenant shall be**
26  **permitted to refurbish the leased Premises to a condition reflective of Baskin-Robbins**
27  **then-current standards with Landlord's prior written consent, which consent shall not**
28  **be unreasonably withheld, subject to conditions of this section 10 of the Lease.**
29
30  11. REPAIRS.
31
32    A. By entry hereunder, Tenant shall be deemed to have accepted the Premises as being in
33  good, sanitary order, condition and repair (except as hereinafter provided with respect to
34  Landlord's obligations) including, without limitation, the maintenance, replacement, and repair
35  of any storefront, doors, light fixtures, window casements, glazing, heating and air
36  conditioning system (when there is an air conditioning system, Tenant shall obtain a service
37  contract for repairs and maintenance of said system, said maintenance contract to conform to
38  the requirements under the warranty, if any, on said system), plumbing, pipes, electrical wiring
39  and conduits.  Tenant shall, upon the expiration or sooner termination of this Lease hereof,
40  surrender the Premises to the Landlord in good condition, broom clean, ordinary wear and
41  tear and damage from causes beyond the reasonable control of Tenant excepted.  Any damage
42  to adjacent premises caused by Tenant's use of the Premises shall be repaired at the sole cost
43  and expense of Tenant.
44
45    B. Notwithstanding the provisions of Article 11A hereinabove, Landlord shall repair and
46  maintain the structural portions of the Building, including the exterior walls and roof, unless
47  such maintenance and repairs are caused, in part or in whole, by the act, neglect, fault, or
48  omission of any duty by the Tenant, its agents, servants, employees, invitees, or any damage
49  caused by breaking and entering, in which case Tenant shall pay to Landlord the reasonable
50  cost of such maintenance and repairs.  Landlord shall not be liable for any failure to make any
51  such repairs or to perform any maintenance unless such failure shall persist for an
52  unreasonable time after written notice of the need of such repairs or maintenance is given to
53  Landlord by Tenant.  Except as provided in Article 23 hereof, there shall be no abatement of
54  rent and no liability of Landlord by reason of any injury to or interference with Tenant's
55  business arising from the making of any repairs, alterations, or improvements in or to any
56  portion of the Building or the Premises or in or to fixtures, appurtenances, and equipment
57  therein.  Tenant waives the right to make repairs at Landlord's expense under any law, statute,
58  or ordinance now or hereafter in effect.
59
60  12. LIENS.  Tenant shall keep the Premises and the property in which the Premises are
61  situated free from any lien arising out of any work performed, materials furnished, or
62  obligations incurred by Tenant.  Landlord may require at Landlord's sole option, that Tenant
63  shall provide to Landlord, at Tenant's sole cost and expense, a lien and completion bond in an

5

amount equal to one and one half (1-1/2) times the estimated cost of any improvements, additions, or alterations in the Premises which the Tenant desires to make, to insure Landlord against any liability for mechanic's and materialmen's liens and to insure completion of the work.

13. **ASSIGNMENT AND SUBLETTING**.  Tenant shall not enter voluntarily, or by operation of law, assign, transfer, mortgage, pledge, hypothecate, or encumber this Lease or any interest therein, and shall not sublet the said Premises or any part thereof, or any right or privilege appurtenant thereto, or allow any other person (the employees, agents, servants, and invitees of Tenant excepted) to occupy or use the said Premises, or any portion thereof, without the written consent of Landlord first had and obtained.  A consent to one assignment, subletting, occupation, or use by any other person shall not be deemed to be a consent to any subsequent assignment, subletting, occupation, or use by another person.  Consent to any such assignment or subletting shall in no way relieve Tenant of any liability under this Lease.  Any such assignment or subletting shall in no way relieve Tenant of any liability under this Lease.  Any such assignment or subletting without such consent shall be void, and shall, at the option of the Landlord, constitute a default under the terms of this Lease.

In the event that Landlord shall consent to a sublease or assignment hereunder, Tenant shall pay Landlord reasonable fees, not to exceed One Hundred Dollars ($100.00) incurred in connection with the processing of documents necessary to giving of such consent.

14. **INDEMNITY - INSURANCE - WAIVER OF SUBROGATION**.

A.  Landlord, its partners or the agents, partners, officers, directors, employees, representatives, tenants, licensees, concessionaires, invitees, permittees or contractors or successors or assigns of any of them ("Landlord's Agents") shall not be liable for any damage or liability of any kind or for any injury to or death of person, or damage to property of Tenant or any other person occurring from and after the Delivery Date, from any cause whatsoever, by reason of the use, occupancy, and enjoyment of the Premises by Tenant or any person thereon or holding under Tenant or any of Tenant's agents, partners, officers, directors, representatives, contractors, permittees, employees, subtenants, licensees, concessionaires, customers, and invitees or successors or assigns ("Tenant's Agents") and that Tenant will promptly defend, at its sole cost and expense, indemnify and save Landlord and Landlord's Agents harmless from all claims, demands, obligations, judgments, and liabilities whatsoever, on account of any such actual or claimed damage or injury and from all liens, claims, and demands arising out of such use, occupancy, and enjoyment of the Premises and it facilities, or any repairs, alterations, or improvements which Tenant may make of any or upon said Premises.

This obligation to defend and indemnify shall include reasonable attorney's fees and investigation costs and all other reasonable costs, expenses, and liabilities paid or incurred from the first notice that any claim or demand is to be made or may be made.  In the case of any action or proceeding brought against Landlord by reason of any such claim, upon notice from Landlord, Tenant will defend such action or proceeding by counsel approved by Landlord.

B.  All property kept, stored, or maintained in the Premises shall be so kept, stored, or maintained at the sole risk of Tenant.  In the event of any act, omission, or negligence of Tenant, or Tenant's Agents, Tenant hereby waives all claims for damage to person(s) or property sustained by Tenant or Tenant's Agents resulting from any such act, omission, or negligence.

C.  Landlord and Tenant hereby waive any right each may have against each other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, or their respective property, the Premises, its contents or to other portions of the Shopping Center, arising from any risk generally covered by fire and extended coverage insurance; and the parties each, on behalf of their respective insurance companies insuring the Premises, its contents, the property of either Landlord or Tenant, or other portions of the Shopping Center against any such loss, waive any right of subrogation that it may have against Landlord or Tenant, as the case may be.  The foregoing waivers of subrogation shall be operative only so long as available in California, and they do not invalidate any insurance policy.

6

68

D. Tenant further agrees that from and after the date Tenant takes possession of the Premises, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, in the amount specified and in the form specified below:

I. **Public Liability and Property Damage.** Bodily Injury and Property Damage liability insurance limits of not less than $2,000,000.00 CSL per occurrence with a General Aggregate of $2,000,000.00 insuring against any and all liability of the insured with respect to the Premises, or arising out of the maintenance, use, or occupancy thereof. All such bodily injury liability insurance and property damage liability insurance shall be the Comprehensive Liability form and shall include contractual liability coverage insuring the performance by Tenant on the indemnity agreement in favor of Landlord as to liability for injury or death of persons and injury or damage to property contained in this Article 14. Personal injury and products/completed operations coverage of $2,000,000 per occurrence with $2,000,000 aggregate shall be included. Neither the limits of coverage nor any deductible shall limit Tenant's liability hereunder.

II. **Plate Glass.** Insurance covering all plate glass on the Premises. Tenant may self-insure loss of or damage to any plate glass by giving notice to Landlord of its election to do so, provided, however, Tenant shall at all times during the Lease Term be solely responsible for all such loss or damage.

III. **Air Conditioning Equipment, Etc.** Machinery insurance on all air conditioning equipment and systems exclusively serving the Premises whether provided by Landlord or Tenant. If such equipment and systems and the damage that may be caused by them or result from them are not covered by Tenant's extended coverage insurance, then the insurance specified in this Article 14D(III) shall be in an amount not less than One Hundred Thousand Dollars ($100,000.00). If Tenant requires boilers or other pressure vessels to serve the Premises, they shall also be insured in the amount required by this Article 14D(III), with the proceeds payable to Landlord in the event of loss of, or damage or destruction of Landlord's property arising out of or in connection with an insured peril under such boiler/machinery insurance.

IV. **Tenant Improvements, Etc.** Insurance covering all of the items specified as Tenant's Work, Tenant's leasehold improvements, alterations, additions, or improvements permitted under Article 10, trade fixtures and personal property from time to time, in, on, or upon the Premises, in an amount not less than their full replacement cost from time to time during the Lease Term, providing protection against any peril included within the classification "Fire and Extended Coverage", together with insurance for the perils of sprinkler leakage damage, vandalism, and malicious mischief. Tenant shall repair or replace the property damaged or destroyed (unless this Lease shall cease and terminate under the provisions of Article 23 hereof) and any policy proceeds shall be applied towards the total cost of such repair or replacement.

V. **Policy Form.** All policies of insurance provided for herein shall be issued by insurance companies with general policy holder's rating of not less than "A+" and a financial rating of not less than Class "VI" as rated in the most current available "Best's Insurance Reports", and qualified to do business in California. All such policies shall be issued in the name of Landlord and all its allied entities and Tenant, and if requested by Landlord, Landlord's mortgagee or beneficiary ("Mortgagee"), which policies shall be for the mutual and joint benefit and protection of Landlord, Tenant and the Mortgagee and executed copies of such policies of insurance or certificates thereof shall be delivered to Landlord within ten (10) days after substantial completion of the Premises and thereafter executed copies of renewal policies or certificates shall be delivered to Landlord within thirty (30) days prior to the expiration of the term of each such policy. All public liability and property damage policies shall contain a provision that Landlord, although named as insured, shall nevertheless be entitled to recover under policies for any loss occasioned to Landlord or Landlord's Agents by reason of the negligence of Tenant. As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent. All policies of insurance delivered to Landlord must contain a provision that the company writing the policy will give Landlord not less then thirty (30) days notice in writing in advance of any cancellation or lapse or the effective date of any reduction coverage. All Property and Boiler and Machinery insurance required hereunder must contain a Joint Loss Agreement endorsement. All public liability, property damage, and other casualty

7

69

1  policies shall be written as primary policies, not contributing with and not in excess of
2  coverage which Landlord may carry.  All policies of insurance shall be subject to approval by
3  Landlord as to form, amount(s), or limits of coverage and underwriters.  In the event Tenant
4  fails to comply with any of the provisions of this Article 14, at any time thirty (30) or more
5  days after notice by Landlord, Landlord may, without prejudice to any other rights it may
6  have, elect to purchase the insurance required to be carried, and such cost thereof including an
7  administration fee of ten percent (10%) shall be billed to the refusing or neglecting party in
8  addition to rent and other charges.

9      E.  Landlord shall, at all times from and after the Delivery Date, maintain in effect a policy
10  or policies of insurance covering the building in which the Premises is located and
11  improvements and personal property as respects the common area and the shopping center, in
12  an amount not less than eighty percent (80%) of full replacement cost thereof (exclusive of the
13  cost of excavations, foundations, and footings) from time to time during the Lease Term with
14  such deductibles and/or self-insured retentions determined by Landlord to be responsible or
15  the amount of such insurance Landlord's Mortgagee may require Landlord to maintain,
16  whichever is the greater, providing protection against any peril generally included in the
17  classification "Fire Extended Coverage and Special Extended Coverage", and at the option of
18  the Landlord, business income, earthquake, and/or flood insurance.

19

20      F.  Tenant agrees that it will not, at any time during the Lease Term, carry any stock or
21  goods or do anything in or about the Premises which will in any way tend to increase the
22  insurance rates upon the Shopping Center of which the Premises is a part.  Tenant agrees to
23  pay to Landlord forthwith upon demand the amount of any increase in premiums for insurance
24  against loss by fire that may be charged during the Lease Term or the amount of insurance to
25  be carried by Landlord on the building of which the Premises is a part resulting from the
26  foregoing or from Tenant doing any act in or about said Premises which does so increase the
27  insurance rates, whether or not Landlord shall have consented to such act on the part of
28  Tenant.  If Tenant installs upon the Premises any electrical equipment which constitutes an
29  overload of the electrical lines of the Premises, Tenant shall at its own expense make whatever
30  changes are necessary to comply with the requirements of the insurance underwriters and any
31  governmental authority having jurisdiction thereover, but nothing contained in this Lease shall
32  be deemed to constitute Landlord's consent to such overloading.  Tenant shall, at its own
33  expense, comply with all requirements, including the installation of fire extinguishers or
34  automatic dry chemical extinguishing system, of the insurance underwriters or any
35  governmental authority having jurisdiction thereover, necessary for the maintenance of fire
36  and extended coverage insurance for the Premises.

37

38      G.  In the event the Lease Term, plus any extended term(s), exceed(s) sixty (60) months,
39  Landlord shall have the right, from time to time, to require an increase in the limits of liability
40  insurance required by Article 14D above, at the sole cost and expense of Tenant, based on the
41  standard practices in the industry and the exposures involved.

42

43      H.  If Tenant uses the Premises for such purpose(s) that would increase the hazards with
44  respect to liability to the public, Tenant shall increase its limits of liability insurance called for
45  by Article 14D(I) as required by Landlord, at Tenant's sole cost and expense.

46

47  15.  UTILITIES.  Tenant shall pay for all water, gas, heat, light, power, sewer charges,
48  telephone service, refuse removal, and all other services and utilities supplied to the Premises,
49  together with any taxes thereon.  If any such services are not separately metered to Tenant,
50  Tenant shall pay a reasonable proportion to be determined by Landlord of all charges jointly
51  metered with other premises.

52

53  16.  PERSONAL PROPERTY TAXES.  Tenant shall pay, or cause to be paid, before
54  delinquency, any and all taxes levied or assessed and which become payable during the term
55  hereof upon all Tenant's leasehold improvements, equipment, furniture, fixtures, and any other
56  personal property located in the Premises.  In the event any or all of the Tenant's leasehold
57  improvements, equipment, furniture, fixtures, and other personal property shall be assessed
58  and taxed with the real property, Tenant shall pay to Landlord its share of such taxes within
59  ten (10) days after delivery to Tenant by Landlord of a statement in writing setting forth the
60  amount of such taxes applicable to Tenant's property.

61

62  17.  RULES AND REGULATIONS.  Tenant shall faithfully observe and comply with the rules
63  and regulations that Landlord shall from time to time promulgate and/or modify.  The rules

8

1   and regulations shall be binding upon the Tenant upon delivery of a copy of them to Tenant.
2   Landlord shall not be responsible to Tenant for the nonperformance of any said rules and
3   regulations by any other tenants or occupants.
4
5   18. HOLDING OVER. If Tenant remains in possession of the Premises or any part thereof,
6   after the expiration of the term hereof with the express written consent of Landlord, such
7   occupancy shall be a tenancy from month to month at a rental in the amount of One Hundred
8   Twenty Five percent (125%) of the last monthly Minimum Rent, plus all other charges
9   payable hereunder, and upon all the terms hereof applicable to a month to month tenancy.
10
11  19. ENTRY BY LANDLORD. Landlord reserves, and shall at any and all times have, the
12  right to enter the Premises to inspect the same, to submit said Premises to any Deed of Trust
13  beneficiary, prospective purchasers or tenants, to post notices of non-responsibility, to repair
14  the Premises and any portion of the Building of which the Premises are a part that Landlord
15  may deem necessary or desirable, without abatement of rent, and may for that purpose erect
16  scaffolding and other necessary structures where reasonably required by the character of the
17  work to be performed, always providing that the entrance to the Premises shall not be blocked
18  thereby, and further providing that the business of the Tenant shall not be interfered with
19  unreasonably. Tenant hereby waives any claim for damages or for any injury or
20  inconvenience to or interference with Tenant's business, any loss of occupancy or quiet
21  enjoyment of the Premises, and any other loss occasioned thereby. For each of the aforesaid
22  purposes, Landlord shall at all times have and retain a key with which to unlock all of the
23  doors in, upon, and about the Premises, excluding Tenant's vaults, safes and files, and
24  Landlord shall have the right to use any and all means which Landlord may deem proper to
25  open said doors in an emergency, in order to obtain entry to the Premises without liability to
26  Tenant except for any failure to exercise due care for Tenant's property and any entry to the
27  Premises obtained by Landlord by any of said means, or otherwise, shall not under any
28  circumstances be construed or deemed to be a forcible or unlawful entry into, or a detainer of,
29  the Premises, or an eviction of Tenant from the Premises or any portion thereof.
30
31  20. TENANT'S DEFAULT. The occurrence of any one or more of the following events shall
32  constitute a default and breach of this Lease by Tenant:
33
34      A. The vacating or abandonment of the Premises by Tenant.
35
36      B. The failure by Tenant to make any payment of rent or any other payment required to
37  be made by Tenant hereunder, as and when due, where such failure shall continue for a period
38  of three (3) days after written notice thereof by Landlord to Tenant. Tenant shall be assessed
39  a ten (10%) penalty if rent not received on the first day of each calendar month.
40
41      C. The failure by Tenant to observe or perform any of the covenants, conditions, or
42  provisions of this Lease to be observed or performed by the Tenant, other than described in
43  Article 20B above, where such failure shall continue for a period of thirty (30) days after
44  written notice hereof by Landlord to Tenant; provided, however, that if the nature of Tenant's
45  default is such that more than thirty (30) days are reasonably required for its cure, then Tenant
46  shall not be deemed to be in default if Tenant commences such cure within said thirty (30) day
47  period and thereafter diligently prosecutes such cure to completion.
48
49      D. The making by Tenant of any general assignment or general arrangement for the
50  benefit of creditors; or the filing by or against Tenant of a petition to have Tenant adjudged
51  bankrupt; or a petition or reorganization or arrangement under any law relating to bankruptcy
52  (unless, in the case of a petition filed against Tenant, the same is discussed within sixty (60)
53  days; or the appointment of a trustee or a receiver to take possession of substantially all of
54  Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession
55  is not restored to Tenant within thirty (30) days; or the attachment, execution, or other
56  judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's
57  interest in this Lease, where such seizure is not discharged in thirty (30) days).
58
59  21. REMEDIES IN DEFAULT. In the event of any such default or breach by Tenant,
60  Landlord may any time thereafter, with or without notice or demand and without limiting
61  Landlord in the exercise of a right or remedy which Landlord may have by reason of such
62  default or breach:
63

9

A.  Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord.  In such event Landlord, by reason of Tenant's default, shall be entitled to recover from Tenant all damages incurred by Landlord, including, but not limited to, the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, that portion of any leasing commission paid by Landlord and applicable to the unexpired term of this Lease, reasonable attorney's fee, and the worth at the time of award by the court having jurisdiction thereof, of the amount by which the unpaid rent and other charges and adjustments called for herein for the balance of the term after the time of such award exceeds the amount of such loss for the same period that Tenant proves could be reasonably avoided.  Unpaid installments of rent or other sums shall bear interest from the date due at the rate of ten percent (10%) per annum; or

B.  Maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises.  In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover the rent and any other charges and Adjustments as may become due hereunder; or

C.  Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the State in which the Premises are located.

22.  DEFAULT BY LANDLORD.  Landlord shall not be in default unless Landlord fails to perform obligations required of Landlord within a reasonable time, but in no event later than thirty (30) days after written notice by Tenant to Landlord and to the holder of any first mortgage or deed of trust covering the Premises whose name and address shall have theretofore been furnished to Tenant in writing, specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligations are such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion.  In no event shall Tenant have the right to terminate this Lease as a result of Landlord's default, and Tenant's remedies shall be limited to damages and/or an injunction.

23.  RECONSTRUCTION.  In the event the Premises are damaged by Fire or other perils covered by extended coverage insurance, Landlord agrees to forthwith repair same, and this Lease shall remain in full force and effect, except that Tenant, shall be entitled to a proportionate reduction of the Minimum Rent from the date of damage and while such repairs are being made.  The Minimum Rent shall be equitably abated and adjusted in the proportion that the unusable portion of the Premises bears to the whole thereof, as determined by Landlord.  If the damage is due to the fault or neglect of Tenant or its employees, there shall be no abatement of rent.

In the event the Premises are damaged as a result of any cause other than the perils covered by fire and extended coverage insurance, then Landlord shall forthwith repair the same, provided the extent of the destruction be less than ten percent (10%) of the full replacement cost of the Premises.  In the event the destruction of the Premises is to an extent ten percent (10%) or more of the full replacement cost, then Landlord shall have the option: (1) to repair or restore such damage, this Lease continuing in full force and effect, but the Minimum Rent to be proportionally reduced as hereinabove in this Article provided; or (2) give notice to Tenant at any time within sixty (60) days after such damage, terminating this Lease as of the date specified in such notice, which date shall be no more than thirty (30) days after the giving of such notice.  In the event of giving such notice, this Lease shall expire and all interest of the Tenant in the Premises shall terminate on the date so specified in such notice and the Minimum Rent shall be equitably abated and adjusted based upon the extent, if any, that the unusable portion of the Premises bears to the whole thereof, as determined by Landlord, shall be paid up to date of said such termination.

Notwithstanding anything to the contrary contained in this Article, Landlord shall not have any obligation whatsoever to repair, reconstruct, or restore the Premises when the damage resulting from any casualty covered under this Article occurs during the last twenty-four (24) months of the term of this Lease or any extension thereof.

10

1   Landlord shall not be required to repair any injury or damage by fire or other cause, or to
2   make any repairs to replacements of any leasehold improvements, fixtures, or other personal
3   property of Tenant.
4
5   24. EMINENT DOMAIN. If more than twenty-five percent (25%) of the Premises shall be
6   taken or appropriated by any public or quasi-public authority under the power of eminent
7   domain, Landlord hereto shall have the right, at its option, within sixty (60) days after said
8   taking, to terminate this Lease upon thirty (30) days written notice. If either less than or more
9   than twenty-five percent (25%) of the Premises are taken (and Landlord elects not to
10  terminate as herein provided) the Minimum Rent thereafter to be paid shall be equitably
11  reduced in the proportion that the unusable portion of the Premises bears to the total thereof,
12  as determined by Landlord. If any part of the Shopping Center other than the Premises may
13  be so taken or appropriated, Landlord shall within sixty (60) days of said taking have the right
14  at its option to terminate this Lease upon written notice to Tenant. In the event of any taking
15  or appropriation whatsoever, Landlord shall be entitled to any and all awards and/or
16  settlements which may be given, and Tenant shall have no claim against Landlord for the value
17  of any unexpired term of this Lease.
18
19  25. TENANT'S STATEMENT. Tenant shall at any time and from time to time upon not less
20  than three (3) days prior written notice from Landlord execute, acknowledge, and deliver to
21  Landlord and any Deed of Trust beneficiary, a statement in writing in form approved by any
22  Deed of Trust beneficiary (a) certifying that (this Lease is unmodified and in full force and
23  effect (or, if modified, stating the nature of such modification and certifying that this Lease as
24  so modified is in full force and effect), and the date to which the rental and other charges are
25  paid in advance, if any, and (b) acknowledging that there are not, to Tenant's knowledge, any
26  uncured defaults on the part of the Landlord hereunder, or specifying such defaults if any are
27  claims, and (c) setting forth the date of commencement of rents and expiration of the term
28  hereof. Any such statement may be relied upon by any prospective purchaser or
29  encumbrances of all or any portion of the real property of which the Premises are a part.
30
31  26. PARKING AND COMMON AREAS. Landlord covenants that upon completion of the
32  Shopping Center, an area approximately equal to the common and parking areas as shown on
33  the attached Exhibit "A" shall be at all times available for the non-exclusive use of Tenant
34  during the full term of this Lease or any extension of the term hereof, provided that the
35  condemnation or other taking by any public authority, or sale in lieu of condemnation, of any
36  or all of such common and parking areas shall not constitute a violation of this covenant.
37  Landlord reserves the right to change the entrances, exits, traffic lanes, and the boundaries and
38  locations of such parking area or areas; provided, however, that anything to the contrary
39  notwithstanding contained in this Article 26, said parking area or areas shall at all times be
40  substantially equal or equivalent to that shown on the attached Exhibit "A".
41
42      A. Prior to the date of Tenant's opening for business in the Premises, Landlord shall cause
43  said common and parking area or areas to be graded, surfaced, marked, and landscaped at no
44  expense to Tenant.
45
46      B. The Landlord shall keep said automobile parking and common areas in a neat, clean,
47  and orderly condition, and shall repair any damage to the facilities thereof, but all expenses in
48  connection with said automobile parking and common areas shall be charged and prorated in
49  the manner as set forth in Article 7 hereof.
50
51      C. Tenant, for the use and benefit of Tenant, its agents, employees, customers, licensees,
52  and subtenants, shall have the non-exclusive right in common with Landlord, and other
53  present and future owners, tenants and their agents, employees, customers, licensees, and
54  subtenants, to use said common and parking .... during the entire term of this Lease, or any
55  extension thereof, for ingress and egress, and automobile parking.
56
57      D. The Tenant, in the use of said common and parking areas, agrees to comply with such
58  reasonable rules, regulations, and charges for parking as the Landlord may adopt from time to
59  time for the orderly and proper operation of said common and parking area. Such rules may
60  include, but shall not be limited to, the following: (1) the restricting of employee parking to a
61  limited, designated area or areas; and (2) the regulation of the removal, storage, and disposal
62  of Tenant's refuse and other rubbish at the sole cost and expense of Tenant.
63

11

**27. AUTHORITY OF PARTIES.**

A. Corporate Authority. If the Tenant is a corporation, each individual executing this Lease on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said corporation, in accordance with a duly adopted resolution of the board of directors of said corporation, a copy of which is attached hereto, in accordance with the bylaws of said corporation, and that this Lease is binding upon said corporation in accordance with its terms.

B. Limited Partnership. If the Tenant herein is a limited partnership, it is understood and agreed that the claims by Tenant or Landlord shall be limited to the assets of the limited partnership, and furthermore, Tenant expressly waives all rights to proceed against the individual partners, or the officers, directors, or shareholders of any corporate partner, except to the extent of their interest in said limited partnership.

**28. SIGNS.** The Tenant may affix and maintain upon the glass panes and supports of the show windows and within twelve (12) inches of any window and upon the exterior walls of the Premises only such signs, advertising placards, names, insignia, trademarks, and descriptive material as shall have first received the written approval of the Landlord as to type, size, color, location, copy nature, and display qualities. Anything to the contrary in this Lease notwithstanding, Tenant shall not affix any sign to the roof. Tenant shall, however, erect one sign on the front of the Premises not later than the date Tenant opens for business, in accordance with a design to be prepared by Tenant and approved in writing by Landlord and all governmental authorities. Sign attached to building shall become property of Landlord when Tenant vacates Premises. Landlord's sign criteria is attached hereto. Notwithstanding anything herein to the contrary, Tenant may utilize Baskin-Robbins' corporate colors, letterstyle and graphics on all interior and exterior signage. Landlord shall not unreasonably withhold its consent to Tenant's signs which conform to Landlord's sign criteria and local sign ordinances. Tenant may use Baskin-Robbins' professionally designed monthly promotional signs in the interior of the Premises without Landlord's prior approval, provided said signs are not in violation of any local sign ordinance.

**29. DISPLAYS.** The Tenant may not display or sell merchandise or allow grocery carts or other similar devices within the control of Tenant to be stored or to remain outside the defined exterior walls and permanent doorways of the Premises. Tenant further agrees not to install any exterior lighting, amplifiers, or similar devices, or use in or about the Premises any advertising medium which may be heard or seen outside the Premises, such as flashing lights, searchlights, loudspeakers, phonographs, or radio broadcasts.

**30. AUCTIONS.** Tenant shall not conduct or permit to be conducted any sale by auction in, upon, or from the Premises, whether said auction be voluntary or involuntary, pursuant to any assignment for the payment of creditors or pursuant to any bankruptcy or other insolvency proceeding.

**31. HOURS OF BUSINESS.** Subject to the provisions of Article 23 hereof, Tenant shall continuously during the entire term hereof conduct and carry on Tenant's business in the Premises and shall keep the Premises open for business and cause Tenant's business to be conducted therein during the usual business hours of each and every business day as is customary for businesses of like character in the city in which the Premises are located to be open for business; provided, however, that this provision shall not apply if the Premises should be closed and the business of Tenant temporarily discontinued therein on account of strikes, lockouts, or similar causes beyond the reasonable control of Tenant or closed for not more than three (3) days out of respect to the memory of any deceased officer or employee of Tenant, or the relative of any such officer or employee. Tenant shall keep the Premises adequately stocked with merchandise, and with sufficient sales personnel to care for the patronage, and to conduct said business in accordance with sound business practice.

In the event of breach by the Tenant of any of the conditions in this Article contained, the Landlord shall have, in addition to any and all remedies herein provided, the right at its option to collect not only the Minimum Rent herein provided, but additional rent at the rate of one-thirtieth (1/30) of the Minimum Rent herein provided for each and every day that the Tenant shall fail to conduct its business as herein provided; said additional rent shall be deemed to be in lieu of any percentage rent that might have been earned during such period of the Tenant's failure to conduct its business as herein provided.

12

32. **MERCHANT'S ASSOCIATION.** If a majority of tenants in the Shopping Center shall determine that it is in the best interests of the Shopping Center, Tenant will become a member of, and participate fully in, and remain in good standing in the Merchant's Association (as soon as the same has been formed), organized for Tenants occupying premises in the Shopping Center, and Tenant shall abide by the regulations of such Association. Each member Tenant shall have one (1) vote, and the Landlord shall also have one (1) vote, in the operation of said Association. The objects of such Association shall be to encourage its members to deal fairly and courteously with their customers, to encourage ethical business practices, and to assist the business of the Tenant's by sales promotion and center-wide advertising. The Tenant agrees to pay minimum dues to the Merchant's Association, provided, however, that in no event shall the dues paid by Tenant in any fiscal year of said Association be in excess of twenty cents ($.20) per square foot of Premises leased to Tenant. Default in payment of dues shall be treated in similar manner to default in rent with like rights of Landlord at its option to the collection thereof on behalf of the Merchant's Association.

33. **COMPETITION.** During the term of this Lease, Tenant shall not directly or indirectly engage in any similar or competing business within a driving radius of three (3) miles from the outside boundary of the Shopping Center.

34. **GENERAL PROVISIONS.**

A. Plats and Riders. Clauses, plats, riders and addenda, if any, affixed to this Lease are a part hereof.

B. Waiver. The waiver by Landlord of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant, or condition of any subsequent breach of the same or any other term, covenant, or condition herein contained. The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any preceding default by Tenant of any term, covenant, or condition of this Lease, other than the failure of the Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such preceding default at the time of the acceptance of such rent.

C. Joint Obligation. If there be more than one Tenant, the obligations hereunder imposed shall be joint and several.

D. Marginal Headings. The marginal headings and article titles to the articles of this Lease are not a part of this Lease and shall have no effect upon construction of interpretation of any part hereof.

E. Time. Time is of the essence of this Lease and each and all of its provisions in which performance is a factor.

F. Successors and Assigns. The covenants and conditions herein contained, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators, and assigns of the parties hereto.

G. Recordation. Neither Landlord nor Tenant shall record this Lease, but a short form memorandum hereof may be recorded at the request of Landlord.

H. Quiet Possession. Upon Tenant paying the rent reserved hereunder and observing and performing all of the covenants, conditions, and provisions on Tenant's part to be observed and performed hereunder, Tenant shall have quiet possession of the Premises for the entire term hereof, subject to all the provisions of this Lease.

I. Late Charges. Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by terms of any mortgage or trust deed covering the Premises. Accordingly, if any installment of rent or any sum due from Tenant shall not be received by Landlord or Landlord's designee when due, then Tenant shall pay to Landlord a late charge equal to ten percent (10%) of such overdue amount, plus any attorney's fees incurred by

13

75

Landlord by reason of Tenant's failure to pay rent and/or other charges when due hereunder. The parties hereby agree that such late charges represent a fair and reasonable estimate of the cost that Landlord will incur by reason of the late payment by Tenant. Acceptance of such late charges by the Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

J. Prior Agreements. This Lease contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreements or understanding pertaining to any such matters shall be effective for any purpose. No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest. This Lease shall not be effective or binding on any party until fully executed by both parties hereto.

K. Inability to Perform. This Lease and the obligations of the Tenant hereunder shall not be affected or impaired because the Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of the Landlord.

L. Partial Invalidity. Any provisions of this Lease which shall prove to be invalid, void, or illegal shall in no way affect, impair, or invalidate any other provision hereof and such other provision shall remain in full force and effect.

M. Cumulative Remedies. No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

N. Choice in Law. This Lease shall be governed by the laws of the State in which the Premises are located.

O. Attorney's Fees. In the event of any action or proceeding brought by either party against the other under this Lease, the prevailing party shall be entitled to recover for the fees of its attorneys in such action or proceeding, including costs of appeal, if any, in such amount as the court may adjudge reasonable as attorney's fees. Should it be necessary for Landlord to employ legal counsel to enforce any of the provisions herein contained, Tenant agrees to pay all attorney's fees and court costs reasonably incurred, including attorney's fees incurred in connection with assumption or rejection of this Lease in any bankruptcy proceedings brought by or on behalf of the Tenant. In addition, Landlord is entitled to reimbursement of any attorney's fees incurred in any proceeding to compel assumption or rejection or termination of the Lease in any bankruptcy proceeding filed by or on behalf of Tenant.

P. Sale of Premises by Landlord. In the event of any sale of the Premises by Landlord, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence, or omission occurring after the consummation of such sale; and the purchaser, at such sale or any subsequent sale of the Premises shall be deemed, without any further agreement between the parties of their successors in interest or between the parties and any such purchaser, to have assumed and agreed to carry out any and all of the covenants and obligations of the Landlord under this Lease.

Q. Subordination, Attornment. Upon request of the Landlord, Tenant will, in writing, subordinate its rights hereunder to the lien of any mortgage or deed of trust, to any bank, insurance company, or other lending institution, now or hereafter in force against the Premises, and to all advances made or hereafter to be made upon the security thereof.

In the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by the Landlord covering the Premises, the Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as the Landlord under this Lease. Said provision for attornment shall be self-operative, however, Tenant will execute and deliver to Landlord or Landlord's beneficiary under any Deed of Trust any document required to evidence such Attornment, in form approved by Landlord or Landlord's beneficiary under any Deed of Trust.

14

The provisions of this Article to the contrary notwithstanding, and so long as Tenant is not in default hereunder, this Lease shall remain in full force and effect for the full term hereof.

R. Notices. All notices and demands which may or are to be required or permitted to be given by either party on the other hereunder shall be in writing. All notices and demands by the Landlord to the Tenant shall be sent by United States Mail, postage prepaid, addressed to the Tenant at the Premises, and to the address hereinbelow, or to such other place as Tenant

may from time to time designate in a notice to the Landlord. All notices and demands by the Tenant to the Landlord shall be sent by United States Mail, postage prepaid, addressed to the Landlord at the address set forth herein, and to such other person or place as the Landlord may from time to time designate in a notice to the Tenant.

To Landlord at:       Century Plaza Corporation
                      c/o Sierra Pacific Properties, Inc.
                      4300 Railroad Avenue
                      Pittsburg, CA  94565

To Tenant at:         4493 Century Blvd.
                      Pittsburg, CA  94565

w/a copy to:          Baskin-Robbins USA Co.
                      31 Baskin-Robbins Place
                      Glendale, California  91202
                      Attention: Legal Department

S. Financial Statements. Tenant will provide Landlord with updated financial statements annually.

35. <u>BROKERS</u>. Tenant warrants that it has had no dealings with any real estate broker or agents in connection with the negotiation of this Lease.

36. This Lease will only be effective if Baskin-Robbins USA Co. enters into a Termination Agreement of the lease dated March 20, 1990 by and between Century Plaza Corporation, as Landlord, and Baskin-Robbins USA, Co, as Tenant.

37. The Landlord acknowledges that neither the Landlord or any other party shall have the right to operate the Premises as a Baskin-Robbins store without first qualifying as a Baskin-Robbins franchisee and obtaining the express written consent of Baskin-Robbins, the Landlord further acknowledges that it cannot sell or use any item bearing any Baskin-Robbins trademark, trade names, trade dress or other indicia without Baskin-Robbins prior written consent. In the event Tenant's franchisee agreement is terminated, Baskin-Robbins USA Co. will serve notice to Landlord.

If this Lease has been filled in, it has been prepared for submission to your attorney for his approval. No representation or recommendation is made by the real estate broker or its agents or employees as to the legal sufficiency, legal effect, or tax consequences of this Lease or the transactions relating thereto.

<u>Notice to all Parties</u>: The submission of this document for examination, negotiation, and/or signature does not constitute an offer to lease, or a reservation of, or an option for the ___ ___aise. This document shall not be binding and in effect against either party until at lease one counterpart, duly executed by Landlord and Tenant, has been received by each of Landlord and Tenant.

SIGNATURE PAGE FOLLOWS

15

11/20/96   13:49   FAX

1    Dated: _____

2

3

4

5

6

7

8

9

10

11

12    DATED: _Nov. 20'96_

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

34

35

36

37

38

39

40

41

42

43

44

45

46

47

48

49

50

51

52

53

54

55

56

57

58

59

60

61

62

63

LANDLORD: CENTURY PLAZA
CORPORATION

By: _____
    Michael J. Welton

Its: _____President_____

By: _____
    Ernest M. Davis

Its: _____Authorized Agent_____

TENANT: SUKPRAN AND GURMEET GILL
D.B.A. BASKIN ROBBINS

By: _____
    Sukpran Gill

By: _____
    Gurmeet Gill

16



CENTURY · PLAZA · SHOPPING · CENTER
PITTSBURG, CALIFORNIA

## EXHIBIT "B"
## LANDLORD'S IMPROVEMENTS

Landlord is delivering and Tenant is accepting Premises in "AS IS" CONDITION.

### TENANT'S IMPROVEMENTS

Tenant shall give Landlord five (5) business days notice prior to the commencement of any work in the Premises, and Landlord shall have the right to post notices of non-responsibility on the Premises. Tenant shall fully comply with all laws, statutes, ordinances, or governmental rules or regulations governing said improvements. Tenant agrees not to use the Premises for business purposes until all required approvals, permits, and certificates of occupancy, for the improvements have been delivered to Landlord in a form acceptable to Landlord at its sole discretion.

In the event Tenant fails to comply with the conditions of the preceding paragraph within ten (10) days of written notice of default by Landlord, Landlord may immediately in addition to all other rights and remedies contained herein: (1) assess a daily penalty of Two Hundred Dollars ($200.00) until said default has been corrected to Landlord's sole satisfaction; (2) perform such work, make such payment, cause such work to be performed, or perform such other obligation for Tenant's account (and may enter the Premises hereunder) to cure said default, at Tenant's sole cost and expense; (3) be fully indemnified by Tenant for any and all costs and expenses (including legal fees) incurred by Landlord in connection with curing said default and/or enforcing this agreement.

Re: REQUIREMENTS PRIOR TO TENANT'S CONSTRUCTION OF THE PREMISES

Prior to the commencement of Tenant's construction of the above-referenced premises, the following documentation is required:

1. A list providing the names of Tenant's general contractor and/or subcontractors, and material suppliers;

2. A copy of the construction Contract with Tenant's contractor; and

3. Tenant's Certificate of Insurance as proof of coverage in an amount not less than $2,000,000.00 and Contractor's Certificate of Insurance as proof of coverage in an amount not less than $1,000,000.00. These Certificates of Insurance must include proof of Workman's Compensation coverage and business automobile coverage. In addition, the Certificate must name **Century Plaza Corporation** and all its allied entities as Additional Insureds on the policy.

**EXHIBIT "C"**
**BASKIN-ROBBINS USA., CO. AS GUARANTOR**
**GUARANTOR'S OBLIGATIONS**

1.  Guarantor, in consideration of the sum of One Dollar ($1.00) now paid by Landlord to Guarantor (the receipt whereof is hereby acknowledged) and other valuable consideration, hereby directly and unconditionally guarantees to and covenants with Landlord that Tenant will duly perform, observe and keep each and every covenant, proviso, condition, and agreement in this Lease on the part of Tenant to be performed, observed, and kept, including the payment of Rent and all other sums and payments agreed to be paid or payable under this Lease on the days and at the times to be paid or payable under this Lease and in the manner herein specified, and that if any default shall be made by Tenant whether in payment of any Rent or other sums from time to time falling due hereunder as and when the same become due and payable, whether through acceleration or otherwise, or in the performance, observance, or keeping of any of the said covenants, provisions, conditions, and agreements, which under the terms of this Lease are to be performed, observed, or kept by Tenant, Guarantor will forthwith pay to Landlord on demand the said Rent and other sums, including interest, penalties, and attorney's fees and costs, in respect of which such default shall have occurred and all damages that may arise in consequence of the non-observance or non-performance of any of the said covenants, provisos, conditions, or agreements.

2.  Guarantor covenants with Landlord that Guarantor is jointly and severally bound with Tenant as principal debtor or obligor and not as surety, for the fulfillment of all obligations of Tenant under this Lease. In the enforcement of its rights hereunder, Landlord may proceed directly against Guarantor as if Guarantor were named Tenant hereunder.

3.  Guarantor hereby waives any right to require Landlord to proceed against Tenant or to proceed against or to exhaust any security held from Tenant or to pursue any other remedy whatsoever which may be available to Landlord before proceeding against Guarantor.

4.  No neglect or forbearance of Landlord in endeavoring to obtain payment of the Rent reserved herein or other payments required to be made under the provisions of this Lease as and when the same become due, whether through acceleration or otherwise, no delays of Landlord in taking any steps to enforce performance or observations of the several covenants, provisos, or conditions contained in this Lease to be performed, observed, or kept by Tenant, no extension or observance of the several covenants, provisos, or conditions contained in this Lease to be performed, observed, or kept by Tenant, no extension or extensions of time which may be given by Landlord from time to time to Tenant, no consent by Landlord to any assigning or subletting by Tenant, and no other act or failure to act or by Landlord shall release, discharge, or in any way reduce the obligations of Guarantor hereunder.

5.  In the event of termination of this Lease, other than by surrender specifically accepted by Landlord in writing, or in the event of disclaimer of this Lease pursuant to any statute, or in the event that Tenant (being a corporation) ceases to exist, then at the option of Landlord, Guarantor shall execute a new lease of the Premises between Landlord as Landlord and Guarantor as Tenant for a term equal in duration to the balance of the Term remaining unexpired at the date of such termination or such disclaimer, or such cessation or existence. Such lease shall contain the like Landlord and Tenant's obligations respectively and the like covenants, provisos, agreements, and conditions in all respect (including the proviso for re-entry) as are contained in this Lease.

GUARANTOR(S)

Baskin-Robbins USA, Co.

By:_____

By:_____

EXHIBIT "D"

CENTURY PLAZA

## EXCLUSIVES AND RESTRICTIONS

**3 DAY BLINDS**

**N/A**

**BASKIN ROBBINS**

~~#33. Excluding existing tenants, Landlord hereby agrees and covenants that no other part of the buildings or of the premises, shopping center, or group of buildings of which the Leased Premises are a part, or group of adjoining buildings, owned or otherwise controlled by Landlord, shall be leased or used for the purpose of selling machine-dispensed or hand-packed ice cream, sherbets, frozen custards, yogurt, ice milk, frozen desserts, and soda fountain items, excluding soft drinks, and that Tenant shall have the exclusive right to conduct said kind of business within said building, the premises, shopping center, group of buildings of which the Leased Premises are a part, or group of adjoining buildings owned or otherwise controlled by Landlord. Said exclusive right of Tenant shall cease in the event of a change of use of the Leased Premises to a different kind of business. Nothing herein contained, however, shall limit the sale by a grocery store of prepackaged ice cream, bottled or canned soft drinks, or the sale of ice cream and related products by a restaurant or coffee shop for consumption on premises as a dessert incidental to their menu and as a specialty. By definition the term "on premises" shall be deemed to prohibit the utilization of cones or other disposable containers.~~ **N/A**

## BIG 5 SPORTING GOODS

**Schedule A, #4:** Lessor covenants that Lessor's property shall be used during the term hereof for the general purpose of a retail shopping center. Lessor covenants that it will not permit the operation or occupancy of any of the following businesses or facilities on Lessor's Property (a) entertainment, athletic or recreational facility, including, but not limited to, a bowling alley, skating rink, health club, theater (except in that area designated by cross-hatch markings on page A-4 of the Plot Plan attached hereto), video or pinball game operation; (b) educational, vocational or religious facility, including but not limited to, a church, beauty school or other institution for vocational training; (c) professional and business offices of an aggregate total in excess of 1,000 sq. ft. including but not limited to, any governmental office or operation; (d) industrial facility, including but not limited to, manufacturing and warehousing facility. Lessor covenants that it will, at its own cost and expense, enforce the foregoing restrictions.

**Schedule A, #9/Schedule D, #6:** The demised premises may be used by Lessee for the purpose of conducting any lawful business, provided, however, in no event shall said Premises be used for the purpose of operating a drug store.

**Schedule G:** Target's lease restrictions are attached as an exhibit to Big 5's lease.

## BRENDEN THEATRES

**Article X, #1:** Tenant shall further not use the Demised Premises for the purpose of showing motion pictures of a type not generally shown in comparable theatres.

**Article X, #2:** The following provisions as described in this Section 2 are contained in all leases between Landlord and other tenants in the Project which provisions Tenant and Landlord hereby acknowledge and/or agree to comply with as appropriate: **See Target lease restrictions.** Following are additions to Target lease language:

(b) No use shall be permitted in the Project which is inconsistent with the operation of a first-class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted on the Demised Premises:

(ix)   any supermarket which primarily sells food;

82

Article XI: Landlord shall not use or permit to be used any part of the Property ...

the operation of the ~~~ in the Demised Premises by obnoxious odors, noises, sounds, vibrations or any ~~~ constituting a nuisance and any and a ~~~ by Landlord of all or any portion of the Property or such adjacent property shall contain appropriate provisions against such uses by tenants thereof. Without limiting the generality of the foregoing, Landlord shall ~~~ not use or permit to be used any part of the Property located with 74 feet of the outer walls of the theatre building for the operation of a discotheque or of a business which sells alcoholic beverages or popcorn.

## BURLINGTON COAT FACTORY

**Article 33.** So long as Tenant leases, uses or occupies any space as shown cross-hatched in red in the area described in Exhibit "A" hereof as Entire Premises, the Landlord covenants that notwithstanding the amendment, cancellation, termination or expiration of the herein lease: (a) except for those restrictions and limitations listed in Exhibit "B", no covenant or agreement made by the Landlord with any other person or corporation restricting the use or occupancy of all or part of said entire premises shall be of any force or effect against Tenant, (b) no building or structure shall be erected or maintained on any part of the Entire Premises other than as designated on Exhibit "A" attached hereof, and (c) except as allowed under existing leases and as proposed under the proposed leases including on Exhibit "B", no other space in said Entire Premises having a ground floor area in excess of 20,000 square feet shall be leased for use by any person or corporation as a store for the retail sale of clothing at discount unless said lease, use or occupancy is specifically consented to in writing by Tenant, which consent shall not be unreasonably withheld.

## CARL'S JR.

**#8.** See Target lease restrictions. Language in bold are additions to Target lease language:

8(b)(i) Any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any building in the Shopping Center; provided however, that this prohibition shall not prohibit a paging system within a building or the noise, sound or odors normally associated with a drive-thru restaurant facility.

8(b)(ix) Any supermarket which primarily sells foods;

8(b)(x) Any drug store that which primarily sells drugs;

8(c)(iii) No hamburger oriented fast-food type business such as McDonalds, Burger King or Jack-In-The-Box which would directly compete with Lessee shall occupy Pad(s) 5 and/or 7 as shown on Exhibit "B". This restriction shall not apply to a restaurant type facility which provides for sit-down breakfast, lunch, and dinner accommodations.

## CELLULAR SYSTEMS

N/A

## CHEESE STEAK SHOP

N/A

## COFFEE CAVERN

**#3. Use.** . . . Tenant may be allowed to serve desserts (not to include ice cream, ice cream desserts, or frozen yogurt) . . . Tenant is not to violate any of the exclusives and restrictions of existing tenants or their assignees or sublessees.

83

# FABRI-CENTERS OF CALIFORNIA

**#11(b):** Except as otherwise provided in this Paragraph, the Premises shall not be used in violation of the use restrictions set forth in Exhibit "E"* (which Landlord represents to presently encumber the Premises as terms of existing leases of Shopping Center premises or which Landlord anticipates will encumber the Premises as terms of leases presently being negotiated for the Shopping Center) (the uses covered by such restrictions herein collectively referred to as the "Restricted Uses" and individually as a "Restricted Use"). Any restriction indicated on Exhibit "E" as presently under negotiation shall automatically terminate if Landlord has not entered into a lease containing such restriction by December 31, 1992. At such time as a restriction on use no longer encumbers the Premises, the Premises shall not be subject to such restriction under this Lease and such shall no longer be a Restricted Use until such time, if any, as such Restricted Use shall be granted in favor of the same tenant or to a new tenant of the Shopping Center.

**#11(c):** Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Shopping Center or injure or annoy them or use or allow the Premises to be used for any unlawful purpose, nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises.

**#26(a)(vii)** The Shopping Center shall be maintained, operated and managed as a first-class retail project in compliance with all laws, regulations and orders and shall be used and occupied only for normal retail uses customarily conducted in first-class shopping centers; and in no event shall the Shopping Center or any portion thereof be used as or for a movie theater (except as shown on the Site Plan); auditorium; meeting hall; bingo hall or a place of public assembly; library; sale or service of automobiles or other vehicles; bar serving alcoholic beverages except as incidental to a restaurant; funeral parlor; massage parlor; animal clinic (except to the extent the Pets/Mart store located or to be located adjacent to the Premises treats animals); discotheque; dance hall (or otherwise for musical/dance reviews or topless/nude shows); karate; gymnasium; skating rink; car wash; off-track betting establishment; game room; amusement arcade, gallery or store; pinball arcade; so-called "flea market"; second hand or used goods store or store selling primarily distressed or damaged merchandise; pool room; bowling alley; health club or spa; so-called "head shop"; night club; school; gun range or guns shop (except to the extent that existing Big 5 Sporting Goods store sells guns); or any business or use which emits offensive odors, fumes, dust or vapors; is a public or private nuisance; emits loud noise or sounds which are objectionable; creates fire, explosive or other hazard; warehousing, except as incidental to a retail business; adult book store or store selling or exhibiting sexually explicit materials (all of the foregoing collectively referred to as the "Prohibited Uses").

*Exhibit E: Exclusives from the following tenants are attached to this lease: Target, Cost Rite Furniture, Big 5 Sporting Goods, Carl's Jr., Ross Stores, Pier 1 Imports, Site for Sore Eyes, Brenden Theatre, Pac 'N Save, Standard Brand Paints, Baskin-Robbins, Fashion Bug, Olive Garden, Sally's Beauty Supply, Toys 'R Us, Red Lobster, Household Finance Corp., Evenson Card Shops, Anna's Linens, Petsmart, Burlington, Five Dollar Clothing Stores, Inc., and Wherehouse.

## GAP OLD NAVY

**#3.02:** Landlord expressly acknowledges that subject to the provisions hereinafter set forth, Tenant is entering into this Lease in reliance upon its ability to conduct the Apparel Use and the sale of Children's Hardgoods without any limitation or restriction whatsoever by reason of any exclusive provision or contractual restriction (any such limitation, exclusive or restriction being called a "Restriction") granted to any other party whatsoever and wherever located, which applies or pertains to the Premises or Tenant's use thereon.

Present Restrictions: Landlord has furnished to Tenant the names of the parties and verbatim excerpts (exclusive of economics) of all such Restrictions, regardless of such parties' use or business, which have heretofore been granted to any party and which are applicable to the Property. A schedule containing such Restrictions is attached hereto as Exhibit F. Except as hereinafter provided, Tenant shall not violate the Restrictions set forth in Exhibit F. With respect to any such present Restriction which applies to or restricts in any manner the Apparel Use or Children's Hardgoods Use (as these terms are herein defined) or any portion of such

84

uses, Landlord shall obtain an express, unconditional waiver by such party of the application of such Restriction to the Premises and to such Apparel Use and Children's Hardgoods Use during the term of this Lease and the obtaining of such waiver(s) shall be a condition to the validity and effectiveness of this Lease; such waiver(s) shall be attached hereto as Exhibit F-1.

**Fashion Bug Lease.** Tenant acknowledges that the lease entered into between Landlord and Fashion Bug #2274, Inc., ("Fashion Bug") dated June 21, 1990 ("Fashion Bug Lease"), Section 21.17 thereof contains certain provisions concerning the sales of women's apparel. Said provision is set forth in Exhibit F. Landlord represents and warrants to Tenant that such provision is not a prohibition against the sale by Tenant of women's apparel; instead said provision is not a prohibition against the sale by Tenant of women's apparel; instead said provision provides for a rent adjustment as between Landlord and Fashion Bug in the event that Section provides for a rent adjustment as between Landlord and Fashion Bug in the event that the apparel items set forth therein are sold by other occupants of the Shopping Center. Landlord acknowledges that Tenant is entering into this Lease in material reliance upon such representations by Landlord. Accordingly, Landlord agrees to indemnify, defend and hold Tenant harmless from and against all liability, obligation, claims, suits, expenses, including reasonable attorney's fees, damages or loss, including, without limitation, loss of sales and profits and including any civil fine or penalty and (to the extent permitted by law) any criminal fine or penalty incurred or suffered by Tenant by reason of the breach of Landlord's representation or warranty or any actions brought against Tenant by Fashion Bug, or against Landlord in which Tenant is made a party, by reason of said Fashion Bug Lease.

**Future Restrictions.** Landlord agrees that any Restriction granted after the date of this Lease which would in any way or manner pertain to the Apparel Use or Children's Hardgood Use or any portion of such uses, the same shall have no application whatsoever to the Tenant's conduct of such Apparel Use or Children's Hardgoods Use in the Premises and all such Restrictions shall expressly exclude, by specific reference, the Premises so long as this Lease is in full force and effect. Landlord agrees to advise all such parties of the provisions of Section 3.01 and 3.02 hereof and is hereby authorized to disclose such provisions verbatim to such party. In addition, the provisions of Sections 3.01 and 3.02 hereof shall be included in the memorandum of lease referred to in Article 25 and as set forth in Exhibit D.

With respect to any such future Restrictions, Landlord agrees to indemnify, defend and hold Tenant harmless from and against all liability, obligation, claims, suits, expenses, including reasonable attorney's fees, damages or loss including any civil or (to the extent permitted by law) criminal fine or penalty incurred or suffered by Tenant by reason of the enforcement by any party of such Restriction.

**Exhibit F:** Exclusives from the following tenants are attached to this lease: Target, Big 5, Carl's Jr., Pier I, Site for Sore Eyes, Brenden, Pak N' Save, Baskin Robbins, Fashion Bug, HFC, Sally Beauty, Burlington, and Shoe Inn.

## GRACELAND

**#3. Use.** . . . This use shall not conflict with any existing tenants' exclusives or restrictions. Excluding existing major tenant, no other tenant in the Shopping Center may sell Christian books, in excess of 16 sq. ft.

## HOLLYWOOD VIDEO

**#5.2.** . . . Tenant shall not do anything which may unreasonably obstruct or interfere with the rights of other tenants, owners, or occupants of the Retail Center or injure them (and Tenant shall take all reasonable action to prevent odors, emissions, fumes, liquids, or other substances or excessive noise from escaping or extending beyond the Premises), nor shall the Tenant use or allow the Premises to be used for any immoral or unlawful purpose, nor shall Tenant cause, maintain, or suffer or permit any nuisance in, on or about the Premises. Tenant shall not commit or allow to be committed any waste in or upon the Premises and shall refrain from using or permitting the use of the Premises or any portion thereof as living quarters, sleeping quarters, or for lodging purposes.

**HOUSEHOLD FINANCE CORPORATION**

#36. Landlord shall not lease any portion of the building in which the demised premises are located in, or permit the same to be occupied by, any person doing business in whole or in part as an adult book store, video arcade, pool room, tavern, dance hall, karate or judo schools or parlors or other schools or gymnasia.

**LESLIE'S SWIMMING POOL SUPPLY**

N/A

**MATTRESS DISCOUNTERS**

#3. Use. . . . LL will grant Tenant the exclusive right to sell mattresses as its primary use, not including major tenants.

**OLIVE GARDEN**

#8. . . . Lessee shall be permitted to use the Premises for any other restaurant concept owned by Lessee without Lessor's prior written consent provided said use does not conflict with other exclusive restaurant users within the shopping center.

**PAK N SAVE**

XXII. 22.1. Lessor recognizes Lessee's customers' need for adequate parking facilities in close proximity to the Leased Premises, and the importance of protecting such parking facilities against unreasonable or undue encroachment which is likely to result from long-term parking by patrons or employees of certain types of business establishments. Lessor further recognizes Lessee's interest in not having tenants occupying space in close proximity to the Leased Premises who create or cause excessive noise, litter or odor. To safeguard Lessee's interest in a clean, quiet and odor free environment and adequate parking for its customers, Lessor covenants and agrees that (a) within 300 feet of any front door of the Leased Premises, it shall not permit the operation of any restaurant (fast food or sit down) or places of instruction or a real estate office or beauty school or college, and (b) that it shall not permit the use or operation of any portion of the Shopping Center for the purposes of any entertainment or recreational facility. As used herein, "entertainment or recreational facility" includes, but is not limited to, a bowling alley, skating rink, pool hall, billiard room, game parlor, health spa or studio, gym, massage parlor, or tavern, dance hall, adult book store, or other place of public or private amusement.

XXIX. 29.1. Except with respect to the Target Store, Lessor covenants not to permit over 1,500 square feet of sales area (including isle space adjacent thereto) in any store in the Shopping Center, other than Lessee's to be devoted to the sale of food for off-premises consumption. In the event of a violation of this covenant, Lessee may cancel this Lease by notice to Lessor.

**PETSMART**

#30. Throughout the Term of this Lease and any renewal Periods, Landlord covenants and agrees that none of the following uses shall be conducted or permitted within the Shopping Center: nuisance; use causing loud noises or offensive odors; manufacturing facility; automobile repair shop; thrift store or liquidation outlet (it is agreed that the Burlington Coat Factory Warehouse is not considered to be a liquidation outlet); massage parlor; adult book store or movie house; coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except in conjunction with a restaurant permitted hereunder; night club; place of recreation (including but not limited to theater, bowling alley, skating rink, carnival, any business using loud speakers within the Common Area, game arcade and health spa) except that this restriction shall not apply to the movie theatre existing on the date of this Lease; church, kiosk or other like-kind structure; school of any nature; restaurants in excess of 20% of the aggregate Gross Floor Area of the Shopping Center; offices and professional uses in excess of 15% of the Gross Floor Area of the Shopping Center; or any other use inconsistent with the operation of a high quality retail shopping center. As used herein, "school" includes, but is not limited to, a beauty school,

86

1     barber college, reading room, place of instruction or any other operation catering primarily to
2     students or trainees rather than to retail customers, it being the intent of this provision that the
3     parking and other common facilities should not be burdened by either large scale or protracted
4     use. In addition, the following uses in or immediately adjacent to the Control Area must first
5     be approved in writing by Tenant: drive-thrus; restaurants; offices; and professional uses. As
6     long as the Premises are used by Tenant or any permitted subtenant or assignee to conduct
7     any part of Tenant's Primary Business, all other tenants in the Shopping Center shall be
8     prohibited from engaging in any part of Tenant's Primary Business. Except to the extent that
9     they may conflict with Tenant's Primary Business, Tenant shall not use or permit the Premises
10   to be used in violation of the restrictions attached as Exhibit J (this exhibit lists
11   exclusive restrictions for the following tenants: Target, Cost Rite Furniture, Big 3 Sporting
12   Goods, Carl's Jr., Ross Stores, Pier 1 Imports, Site for Sore Eyes, Brenden Theatre, Pac 'N
13   Save, Standard Brand Paints, Baskin-Robbins, Fashion Bug, Olive Garden, Sally's Beauty
14   Supply, Toys R Us, Red Lobster, Household Finance Corp, Evenson Card Shops d.b.a.
15   Parties Galore, Anna's Linens, Five Dollar Clothing Store, Fabri-Centers of California,
16   Wherehouse, and Burlington). Tenant also shall not use the Premises or permit the Premises
17   to be used for a purpose in conflict with exclusive rights granted in the future to which Tenant
18   has consented. Tenant shall not unreasonably withhold or delay consent, upon request by
19   Landlord, to exclusive use rights which: (a) do not conflict with Tenant's Primary Business,
20   (b) are the primary business of the lessee involved, (c) are for the benefit of a lessee occupying
21   at least 15,000 sq. ft. of Gross Floor Area, and (d) expire whenever the lessee involved ceases
22   to use its premises for those purposes.

23
24   **PLAY IT AGAIN SPORTS**
25
26   #3.  Use. . . . Merchandise must be displayed in keeping with Exhibit "E".
27
28   **RED LOBSTER**
29
30   #8. . . . Lessee shall be permitted to use the Premises for any other restaurant concept owned
31   by Lessee without Lessor's prior written consent provided said use does not conflict with
32   other exclusive restaurant users within the shopping center.
33
34   **ROSS DRESS FOR LESS**
35
36   #3.1  Landlord hereby leases the Store to Tenant together with all easements, rights and
37   privileges appurtenant thereto. Tenant has entered into this Lease in reliance upon
38   representations by Landlord that the Shopping Center is and will remain retail in character,
39   and further, no part of which shall be used as a theater (except as shown on the Site Plan)
40   auditorium, meeting hall, school, church or other place of public assembly, "flea market",
41   gymnasium, health club, dance hall, billiard or pool hall, massage parlor, video game arcade,
42   bowling alley, skating rink, car wash, facility for the sale, leasing or repair of motor vehicles,
43   night club or adult book or adult video tape store (which are defined as stores at least 10% of
44   the inventory of which is not available for sale or rental to children under 15 years old because
45   such inventory explicitly deals with or depicts human sexuality). No restaurant or other
46   business selling food or beverages for on-premises consumption and having either 2500 sq. ft.
47   or more than 15 seats ("Food Service Establishment") shall be permitted within 500 feet of the
48   Store. Food Service Establishments may be permitted on Pad 5, but not to exceed 5000 sq.
49   ft. in all.
50
51   #3.3. . . . The Site Plan is a material consideration for Tenant entering into this Lease, and no
52   significant change, alteration, or addition shall be made to the area on the Site Plan shown as
53   "Controlled Area", including but not limited to the configuration of the Common Areas,
54   methods of ingress and egress, direction of traffic, lighting, curbing, building heights and
55   stories, without the express written consent of Tenant, which shall not be unreasonably
56   withheld.
57
58   **SALLY BEAUTY SUPPLY**
59
60   #33. Landlord shall not enter into any leases for space in the Shopping Center with Lessees
61   engaged in the same or substantially the same business as Tenant; provided, however, that
62   nothing contained herein shall be deemed to prohibit or prevent Landlord from renewing or
63   extending the leases of presently existing tenants of the Shopping Center on substantially the

same terms and conditions, and nothing contained herein shall be deemed to impose any liability upon the Landlord if any presently existing Tenant of the Shopping Center begins operations which compete with Tenant's business, provided the lease of such pre-existing Tenant allows such operation.

**SCISSORS**

**#3. Use.** . . . secondary use shall be of the sale of related hair care products not to exceed 10% of the floor area . . .

**SEES CANDIES**

N/A

**SHOE PAVILION**

**#3. Use.** Landlord shall not allow more than 2 moderate to better priced shoe stores with the primary use women's shoes in the store space. This limitation does not include shoe stores where the primary use is men's, children's, and athletic shoes.

**SITE FOR SORE EYES**

**#33.** Landlord shall not lease to a direct competitor featuring a dispensing option offering "1-Hour" service. This provision shall not, however, prevent Landlord from having a full service optometrist doing business within the center, excepting the major tenants (Target, Pak 'N Pack, supermarket, drug, etc.)

**TAP PLASTICS**

N/A

**TARGET**

**#6.** Tenant shall conduct its business insofar as the same relates to Tenant's use and occupancy of the demised premises in a lawful manner and in strict compliance with all governmental laws, rules, regulations and orders applicable to the business of Tenant conducted in and upon the demised premises.

A.   No part of the Shopping Center located within the real property on Exhibit "A" hereto shall be used for other than retail sales or services, restaurants or commercial purposes, provided any retail service uses located in the Shopping Center shall be of the type defined below and shall not occupy more than 5% of the total Floor Area in such Shopping Center. Retail services uses shall mean financial institutions, real estate and stock brokerage offices, travel or insurance agencies and similar uses providing services directly to the public for retail fees.

B.   No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted:

1.   Any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any building in the Shopping Center; provided, however, that this prohibition shall not prohibit a paging system within a building.

2.   Any operation primarily used as a warehouse operation, and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

3.   Any "second hand" store or "surplus" store;

88

4.    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

5.    Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any building);

6.    Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

7.    Any central laundry, dry cleaning plant, or laundromat; provided, however, this prohibition shall not be applicable to on-site service oriented to pickup and delivery by the ultimate consumer, including nominal supporting facilities, as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

8.    Any automobile, truck, trailer or recreational vehicles sales, leasing, display or repair;

9.    Any bowling alley;

10.   Any skating rink;

11.   Any living quarters, sleeping apartments, or lodging rooms;

12.   Any veterinary hospital or animal raising facilities (except that this prohibition shall not prohibit pet shops);

13.   Any mortuary;

14.   Any establishment selling or exhibiting pornographic materials;

15.   Any bar, tavern, restaurant, or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds 60% of the gross revenues of such business;

16.   Any health spa;

17.   Any flea market, amusement arcade, pool or billiard hall, car wash, or dance hall;

C.    The following use and occupancy restrictions shall be applicable to the real property within Exhibit "A":

1.    No restaurant shall be located thereon within 450 feet of the Target store. Any building to be located on Pad 3 shall not exceed 7700 sq. ft., nor shall any such building be used for restaurant purposes. An additional Pad, not to exceed 4000 sq. ft., may be added east of Pad 4 or west of Pad 3 within the site plan without further approval of Target which may otherwise be required under the provisions of Section 2 of the lease.

2.    No more than 10% of the Floor Area may be used for office purposes;

3.    A theater or cinema complex may be located in the real property within Exhibit "A" in the location shown thereon. The consent of Tenant, which consent shall not be unreasonably withheld, shall be required in the event said theater or cinema complex is to be located in a different area within Exhibit "A"

11/20/96    16:04   FAX 510 427 3707        SIERRA PACIFIC                    ☒027



## TOGO'S EATERY

**#3.   Use.**   Excluding existing tenants or their replacements, Landlord shall restrict leasing space to a business such as Subway, Blimpie's, Schlotsky's, Arby's, and Port of Subs.

## TOYS 'R' US

**#14.01(d).**   Subject to rights of tenants under existing leases or renewals (assignments and sublets) thereof (but not replacements or extensions) so long as same are in full force and effect, Landlord shall not operate, lease or permit any other store located in the Shopping Center, or on any other property owned or leased by Landlord or any affiliate of Landlord in the "Adjoining Center" shown on the Site Plan, to be used for the sale of toys; outdoor play equipment; wheel goods; layettes, infant and juvenile food; infant and juvenile health and beauty aids; infant and juvenile furnishings; infant and juvenile books and records; family and adult games; computers and accompanying software (other than a full-line computer store such as "Computerland" or "Radio Shack"); video and electronic games and equipment; candy; juvenile sporting goods; infant, juvenile and children's clothing, apparel, shoes, accessories, or furnishings, or as a juvenile hair cutting salon or juvenile photo studio.  Notwithstanding anything to the contrary in this Section 14.01(d), the sale or distribution of any one or all of the above-mentioned items in the lesser of (i) any store devoting not more than 2500 sq. ft. of the gross leasable floor area or (ii) 10% of the gross leasable floor area, in the aggregate, shall not be precluded.

**(e).**   Subject to rights of tenants under existing leases or renewals (assignments and sublets) thereof (but not replacements or extensions) so long as same are in full force and effect, Landlord shall not hereafter lease, rent or permit any other premises in the Shopping Center to be used or occupied as a theater, an automobile repairs shop (mechanical or otherwise), a fast food restaurant incorporating a coin or token operated amusement room, a bowling alley, a billiard parlor, a sales office or showroom for auto- mobiles or other vehicles, an establishment serving alcoholic beverages for on premises consumption, including, without limitation, bars and night clubs (but excluding restaurants which may include a bar with a cocktail lounge in the Demised Premises and in the area shown on the Site Plan as "Permitted Restaurant Area"), a funeral parlor, a massage parlor, a discotheque or dance hall, a health spa or similar type business, a skating rink, a car wash, an off-track betting establishment, an amusement or game room, or a so-called "flea market" or for industrial or residential purposes.

**(f).**   Landlord shall not lease, rent or permit any other premises in the Shopping Center to be used or occupied as an adult book store or a store selling or exhibiting pornographic materials.  As used herein, "an adult book store or store selling or exhibiting pornographic materials" shall include, without limitation, a store displaying for sale or exhibition books, magazines, or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently of or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally "X" or unrated by the Motion Picture Rating Association, or any successor thereto.  For purposes hereof, the "incidental" exhibition, sale or rental of such "sex publications" and "sex videos" of any of such items in connection with the overall business of tenants or occupants in the Shopping Center shall not be deemed a violation hereof. "Incidental" shall be

90

11/20/96    16:07    FAX 510 42    707    SIERRA PACIFIC    @001

1    **WORKWEAR WORLD CA106 INC.**
2
3    <u>#3.  Use.</u>  While this lease or any renewal or extension thereof is in effect and Tenant is not in
4    violation of any of the terms and conditions thereof, LL shall not permit any future Tenant
5    whose primary use is the sale of "work wear" into the shopping center.  Primary use shall be
6    defined as a Tenant who is utilizing 15% or greater of sales floor area for the sale of "work
7    wear".
8
9    For the purpose of this Lease, work wear shall mean any one of or a combination of coveralls,
10   overalls, matched work sets, work pants, work shirts, safety boots, safety shoes as
11   manufactured by work clothing and work features