Harmeet K. Dhillon, Esq. (SBN 207873)
David L.W. Lin, Esq. (SBN 243448)
DHILLON & SMITH
214 Grant Avenue, Suite 400
San Francisco, CA 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Defendants
Sukpran and Gurmeet Gill

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| BASKIN-ROBBINS FRANCHISED SHOPS LLC and BR IP HOLDER LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SUKPRAN GILL and GURMEET GILL,<br><br>Defendants. | Case No. C07-02441 PJH<br><br>DECLARATION of SUKPRAN GILL IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT to FED. R. CIV. P. 12(b)(1)<br><br>Date: November 7, 2007<br>Time: 9:00am<br>Ct. Room: 3 |
|---|---|

I, Sukpran "John" Gill (informally known as "John"), declare under penalty of perjury and of my own personal knowledge as follows (unless it is indicated that I make such statements upon information and good-faith belief):

1.  I am an adult above the age of 18 years of age.

2.  I am a defendant in the above-captioned lawsuit. The other defendant, Gurmeet Gill, my wife.

*Baskin-Robbins Franchised Shops et al. v. Gill et al., C07-02441*                    **GILL DECLARATION ISO MOTION to DISMISS PURSUANT TO Fed.R.Civ.P. 12(b)(1)**

**Page 1**

3. I have been a Baskin-Robbins franchisee since July 16, 1992.

**The Pittsburg Franchise Agreements**

4. Gurmeet Gill and I have been franchisees of a Baskin-Robbins ice cream store located at 4493 Century Boulevard, Pittsburg, California since 1996. The franchise agreement pursuant to which we operate our Pittsburg location is between Gurmeet and myself on the one hand and "Baskin-Robbins USA, CO., a California Corporation, whose principal place of business is 31 Baskin-Robbins Place, Glendale, California 91201)." Attached as Exhibit 1 is a copy of our franchise agreement for the Pittsburg store (the "Pittsburg Franchise Agreement").

5. The Pittsburg Franchise Agreement was extended by a written agreement between Gurmeet and myself on the one hand and "Baskin-Robbins USA CO., a California corporation" as as of October 21, 1999 by a document entitled "Franchise Royalty Conversion Offer: Amendment to Franchise Agreement," ("Pittsburg Franchise Conversion Amendment"), a copy of which is attached as Exhibit 2.

6. The Pittsburg Franchise Agreement was further extended by letter dated May 3, 2006 to Gurmeet and myself from "Dunkin' Brands," a copy of which is attached as Exhibit 3.

**The Concord Franchise Agreement**

7. I have been the franchisee of a Baskin-Robbins ice cream store located at 1924 Grant St., Suite #2, Concord, California pursuant to a written franchise agreement dated April 22, 2004 between myself as an individual on the one hand and "Allied Domenq Quick Service Restaurants" on the other hand ("Concord Franchise Agreement"), which is attached as Exhibit 4.

8. The Concord Franchise Agreement states that "Baskin-Robbins USA Co., a California corporation … [is an] indirect wholly owned subsidiar[y] of Allied Domenq PLC, a

*Baskin-Robbins Franchised Shops et al. v. Gill et al., C07-02441*   GILL DECLARATION ISO MOTION to DISMISS PURSUANT TO Fed.R.Civ.P. 12(b)(1)

**Page 2**

publicly traded United Kingdom company." According to the terms of the Concord Franchise Agreement, it is set to expire on June 30, 2017.

### My Relationship With Baskin-Robbins

9.  My day-to-day dealings with Baskin-Robbins personnel concerning the operation of both the Pittsburg and Concord franchises have been with personnel based in California.

10. At the time I signed each of the Agreements with any Baskin-Robbins entity, I was led to believe that the Baskin-Robbins franchisor was a California corporation.

11. To the best of my knowledge, neither I nor Gurmeet are parties to any contract involving BR IP Holder LLC, listed in the lawsuit as a plaintiff. Nor, to my knowledge, have I ever made any representations to or had any direct dealings with BR IP Holder.

12. Both the Pittsburg and Concord stores consistently have performed above average for the Baskin-Robbins franchise system, with gross sales well in excess of the average stand-alone Baskin-Robbins in the Northern California area.  The Pittsburg Store consistently had sales 60% above average and the Concord Store consistently had sales 100% above average.  Both stores consistently receive favorable performance ratings.

### Notice of Default and Termination

13. Gurmeet and I were operating the Pittsburg Franchise, and I was operating the Concord Franchise, without incident through early this year. As noted above, our locations are successful, and we were paying our franchise fees and royalties to Baskin-Robbins as required by our agreements. Baskin-Robbins had expressed no concerns about the running of the stores in recent memory.

14. On or about May 1, 2007, without any prior warning, Gurmeet and I received copies of a three-page letter dated April 30, 2007 from Jeffrey Karlin, identifying himself as counsel for Baskin-Robbins Franchised Shops LLC, entitled "Notice of Default and

*Baskin-Robbins Franchised Shops et al. v. Gill et al., C07-02441*     GILL DECLARATION ISO MOTION to DISMISS PURSUANT TO Fed.R.Civ.P. 12(b)(1)

Page 3

Termination" and listing both the Pittsburg and Concord franchise locations. A copy of Mr. Karlin's letter ("Termination Notice") is attached as Exhibit 5.

15. The Termination Notice accused both Gurmeet and me of breaching the franchise agreements by my alleged participation in owning and/or operating an ice cream store known as "Country Creamery" in American Canyon, California. According to the letter, this alleged involvement in the Country Creamery was in violation of the terms of covenants not to compete with Baskin-Robbins during and after the term of our franchise agreements.

16. The Termination Notice incorrectly stated that I "own and/or operate" the Country Creamery store. This is false. The store is owned by my father, Isher Gill, and is operated by him and his wife, my mother, Maninder Gill. From time to time, my brother Nev Gill helps operate the store. My family, including my parents, have a long history as ice cream store owners and operators, including experience as frozen yogurt and ice cream store owners.

17. The Termination Notice incorrectly stated that the Country Creamery "is located nearby your franchises and franchises owned by other Baskin-Robbins franchisees." In fact, the Country Creamery is located 32 miles from the Pittsburg location, 23 miles from the Concord location, and 1 mile from the nearest Baskin-Robbins franchise, which is in a different city (Vallejo) and a different county (Sonoma). Copies of internet-generated maps showing these distances are attached as Exhibit 6.

18. On its second page, the Termination Notice stated that my alleged ownership and/or operation of the Country Creamery constituted a default of the two franchise agreements, constituted fraud, could not be "cured," and constituted grounds for terminating the Franchise Agreements. The Termination Notice stated that I should immediately cease using any Baskin-Robbins "methods," any "proprietary marks of Baskin-Robbins," that I should comply with the

*Baskin-Robbins Franchised Shops et al. v. Gill et al., C07-02441*  **GILL DECLARATION ISO MOTION to DISMISS PURSUANT TO Fed.R.Civ.P. 12(b)(1)**

**Page 4**

"post-termination obligations set forth in the Franchise Agreements; and that I should "cease [my] involvement in and ownership of the Country Creamery store."

19. The Termination Notice stated, in the alternative, that "if it should be determined as a matter of law that your defaults are curable, then Baskin-Robbins hereby gives you thirty (30) days from the receipt of this Notice in which to do those acts which you contend constitute a "cure" of the defaults under the Franchise Agreements."

20. The Termination Notice stated that if I attempted to contest Baskin-Robbins' allegations and immediate termination notice, Baskin-Robbins would sue me for damages and to enforce the termination. However, the Termination Notice stated, that "if it should be determined that there is no good cause for termination of the Franchise Agreements then Baskin-Robbins will consider this Notice to be void."

21. The Termination Notice concluded with the statement that "if at any time it is your position that the termination is valid and enforceable, please advise me immediately in writing, so that we can take appropriate legal steps to completely end the relationship."

### Further Communications and Conduct by Baskin-Robbins

22. The Termination Notice was confusing and contradictory in that it stated that we were terminated as franchisees without any opportunity to cure; that in case a court ruled that we had the right to cure, then we had to "cure" within 30 days, but did not say what "cure" would satisfy Baskin-Robbins; that if we contested Baskin-Robbins' allegations, it would sue us; and that the notice was void altogether if it was determined that Baskin-Robbins had no good cause for termination, without saying or implying how it would be determined whether the notice was valid or void.

23. Because of these multiple contradictions, I called Mr. Karlin, the author of the letter, twice on May 2, 2007, to explain that the Country Creamery was owned by my father, not

*Baskin-Robbins Franchised Shops et al. v. Gill et al., C07-02441*     **GILL DECLARATION ISO MOTION to DISMISS PURSUANT TO Fed.R.Civ.P. 12(b)(1)**

**Page 5**

myself, and to better understand whether Baskin-Robbins in fact wanted me and Gurmeet immediately to cease operating the Baskin-Robbins stores and start tearing out all Baskin-Robbins materials. I was particularly surprised that given our two locations' high volume and profits (and correspondingly, franchise and royalty fees to Baskin-Robbins), Baskin-Robbins would rather have us de-identify the stores as Baskin-Robbins locations (the term de-identify is a franchise term for removing all logos and trademarks from the premises and discontinuing the operation of the location as a franchisee, whereupon the former franchisee operates the locations as some other business or terminates operations altogether).

24. I did not reach Mr. Karlin on my first attempt to clarify the meaning of his letter and whether he wanted us to discontinue operation of the stores as Baskin-Robbins. When I called a second time, I was able to reach him and we had a discussion regarding the meaning of his letter and whether he wanted us to continue operating the stores as Baskin-Robbins, or shut them down? I offered to shut the stores down if that was what Baskin-Robbins really wanted.

25. During our May 2, 2007 telephone conversation, Mr. Karlin specifically retracted the Termination Notice's demand that we cease use of the Baskin-Robbins trademarks and methods, and told me that Gurmeet and I should continue operating the two franchises as we had before, pending further discussions between us as to how to proceed. I told him that I would continue to operate the two locations as Baskin-Robbins as he directed.

26. I immediately contacted and retained a northern California franchise law attorney, Bruce Napell, concerning the Termination Notice. Mr. Napell. Mr. Napell sent a letter to Mr. Karlin on May 8, 2007, six days after I spoke to Mr. Karlin. A copy of the letter is attached as Exhibit 7.

27. However, on May 7, 2007, or five days after I spoke to Mr. Karlin and he retracted the Termination Notice's demand that we cease operating the Baskin-Robbins

*Baskin-Robbins Franchised Shops et al. v. Gill et al., C07-02441*  **GILL DECLARATION ISO MOTION to DISMISS PURSUANT TO Fed.R.Civ.P. 12(b)(1)**

locations, and before Mr. Napell had had a chance to respond to the Notice of Termination, Baskin-Robbins filed the original complaint in this matter.

28. Gurmeet and I were served with the original complaint on May 25, 2007.

29. Since this lawsuit was initiated, I have had numerous communications with Baskin-Robbins personnel regarding the orderly running of our two stores.

30. I have continued to send my weekly royalty payments and statements of sales to Baskin-Robbins, without incident, and Baskin-Robbins has continued to accept those payments.

31. I have continued to order ice cream from Baskin-Robbins to replenish the supplies in both stores, and Baskin-Robbins has continued to sell and deliver ice cream to both locations, without incident or objection.

32. I have received regular communications from Baskin-Robbins concerning advertising, promotions, and marketing as would any other Baskin-Robbins franchisee. In fact, Bill Gault invited me to attend a Huddle meeting at the Concord Holiday Inn Hotel on August 8, 2007. I understand from these communications and from Baskin-Robbins' continued business relationship with us that Baskin-Robbins has no real objection to my use of the trademarks and methods pending determination of the contractual dispute between us as to whether or not it was within its rights to terminate the franchise agreements without notice or opportunity to cure.

33. On June 12, 2007, Baskin-Robbins filed a motion for a preliminary injunction against Gurmeet and me asking the Court to order us to stop operating the two locations as Baskin-Robbins. Again, I was surprised by this because Mr. Karlin had earlier retracted Baskin-Robbins' demand that we stop operating the stores as Baskin-Robbins and stop using the Baskin-Robbins trademarks.

34. Baskin-Robbins withdrew its motion for a preliminary injunction on July 19, 2007. I understand that it has not been re-filed.

*Baskin-Robbins Franchised Shops et al. v. Gill et al., C07-02441*   **GILL DECLARATION ISO MOTION to DISMISS PURSUANT TO Fed.R.Civ.P. 12(b)(1)**

**Page 7**

35. On July 19, 2007, Baskin-Robbins filed a First Amended Complaint adding a claim of fraud and naming me, Gurmeet, and also my elderly father Isher Gill as defendants in the fraud claim. They made no specific allegations against either Gurmeet or my father concerning fraud. My family took this tactic as an attempt to coerce us into settlement or abandoning the stores to Baskin-Robbins while the breach of contract dispute was being decided.

36. After my counsel in this lawsuit, Dhillon & Smith, contacted counsel for Baskin-Robbins on August 28, 2007 about the numerous inaccuracies in the First Amended Complaint, including naming my wife and father as defendants in the fraud claim without any basis, Baskin-Robbins voluntarily withdrew the First Amended Complaint and filed a Second Amended Complaint on September 4, 2007 dismissing my father as a defendant and dismissing my wife as a defendant in the fraud count. The Second Amended Complaint also deleted various references to state law claims throughout.

37. Throughout this time, Baskin-Robbins continues to sell our two stores ice cream for sale to the public, continues to accept our franchise royalty fees and advertising fees, and continues to communicate with us as with any other Baskin-Robbins franchise concerning joint marketing, advertising and promotional efforts using the Baskin-Robbins trademarks.

38. Throughout the past several months, since the filing of this lawsuit, we have been assured by Baskin-Robbins that we should continue to operate the Baskin-Robbins stores pending resolution of the contract dispute. It is my understanding that Baskin-Robbins has directly communicated with third parties concerning the transfer of both locations to new owners, and that Baskin-Robbins wishes to see both locations continue as Baskin-Robbins locations using the Baskin-Robbins trademarks and methods.

39. Throughout this litigation, I have offered to shut down the two stores and stop using the Baskin-Robbins trademarks upon Baskin-Robbins' clear direction.

*Baskin-Robbins Franchised Shops et al. v. Gill et al., C07-02441*    **GILL DECLARATION ISO MOTION to DISMISS PURSUANT TO Fed.R.Civ.P. 12(b)(1)**

**Page 8**

40. Since the time that I received the Termination Notice, I have had no contact with the Country Creamery store, other than to drop my children there during the summer to visit their grandparents.

DATED: September 25, 2007.

By: _____
Sukpran "John" Gill