# EXHIBIT 1



FRANCHISE AGREEMENT

# BASKIN-ROBBINS ®
# FRANCHISE AGREEMENT
## CONTENTS

|   | PAGE |
|---|---|
| RECITALS | 1 |
| 1. DEFINITIONS | 1 |
| 2. GRANT OF FRANCHISE | 2 |
| 3. FEES | 2 |
| 4. RENEWAL OF FRANCHISE | 3 |
| 5. GENERAL RETAIL UNIT OPERATIONS STANDARDS | 3 |
| 6. PRODUCTS AND SUPPLIES | 4 |
| 7. SUPPLY OF PRODUCTS | 4 |
| 8. MAINTENANCE OF THE RETAIL UNIT | 4 |
| 9. FRANCHISEE AND EMPLOYEE MANAGEMENT AND TRAINING | 5 |
| 10. PROPRIETARY NAMES AND MARKS | 5 |
| 11. TRADE SECRETS | 6 |
| 12. ADVERTISING AND MARKETING SUPPORT | 6 |
| 13. ACCOUNTS AND RECORDS | 7 |
| 14. INSURANCE AND INDEMNIFICATION | 8 |
| 15. COVENANTS | 9 |
| 16. TERMINATION OF FRANCHISE | 10 |
| 17. OBLIGATIONS UPON EXPIRATION OR TERMINATION | 11 |
| 18. TRANSFER, RIGHT OF FIRST REFUSAL | 12 |
| 19. TRANSFER UPON DEATH, DISABILITY OR MENTAL INCAPACITY | 13 |
| 20. NOTICES | 13 |
| 21. RELATIONSHIP OF PARTIES | 13 |
| 22. SEVERABILITY AND CONSTRUCTION | 13 |
| 23. APPROVALS AND WAIVERS | 14 |
| 24. ENTIRE AGREEMENT | 14 |
| 25. APPLICABLE LAW | 14 |
| 26. CONTINUING OBLIGATIONS | 14 |
| 27. LIQUIDATED DAMAGES | 15 |
| 28. INTERNAL DISPUTE RESOLUTION AND MEDIATION | 15 |
| 29. BANKRUPTCY AND INSOLVENCY | 15 |
| 30. LIMITATION OF ACTIONS | 16 |
| 31. ACKNOWLEDGEMENTS | 16 |

F:\LEGAL\UFOC\UFOC95-6\fltd-docs (c.2)

Baskin-Robbins Retail Unit No. __2354__

# BASKIN-ROBBINS®
# FRANCHISE AGREEMENT

____ New Retail Unit                               ____ Franchise Agreement Only
____ Relocation of Retail Unit                     XX   Traditional Retail Unit
 XX  Transfer of Retail Unit                       ____ Non-Traditional Retail Unit

**ADDENDA**:

____ Retail Unit Construction Agreement
____ Dunkin' Donuts/B-R Combo Program
____ Miami Subs/B-R Combo Program
____ Mobile Sales Unit Agreement
____ Retail Unit Within Host Business

THIS FRANCHISE AGREEMENT ("Agreement") is made and entered into this _26_ day of _October_ 1996, by and between BASKIN-ROBBINS USA, CO., a California corporation, whose principal place of business is 31 Baskin-Robbins Place, Glendale, California 91201 ("BASKIN-ROBBINS"), and __SUKPRAN & GURMEET GILL__ whose home address or principal place of business is __2061 GRANT STREET, #205, CONCORD, CA 94520__ ("FRANCHISEE").

## RECITALS

A.  BASKIN-ROBBINS and its affiliates, as a result of the expenditure of time, skill, effort and money, have developed a distinctive system ("System") relating to the establishment and operation of food service establishments and other techniques for the distribution of Baskin-Robbins ice cream and other authorized products and services.

B.  The distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, decor, color scheme and furnishings; special menu items; standards, specifications and procedures for operations; quality of products and services offered; procedures for inventory and management control; training and assistance; and advertising and promotional programs, all of which may be changed, improved and further developed by BASKIN-ROBBINS from time to time.

C.  BASKIN-ROBBINS identifies the System by means of certain trade names, service marks, logos, emblems and other indicia of origin and identifies Baskin-Robbins ice cream and other products by means of certain trademarks, the foregoing including, without limitation, the trade names, service marks, trademarks, logos, emblems and other indicia of origin, and such other trade names, service marks, trademarks, logos, emblems and other indicia of origin as may hereafter be designated by BASKIN-ROBBINS in writing for use in connection with the System or the sale of Baskin-Robbins ice cream or other authorized products ("collectively the Proprietary Names and Marks").

D.  BASKIN-ROBBINS is a wholly-owned subsidiary of Baskin-Robbins Incorporated a Delaware corporation ("B-R Incorporated"). BASKIN-ROBBINS has been licensed by B-R Incorporated to use the Proprietary Names and Marks in conjunction with the granting of franchises for the operation of Baskin-Robbins Retail Units (as defined below in Section 1.4), upon terms and conditions which have been approved by B-R Incorporated.

E.  FRANCHISEE desires to enter into the business of operating a Retail Unit under the System and to purchase and sell Baskin-Robbins products and services and wishes to obtain a franchise from BASKIN-ROBBINS for that purpose.

F.  FRANCHISEE understands and acknowledges the importance of BASKIN-ROBBINS' high standards of quality, cleanliness, appearance and service, and the necessity of operating the Retail Unit in conformity with these standards and specifications in order to enhance the goodwill which BASKIN-ROBBINS has created through the development and improvement of the System.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.  **DEFINITIONS**

    As used in this Agreement, the following terms shall have the following meanings:

    1.1.   "Products" shall mean and refer to the following products:

        1.1.1.   ice cream, ice milk, sherbets, water ices, yogurts, frozen desserts, syrups, toppings, confections, novelties, food, beverages and fountain ingredients, all of a variety of kinds or flavors, made in accordance with the formulas or specifications designated by BASKIN-ROBBINS and identified by the Proprietary Names and Marks; and

        1.1.2.   such other products as may be specified from time to time in writing by BASKIN-ROBBINS for sale in the Retail Unit.

    1.2.   "Gross sales" shall include all revenue from the sale of all Products and services and all other income of every kind and nature related to the Retail Unit, whether for cash or credit and regardless of collection in the case of credit; provided, however, that "gross sales" shall not include any sales taxes or other taxes collected from customers by FRANCHISEE for transmittal to the appropriate taxing authority.

    1.3.   "Supplies" shall mean and refer to paper goods, materials and other accessories used in connection with the serving and sale of Products, of such quality, uniformity, design and performance as are approved from time to time by BASKIN-ROBBINS.

    1.4.   "Retail Unit" shall mean the BASKIN-ROBBINS retail business for which this franchise is granted

    1.5.   "Premises" shall mean the space within which the Retail Unit is operated, together with all the fixtures, furnishings, equipment, inventory and supplies located therein or attached thereto.

F:\LEGAL\UFOC\UFOC95-6\EXHIBITS\EXHIB-C                1

1.5. "Premises" shall mean the space within which the Retail Unit is operated, together with all the fixtures, furnishings, equipment, inventory and supplies located therein or attached thereto.

1.6. "Lease" shall mean the document pursuant to which the FRANCHISEE holds possession of the Premises either by: (i) a lease between FRANCHISEE and a Landlord, or (ii) a sublease between FRANCHISEE and BASKIN-ROBBINS.

1.7. "Lessee" shall mean the FRANCHISEE as a party to the Lease.

2. GRANT OF FRANCHISE

2.1. Grant of Franchise. BASKIN-ROBBINS hereby grants to FRANCHISEE the right, and FRANCHISEE accepts the obligation, subject to the terms and conditions herein, to operate a Retail Unit only at the Premises located at ___4493 CENTURY BLVD,___ in the City of ___PITTSBURG___, County of ___CONTRA COSTA___, State of ___CALIFORNIA___, including the right to use, solely in connection with such Retail Unit, the Proprietary Names and Marks and the System as they may be changed, improved and further developed from time to time (the "Franchise").

2.2. Term. The Franchise shall commence upon FRANCHISEE'S satisfaction, and/or the occurrence, of all of the following:

a. Initial Training. Successful completion by FRANCHISEE, or its designated manager, prior to opening of the Retail Unit, of BASKIN-ROBBINS' then current initial training program at the Baskin-Robbins Training Center located in Southern California or other authorized location. Such program is more fully described in Section 9 of this Agreement.

b. Financing Commitments. Prompt delivery upon request by BASKIN-ROBBINS, of evidence that FRANCHISEE has obtained binding commitments for all financing needed, if any, to meet all obligations for opening the Retail Unit.

c. Execution of all Documents. Execution of all related documents in their then current form as provided by BASKIN-ROBBINS.

d. Payment of Monies. Payment to BASKIN-ROBBINS of all monies due prior to opening of the Retail Unit, including but not limited to purchase price, cost of inventory, rent and/or security deposit if required under the Lease.

e. Possession of Premises. Either (a) entry by FRANCHISEE into: (i) a Lease (containing those provisions required by BASKIN-ROBBINS); (ii) an agreement entitling FRANCHISEE to enter into a Lease (containing those provisions required by BASKIN-ROBBINS); or (iii) a Sublease with BASKIN-ROBBINS for premises approved by BASKIN-ROBBINS at its sole discretion, or (b) providing BASKIN-ROBBINS with reasonably sufficient evidence of FRANCHISEE'S right to possession of the Premises on terms satisfying BASKIN-ROBBINS' then current lease policy for a period of time equal to, or greater than that for which the franchise is to be granted.

f. Retail Unit Opening. The opening for business to the public of the Retail Unit.

Unless otherwise terminated in accordance with the provisions of this Agreement, this Franchise shall be for a term of __5 YEARS__ commencing as of the date the Retail Unit opens for business, the "Commencement Date." The Commencement Date will be confirmed by a writing signed by the parties and attached hereto. FRANCHISEE agrees to operate the Retail Unit for the entire term. The Franchise is non-exclusive, except as otherwise expressly stated in Paragraph 2.3 of this Agreement.

2.3. BASKIN-ROBBINS and its affiliates reserve and retain the right to construct and operate, and to authorize and franchise others to construct and operate, additional Retail Units anywhere in the world, except at the Premises. Nothing in this Agreement limits the right of either BASKIN-ROBBINS or its affiliates, to sell, distribute and/or to provide products and services of any kind, under the Proprietary Names and Marks or otherwise, anywhere except at the Premises.

3. FEES

3.1. Franchise Fee. The initial franchise fee is $ __-0-__. Upon execution of this Agreement Franchisee shall deliver to BASKIN-ROBBINS, the amount of $ __-0-__. The balance of the franchise fee is due on or before the Retail Unit opens for business. BOTH THE DEPOSIT AND THE BALANCE OF THE FRANCHISE FEE ARE FULLY EARNED UPON RECEIPT AND ARE NON-REFUNDABLE.

3.2 Grand Opening Fee. If this is the initial term of the franchise, upon execution of this Agreement FRANCHISEE shall deliver to BASKIN-ROBBINS a grand opening fee in the amount of $1,000.00 which shall be applied towards the advertising and promotion of the opening of the Retail Unit.

3.3 Royalty Fee. FRANCHISEE shall pay to BASKIN-ROBBINS, a continuing monthly royalty fee in an amount equal to [ X ] one-half percent (.5%) (for a Traditional Retail Unit) or [ ] _____ (for a Non-Traditional Retail Unit) of the gross sales of the Retail Unit during the term hereof. In addition to the foregoing, if any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of Royalty Fees by the FRANCHISEE under this Agreement, the FRANCHISEE shall pay to the BASKIN-ROBBINS a sum equal to the amount of such tax as an additional Royalty Fee (but this provision shall not apply to Federal or Minnesota income taxes imposed upon the BASKIN-ROBBINS).

3.4. Advertising Fee. FRANCHISEE shall also make the monthly contributions for advertising specified in Section 12 of this Agreement.

3.5. Payment of Monthly Fees. All monthly payments specified in this Section 3 shall be paid on or before the tenth (10th) day of each month on the gross sales of the Retail Unit for the preceding calendar month, and shall be submitted to BASKIN-ROBBINS, as appropriate, at file #51040, Los Angeles, California 90074-1040, or at the address which BASKIN-ROBBINS shall specify, together with any reports or statements required under Section 13 hereof. All amounts payable by FRANCHISEE to BASKIN-ROBBINS under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies BASKIN-ROBBINS may have. Receipt of any check, draft or other commercial paper shall not constitute payment until BASKIN-ROBBINS shall have collected all the funds therefrom. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees. Any dishonored and returned checks will not be redeposited but shall be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount of the payment tendered, plus the interest thereon as provided in this Agreement, plus the highest late charge amount allowable by law for each such non-payment to defray expenses of handling, processing and bookkeeping.

F:\LEGAL\UFOC\UFOC95-6\EXHIBITS\EXHIB-C                    2

## 4. RENEWAL OF FRANCHISE

FRANCHISEE may, at its option, renew the Franchise granted hereunder for one (1) additional term (the "renewal term") of five (5) years or the remainder of the Lease term, whichever is less, if the following conditions shall have been met prior to renewal:

4.1. FRANCHISEE shall give BASKIN-ROBBINS written notice of FRANCHISEE'S election to renew not less than six (6) months nor more than twelve (12) months prior to the end of the initial term of this Agreement;

4.2. FRANCHISEE shall, in a manner satisfactory to BASKIN-ROBBINS, make or have substantially completed such renovation and modernization of the Premises as BASKIN-ROBBINS may reasonably require to reflect the then-current standards and image of the System, including, without limitation, replacement or renovation of signs, equipment, furnishings, fixtures and decor;

4.3. FRANCHISEE shall not be in default of any provision of this Agreement, any amendment hereof or successor hereto, the Lease, or any other agreement between FRANCHISEE and BASKIN-ROBBINS, or their subsidiaries or affiliates; and FRANCHISEE shall have substantially complied with all the terms and conditions of such agreements during the respective terms thereof;

4.4. FRANCHISEE shall have satisfied all monetary obligations owed by FRANCHISEE to BASKIN-ROBBINS and Lessor, and their subsidiaries and affiliates, and shall have timely met those obligations throughout the term of this Agreement;

4.5. FRANCHISEE shall execute, for the renewal term, BASKIN-ROBBINS' then-current form of Retail Unit franchise agreement, which agreement shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement, including, without limitation, a higher percentage royalty fee and advertising contribution;

4.6. FRANCHISEE shall execute a general release of BASKIN-ROBBINS and its officers, directors and employees, in their corporate and individual capacities, applicable to the expiring Franchise Agreement and related Sublease, in a form satisfactory to BASKIN-ROBBINS;

4.7. FRANCHISEE shall comply with BASKIN-ROBBINS' then-current qualification and training requirements;

4.8. FRANCHISEE shall (a) have entered into one of the following: (i) a Lease (containing those provisions required by BASKIN-ROBBINS); (ii) an agreement entitling FRANCHISEE to enter into a Lease (containing those provisions required by BASKIN-ROBBINS); or (iii) a Sublease with BASKIN-ROBBINS for premises approved by BASKIN-ROBBINS at its sole discretion, or (b) provided BASKIN-ROBBINS with reasonably sufficient evidence of FRANCHISEE'S right to possession of the Premises on terms satisfying BASKIN-ROBBINS' then current lease policy for a period of time equal to, or greater than that for which the franchise is to be granted, and

4.9. FRANCHISEE shall deliver the sum of $200.00 which shall be used towards costs and expenses associated with updating and maintaining the Store Operations Management Guide ("Operations Manual").

## 5. GENERAL RETAIL UNIT OPERATIONS STANDARDS

5.1. FRANCHISEE agrees to use its best efforts to enhance the goodwill which BASKIN-ROBBINS has created for the Proprietary Names and Marks and for the System, including, without limitation, operating the Retail Unit and promoting the retail sale of Products and services in such manner as will further enhance the goodwill of, and customer demand for, Products and services.

5.2. In order to promote and protect the value of the Proprietary Names and Marks and the System, including the goodwill and reputation of the Retail Units and the business thereof, and the business interests of the parties hereto, and to insure optimum quality control as to the Products and services provided and sold in the Retail Units, FRANCHISEE acknowledges and agrees that substantial uniformity must be maintained in the quality, type and standard of Retail Units similar to that franchised hereunder, and in the facilities, Products, services and operations thereof. Therefore, FRANCHISEE agrees to operate the Retail Unit in accordance with the provisions of this Agreement and such other of BASKIN-ROBBINS' reasonable requirements with respect to the operation of Retail Units as may be prescribed to FRANCHISEE from time to time (hereinafter collectively referred to as the "Standards").

5.3. The Standards shall include the Operations Manual receipt of which, FRANCHISEE hereby acknowledges, and the Rules for Operation of a Retail Unit ("Rules"), and the BASKIN-ROBBINS refurbishing requirements. FRANCHISEE acknowledges that changes in the Standards may become necessary and/or appropriate from time to time, and agrees to comply with such modifications, revisions and additions thereto which BASKIN-ROBBINS, in the good faith exercise of its judgment, believes to be necessary and/or appropriate.

5.4. FRANCHISEE acknowledges that the Standards and the manuals created for, or approved for use in, the operation of the Retail Unit are copyrighted. FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

5.5. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Retail Unit and insure that they are kept current and up to date. In the event of any dispute as to the contents of the Standards, the terms of the master copy(s) maintained by BASKIN-ROBBINS shall be controlling.

5.6. FRANCHISEE acknowledges and agrees that the System, the Products and services which the System offers, and the methods, procedures and techniques which the System employs may be supplemented, improved and otherwise modified from time to time by BASKIN-ROBBINS. FRANCHISEE further acknowledges and agrees that BASKIN-ROBBINS shall have sole control and discretion over the development of the System and the designation of the Products and services to be offered in the Retail Unit, and that FRANCHISEE will comply with BASKIN-ROBBINS' requirements in that regard. Without limiting the generality of the foregoing, FRANCHISEE agrees as follows:

5.6.1. FRANCHISEE shall offer such new Products and services as BASKIN-ROBBINS may from time to time require, and shall make such expenditures as may be necessary to enable it to fulfill such obligation, including, without limitation, the purchase or lease of new equipment or services, and the hiring and training of suitable personnel.

5.6.2. BASKIN-ROBBINS may, in its sole discretion, waive or modify any of FRANCHISEE's obligations under this Section 5.6 or the like obligations of other FRANCHISEES under the System, but no such waiver or modification shall oblige to grant a similar waiver or modification to FRANCHISEE; and BASKIN-ROBBINS may make such revisions in the form

or technique of the Products or services and in the merchandising thereof under the System without affecting FRANCHISEE's rights or obligations under this Agreement.

6. PRODUCTS AND SUPPLIES

6.1. FRANCHISEE shall maintain in sufficient supply, and use and/or sell at all times, only such Products and Supplies as meet BASKIN-ROBBINS' standards and specifications (from which FRANCHISEE shall not deviate without BASKIN-ROBBINS' prior written consent) and as are expressly approved for use and/or sale in writing by BASKIN-ROBBINS; FRANCHISEE shall sell or offer for sale all types of Products and services specified by BASKIN-ROBBINS; and shall discontinue selling and offering for sale any Products or services which BASKIN-ROBBINS may, in its sole discretion, disapprove in writing at any time. With respect to the offer and sale of all Products and services, FRANCHISEE shall have sole discretion as to the prices to be charged its customers.

6.2. FRANCHISEE shall purchase all the Products described in Section 1.1.2 and all Supplies used or offered for sale by the Retail Unit which Products and Supplies are not manufactured or distributed by BASKIN-ROBBINS, solely from suppliers (including manufacturers, distributors, and other sources) who are currently approved by BASKIN-ROBBINS.

6.3. FRANCHISEE shall sell, distribute and deliver Products only in such weights, sizes, forms and packages as are approved in writing by BASKIN-ROBBINS from time to time.

7. SUPPLY OF PRODUCTS

7.1. BASKIN-ROBBINS agrees to supply to FRANCHISEE, and FRANCHISEE agrees to purchase from BASKIN-ROBBINS, all of the Retail Unit's requirements for the Products described in Section 1.1.1 as shall be specified by BASKIN-ROBBINS from time to time in the Standards, at BASKIN-ROBBINS' wholesale prices at the time of delivery. Such Products will be of the variety of kinds and flavors which from time to time are selected by BASKIN-ROBBINS for supply to BASKIN-ROBBINS franchisees. BASKIN-ROBBINS may change, at any time and from time to time without prior notice, its wholesale prices for the sale and delivery of any such Products.

7.2. FRANCHISEE agrees to place its orders with BASKIN-ROBBINS for such Products as are to be supplied by BASKIN-ROBBINS at such times and in such manner as from time to time prescribed by BASKIN-ROBBINS. BASKIN-ROBBINS agrees to deliver such orders to FRANCHISEE in accordance with regular route schedules and times of delivery established by BASKIN-ROBBINS from time to time, including during non-business hours of FRANCHISEE, in its sole discretion. FRANCHISEE agrees upon receipt of notice of the scheduled delivery time, to provide BASKIN-ROBBINS with a means of access to the Retail Unit's frozen storage facility for the purpose of such delivery, by providing BASKIN-ROBBINS with a key to the Retail Unit, or by having an agent present to open the Retail Unit, or by other appropriate arrangements made with BASKIN-ROBBINS. FRANCHISEE will also provide adequate freezer storage space to permit delivery of products required by BASKIN-ROBBINS in connection with the Franchise. FRANCHISEE acknowledges that late orders by FRANCHISEE cause additional administrative expenses to BASKIN-ROBBINS. FRANCHISEE agrees that BASKIN-ROBBINS may, in its discretion, refuse to process a late order or impose a reasonable late charge or additional delivery expense charge, and add such charge to the next invoice payable by FRANCHISEE.

7.3. FRANCHISEE agrees to pay for all Products which it purchases from BASKIN-ROBBINS on such terms and conditions as BASKIN-ROBBINS may from time to time specify. Should FRANCHISEE fail to make timely payment, BASKIN-ROBBINS shall have the right, upon notice to FRANCHISEE, to require cash or cash equivalent on, or in advance of, delivery.

7.4. In the event of a default by FRANCHISEE in its payment obligations under this Section 7, or in payment of rent under the Lease, BASKIN-ROBBINS shall have the right, in addition to any other remedies, without notice, to discontinue the sale or delivery of any Products to the Retail Unit and to any other Retail Unit in which FRANCHISEE or any of its shareholders or partners has an interest, until the next regularly scheduled delivery date following the date on which BASKIN-ROBBINS has received payment in full of all of FRANCHISEE's outstanding invoices for Products and all rent due under the Lease has been received by the Lessor.

7.5. BASKIN-ROBBINS shall not be liable to FRANCHISEE, or be deemed in breach or default of any obligation contained in this Agreement, for any delay or failure of delivery for any cause beyond its reasonable control, including, without limitation, difficulties of supply occasioned by war, law, weather conditions, acts of God, regulations or order of public authority, labor troubles or shortages of materials. If BASKIN-ROBBINS shall not be able to supply the full requirements of all Retail Units, BASKIN-ROBBINS shall endeavor to apportion available Products and Supplies equitably among them.

8. MAINTENANCE OF THE RETAIL UNIT

8.1. FRANCHISEE acknowledges and agrees that the layout of the leasehold improvements, equipment, fixtures and furnishings within the Retail Unit shall not be changed without the prior written approval of BASKIN-ROBBINS.

8.2. FRANCHISEE agrees that the Retail Unit and all leasehold improvements, equipment, fixtures and furnishings within or attached to the exterior thereof shall be maintained in accordance with the Standards. FRANCHISEE agrees to renovate and remodel the interior of the Retail Unit (including but not limited to fixtures, furnishings, signs and equipment) no later than the fifth (5th) anniversary of the date of this Agreement to the then-current design for Retail Units of comparable age and condition in the event this Agreement is for a term in excess of five years. The nature and scope of renovation and remodeling shall be as then generally required by BASKIN-ROBBINS for Retail Units of comparable age and condition. Without limiting the generality of the foregoing, FRANCHISEE shall at the direction of BASKIN-ROBBINS replace or refurbish individual items of leasehold improvements, equipment, fixtures and furnishings in accordance with BASKIN-ROBBINS' then-current designs and specifications; and shall maintain the Retail Unit and all of such property within or attached to the exterior thereof and any adjacent sidewalks in the highest degree of safety, cleanliness, orderliness and sanitation. FRANCHISEE acknowledges and agrees that the requirements of this Section 8.2 are both reasonable and necessary to insure continued public acceptance and patronage of the System and to avoid deterioration or obsolescence of the Retail Unit.

8.3. The Retail Unit shall be operated and maintained at all times in compliance with all applicable laws, ordinances and regulations. FRANCHISEE shall maintain the highest health and safety standards and ratings applicable to the Retail Unit. FRANCHISEE shall furnish to BASKIN-ROBBINS, within five (5) days after receipt thereof, a copy of any inspection report, warning, citation, certificate, and/or rating which indicates FRANCHISEE's failure to meet or maintain the highest applicable health or safety standards in the operation of the Retail Unit.

8.4. BASKIN-ROBBINS shall have the right to require FRANCHISEE to close and suspend operation of the Retail Unit, and/or to require such other actions as BASKIN-ROBBINS, in its sole discretion, deems necessary, whenever there is reason to believe that any of the Products carried in the Retail Unit is contaminated, or for other reasons of public health and safety. FRANCHISEE agrees

to notify BASKIN-ROBBINS immediately of any suspected product contamination and promptly to take any action which BASKIN-ROBBINS requires in connection therewith. FRANCHISEE shall be solely responsible for all expenses it incurs in complying with the provisions of this Section.

8.5. FRANCHISEE shall not permit the exhibition at the Premises of any sign or poster, or otherwise permit advertising of any product or service at the Premises, unless first approved by BASKIN-ROBBINS.

8.6. The Retail Unit shall be kept open for business every day of the year during such minimum hours as are set forth in the Rules, excepting only (a) two days of FRANCHISEE's choice, provided at least fifteen (15), and no more than thirty (30) days written notice is given to BASKIN-ROBBINS of the dates the Retail Unit is to be closed, (b) such other days or during such hours as the closing of the Retail Unit shall be required by applicable public law or ordinance, (c) as otherwise required by the Lease, and (d) as otherwise approved in writing by BASKIN-ROBBINS.

8.7. BASKIN-ROBBINS' designated personnel shall have the right to enter the Premises, at any reasonable time, for the purpose of examining the same, conferring with FRANCHISEE or FRANCHISEE's employees, inspecting and checking operations, Products and Supplies, and determining whether the business is being conducted in accordance with the Standards and this Agreement. Such personnel shall have the further right to inspect, test and take samples of Products and Supplies being used, served or sold at the Retail Unit. BASKIN-ROBBINS will reimburse FRANCHISEE the wholesale cost of any Products or Supplies used or taken as samples.

9. FRANCHISEE AND EMPLOYEE MANAGEMENT AND TRAINING

9.1. FRANCHISEE agrees to hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Retail Unit. FRANCHISEE shall require all of its employees to comply with all of the Standards applicable to them or affecting operation of the Retail Unit, and agrees to instruct and keep its employees fully informed of all such Standards. Training of FRANCHISEE's employees shall be in conformance with guidelines established by BASKIN-ROBBINS.

9.2. FRANCHISEE shall designate a manager (who may be FRANCHISEE) who shall be responsible for the daily operation of the Retail Unit. FRANCHISEE shall promptly notify BASKIN-ROBBINS of the name of its designated manager. In the event of the resignation, termination, disability, incapacity or death of FRANCHISEE'S designated manager, FRANCHISEE shall designate a successor manager as soon as possible, but in any event within two (2) months of such event, FRANCHISEE shall notify BASKIN-ROBBINS in writing of the name of each successor designated manager.

9.3. FRANCHISEE or its designated manager shall attend, or shall have attended, and shall successfully complete the BASKIN-ROBBINS Business Management Education Program provided by BASKIN-ROBBINS at its corporate headquarters or at such other place as BASKIN-ROBBINS may designate, and shall attend and successfully complete such additional training programs as BASKIN-ROBBINS may from time to time require, including, without limitation, training workshops for new Products or services. FRANCHISEE understands that during the Business Management Education Program, which must be successfully completed prior to opening and is an express condition of the grant of this franchise, FRANCHISEE, or its designated manager will be expected, and required, to satisfactorily perform on written and practical achievement tests and demonstrate general ability to manage the Retail Unit as determined by BASKIN-ROBBINS in its sole discretion.

9.4. FRANCHISEE may be required to pay a course registration or similar fee or a fee for materials used in the training programs required by this Agreement. FRANCHISEE shall be responsible for any and all other expenses incurred by FRANCHISEE or its employees in connection with any training programs hereunder, including, without limitation, the costs of transportation, lodging, meals, wages, and, if required by applicable state law, workers' compensation.

9.5. FRANCHISEE is solely responsible for the operation of the Retail Unit, including keeping of FRANCHISEE's accounting system; for any and all labor relations, including wage and hour regulation compliance, hiring, firing, supervising and disciplining FRANCHISEE's employees; for setting work schedules; for compensation of such employees and the correct processing thereof; and for obtaining all necessary business licenses.

10. PROPRIETARY NAMES AND MARKS

10.1. BASKIN-ROBBINS represents with respect to the Proprietary Names and Marks and the Franchise that:

10.1.1. B-R Incorporated is the sole owner of all right, title and interest in and to the Proprietary Names and Marks.

10.1.2. BASKIN-ROBBINS is licensed by B-R Incorporated to grant the Franchise to FRANCHISEE and to license the use of the Proprietary Names and Marks upon the terms and conditions of this Agreement.

10.2. With respect to FRANCHISEE's permitted use of the Proprietary Names and Marks pursuant to this Agreement, FRANCHISEE agrees that:

10.2.1. FRANCHISEE shall use only the Proprietary Names and Marks designated by BASKIN-ROBBINS, and shall use them only in the manner expressly authorized and permitted by BASKIN-ROBBINS.

10.2.2. FRANCHISEE may use the BASKIN-ROBBINS service marks for the operation of the Retail Unit only at the Premises or in advertising for the authorized business conducted at or from the Premises. FRANCHISEE may use the BASKIN-ROBBINS trademarks only in advertising of the Products described in Section 1.1.1.

10.2.3. FRANCHISEE shall operate and advertise the Retail Unit only under the name or names which shall be designated by BASKIN-ROBBINS from time to time, without prefix or suffix.

10.2.4. FRANCHISEE shall identify itself as the FRANCHISEE of the Retail Unit in conjunction with any use of the Proprietary Names and Marks, including, without limitation, uses on invoices, order forms, receipts, and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the Premises as BASKIN-ROBBINS may designate in writing.

10.2.5. Any unauthorized use of the Proprietary Names and Marks shall constitute an infringement of BASKIN-ROBBINS' rights and an event of default under Section 16.4.

10.2.6. FRANCHISEE shall not use the Proprietary Names and Marks to incur any obligation or indebtedness on behalf of BASKIN-ROBBINS.

F:\LEGAL\UFOC\UFOC95-6\EXHIBITS\EXHIB-C            5

10.2.7. FRANCHISEE shall not use the Proprietary Names and Marks as part of its corporate or other legal name.

10.2.8. FRANCHISEE shall comply with BASKIN-ROBBINS' instructions in filing and maintaining the requisite local tradename or fictitious name registrations, and shall execute any documents deemed necessary by BASKIN-ROBBINS to obtain protection for the Proprietary Names and Marks or to maintain their continued validity and enforceability.

10.2.9. In the event that litigation involving the Proprietary Names and Marks is instituted or threatened against FRANCHISEE, or FRANCHISEE becomes aware of the use of, or claims to rights to a trademark or trade name identical to or confusingly similar to the Proprietary Names and Marks, FRANCHISEE shall promptly notify BASKIN-ROBBINS and shall cooperate fully in defending or settling such litigation or stopping the unlawful use.

10.3. FRANCHISEE expressly understands and acknowledges that:

10.3.1. B-R Incorporated is the sole owner of all right, title and interest in and to the Proprietary Names and Marks and the goodwill associated with and symbolized by them.

10.3.2. The Proprietary Names and Marks are valid and serve to identify the System and Products.

10.3.3. FRANCHISEE shall not directly or indirectly contest the validity of B-R Incorporated's ownership of the Proprietary Names and Marks or BASKIN-ROBBINS' right to use, license and sublicense the Proprietary Names and Marks.

10.3.4. FRANCHISEE's use of the Proprietary Names and Marks pursuant to this Agreement does not give FRANCHISEE any ownership or other interest in or to the Proprietary Names and Marks, except the permitted use granted by this Agreement, and such use shall at all times be junior to the interest of BASKIN-ROBBINS.

10.3.5. Any and all goodwill arising from FRANCHISEE's use of the Proprietary Names and Marks shall inure solely and exclusively to BASKIN-ROBBINS' and B-R Incorporated's benefit; and, upon expiration or termination of this Agreement and the Franchise, no monetary amount shall be assigned as attributable to any goodwill associated with FRANCHISEE's use of the System or the Proprietary Names and Marks.

10.3.6. The right to use the Proprietary Names and Marks granted hereunder to FRANCHISEE is nonexclusive, and B-R Incorporated and BASKIN-ROBBINS, therefore have and retain the rights, among others:

10.3.6.1. To use the Proprietary Names and Marks themselves in connection with selling Products and services;

10.3.6.2. To grant other licenses or franchises of the Proprietary Names and Marks in addition to those licenses or franchises already granted; and

10.3.6.3. To develop and establish other systems, products or services using the same or similar Proprietary Names and Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, without providing any rights therein to FRANCHISEE.

10.3.7. FRANCHISEE shall not engage in any trade practice or other activity which is harmful to the goodwill of, or reflects unfavorably on the reputation of BASKIN-ROBBINS, the Retail Units, the System, the Products, the Proprietary Names and Marks, or FRANCHISEE, or which constitutes deceptive or unfair competition, or which is in violation of any applicable laws.

11. TRADE SECRETS

11.1. Except as required for the operation of the Retail Unit or as BASKIN-ROBBINS shall authorize in writing by one of its officers, FRANCHISEE will not at any time disclose or use, either during or subsequent to the term of this Agreement, any trade secret of BASKIN-ROBBINS. Trade secret, as used in this Agreement, means information of any kind, including a formula, pattern, compilation, program, device, method, technique or process, that derives independent economic value, actual or potential, from being not generally known to, and not being readily ascertainable by proper means by, other persons or firms who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

11.2. At BASKIN-ROBBINS' request, FRANCHISEE shall require its manager and such other employees as are designated by BASKIN-ROBBINS to execute a covenant that such manager and such other employees will comply with Section 11.1 Such covenant shall be in a form satisfactory to BASKIN-ROBBINS, including, without limitation, specific identification of B-R Incorporated and BASKIN-ROBBINS as third party beneficiaries of such covenant with the independent right to enforce it. FRANCHISEE shall require its manager and such other employees as are designated by BASKIN-ROBBINS to keep any trade secrets physically at the Retail Unit.

11.3. FRANCHISEE acknowledges that any failure to comply with the requirements of this Section 11 will cause B-R Incorporated and BASKIN-ROBBINS irreparable injury, and FRANCHISEE agrees to pay all court costs and reasonable attorney's fees incurred by B-R Incorporated or BASKIN-ROBBINS in obtaining specific performance of, or an injunction against violation of, the requirements of this Section 11, without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE.

12. ADVERTISING AND MARKETING SUPPORT

12.1. Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to the furtherance of the goodwill and public image of the System and Products, the parties agree as follows:

12.1.1. FRANCHISEE shall contribute monthly to the national fund for System and Product advertising (including promotional purposes, merchandising, public relations and related activities) (hereinafter the "Fund"), described in Section 12.1.2, an amount equal to one and one-half percent (1.5%) of the Retail Unit's gross sales during such month.

12.1.2. The Fund shall be maintained and administered by BASKIN-ROBBINS or its designee, as follows:

12.1.2.1. BASKIN-ROBBINS shall oversee all System and Product advertising, with sole discretion to approve or disapprove the creative concepts, materials and media used in such advertising, and the placement and allocation thereof. FRANCHISEE agrees and acknowledges that the Fund is intended to maximize general public recognition and acceptance of the Proprietary Names and Marks for the benefit of the System and Products, and that BASKIN-ROBBINS and its designee undertake no obligation, in administering the Fund, to make expenditures for FRANCHISEE which are equivalent or proportionate to its contribution, or to ensure that any particular FRANCHISEE benefits directly or pro rata from the advertising or promotion conducted under the Fund.

12.1.2.2. The Fund, all contributions thereto, and any earnings thereon shall be used exclusively to meet any and all costs of maintaining, administrating, directing and preparing advertising activities, including, among other things, the cost of creating, preparing, producing and conducting television, radio, magazine and newspaper advertising campaigns; direct mail and outdoor billboard advertising; marketing surveys and other public relations activities; employing advertising agencies to assist therein; and providing promotional brochures and other marketing materials to the Retail Units operated under the System.

12.1.2.3. FRANCHISEE shall contribute to the Fund by separate check made payable to the Fund. All sums paid by FRANCHISEE to the Fund shall be maintained in an account called the "Baskin-Robbins National Advertising Trust Account" separate from the other monies of BASKIN-ROBBINS, and shall not be used to defray any of BASKIN-ROBBINS' expenses, except for such reasonable expenses, if any, as BASKIN-ROBBINS may incur directly in activities reasonably related to the administration or direction of the Fund and advertising programs for franchisees and the System, or to repay any advances made by BASKIN-ROBBINS to the Fund. The Fund and its earnings shall not otherwise inure to the benefit of BASKIN-ROBBINS.

12.1.2.4. It is anticipated that all contributions to, and earnings of, the Fund shall be expended for advertising and/or promotional purposes during the taxable year within which the contributions and earnings are received. However, if excess amounts remain in the Fund at the end of such taxable year, all expenditures in the following taxable year(s) shall be made first out of contributions, next out of earnings in the current year, and finally out of accumulated earnings from previous years.

12.1.2.5. The Fund is not and shall not be an asset of BASKIN-ROBBINS or its designee. A statement of the use and application of the Fund as shown on the books of BASKIN-ROBBINS or its designee shall be prepared annually by an independent certified public accountant selected by BASKIN-ROBBINS, and a copy thereof shall be provided to FRANCHISEE, upon written request.

12.1.2.6. Although the Fund is intended to be of perpetual duration, BASKIN-ROBBINS may terminate the Fund or suspend its operation. The Fund shall not be terminated, however, until all monies in the Fund have been expended for advertising and/or promotional purposes.

12.2. BASKIN-ROBBINS has established a separate regional advertising fund (hereinafter "Regional Fund") upon such terms and conditions as may be approved, from time to time, by BASKIN-ROBBINS. FRANCHISEE agrees to contribute monthly to such Regional Fund an amount designated by BASKIN-ROBBINS which shall not exceed two percent (2%) of the Retail Unit's monthly gross sales. Retail Units owned by BASKIN-ROBBINS shall contribute to the Regional Fund at the same rate as is applicable to franchisees of BASKIN-ROBBINS.

12.3. FRANCHISEE agrees to expend each year, for local advertising and promotion, an amount equal to one-half of one percent (0.5%) of its annual gross sales, provided, however, any advertising or promotional contributions pursuant to the Lease may be credited against FRANCHISEE'S obligation under this Section 12.3.

12.4. All local advertising and promotion by FRANCHISEE in any medium shall conform to the standards and requirements of BASKIN-ROBBINS, as set forth in the Operations Manual or otherwise. FRANCHISEE shall obtain BASKIN-ROBBINS' prior approval of all local advertising and promotional plans and materials that FRANCHISEE desires to use and that have not been prepared or previously approved by BASKIN-ROBBINS within one (1) year of such desired use. FRANCHISEE shall submit such previously unapproved plans and materials to BASKIN-ROBBINS (by personal delivery or through the mail, return receipt requested); if they have not been disapproved by BASKIN-ROBBINS within fourteen (14) days from the date of receipt thereof, they shall be deemed approved. FRANCHISEE shall not use any disapproved advertising or promotional plans or materials.

12.5. In addition to its other obligations under this Section 12, FRANCHISEE shall participate in all sales promotion programs as required from time to time by BASKIN-ROBBINS. Without limiting the foregoing, FRANCHISEE must redeem, for Products, gift certificates distributed by BASKIN-ROBBINS ("Gifts of Joy") including unexpired Gifts of Joy issued by any previous franchisee operating a Retail Unit at the Premises. FRANCHISEE will be reimbursed or credited for the cost of Products by BASKIN-ROBBINS upon its receipt of redeemed Gifts of Joy. However, FRANCHISEE may, at its discretion, decide to redeem other coupons issued by BASKIN-ROBBINS for which FRANCHISEE is not reimbursed or credited. All certificates and coupons or other promotions in which FRANCHISEE participates shall bear the expiration date thereof.

13. ACCOUNTS AND RECORDS

13.1. FRANCHISEE shall employ sound financial management practices in connection with the operation of the Retail Unit through the services of such personnel as FRANCHISEE may engage.

13.1.1. FRANCHISEE shall prepare and maintain, and shall preserve for at least three (3) years from the dates of their preparation, full, complete, true and accurate records and books of account in accordance with generally accepted accounting principles, consistently applied, including, without limitation, original invoices, sales records, sales slips, sales checks, sales reports, all source documents, including but not limited to, cash register tapes, records of bank deposits, inventories prepared as of the close of FRANCHISEE's accounting period, income, sales and use tax returns, profit and loss statements, general ledger, balance sheet, all other reports made to any governmental taxing and regulatory agencies, all other original records pertaining to the Retail Unit, and other pertinent papers and documents which permit a determination of the gross sales of the Retail Unit.

13.1.2. FRANCHISEE shall, on written request of BASKIN-ROBBINS, install and use in the Retail Unit such cash register system as may be approved by BASKIN-ROBBINS from time to time.

13.1.3. FRANCHISEE shall submit to BASKIN-ROBBINS, no later than the tenth (10th) day of each month after the opening of the Retail Unit, a gross sales report, in the form prescribed by BASKIN-ROBBINS reflecting all gross sales during the preceding calendar month, and such other information as BASKIN-ROBBINS may require. Without limiting the foregoing, upon request FRANCHISEE shall within sixty (60) days after the end of each calendar year, submit to BASKIN-ROBBINS an annual financial statement, including a balance sheet and profit and loss statement; and shall, upon reasonable request, supply such information on an interim basis more frequently. Such statements need not be audited, but shall be prepared in accordance with generally accepted accounting principles.

13.2. BASKIN-ROBBINS, and its designated agents, shall have the right at all reasonable times to examine and, at BASKIN-ROBBINS' expense, copy, the books, records and business tax returns of FRANCHISEE, and any and all persons or entities who are guarantors, who have personal liability or who have joint and several liability under this Agreement, and at any time to conduct or have conducted an independent audit of the books of FRANCHISEE. The failure or refusal of the FRANCHISEE to produce books, records, and the source documents enumerated in Section 13.1.1, shall constitute an event of default under Section 16.4.2. Business tax returns shall mean only those portions of the tax return deemed necessary to make the determination that the information and data contained therein were actually filed with the relevant taxing authority.

If an inspection or audit of the books and records of FRANCHISEE should reveal that any payments have been understated in any report of FRANCHISEE or FRANCHISEE has not reported sales, then FRANCHISEE shall immediately pay BASKIN-ROBBINS and Lessor, as appropriate, the additional amounts due them for royalties, advertising as described in Section 12, rent or other payments based on gross sales, together with interest as provided under Section 3.5.

Further, if an inspection or audit, discloses an understatement by FRANCHISEE in any report of two percent (2%) or more, then FRANCHISEE, in addition, shall reimburse BASKIN-ROBBINS for all costs and expenses connected with such inspection or audit, including, without limitation, reasonable accounting and legal expenses.

13.3. BASKIN-ROBBINS agrees to treat any information received from FRANCHISEE pursuant to this Section 13 as confidential, except that it may be released (a) to any person entitled to such information under the Lease or any underlying lease of the Premises; (b) by reason of any court order or legal process; (c) to a prospective transferee of any interest that is subject to the provisions of Sections 18 and/or 19; and (d) as part of general information disseminated to BASKIN-ROBBINS' franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System and those operating thereunder.

13.4. All debts pertaining to the Retail Unit and the Premises, including all trade payables and other indebtedness of every kind, and all state and municipal taxes and charges, are solely FRANCHISEE's obligation.

14. INSURANCE AND INDEMNIFICATION

14.1. Prior to commencement of the term of this Agreement, FRANCHISEE shall procure, and shall maintain in full force and effect during the term of this Agreement, at FRANCHISEE's expense, an insurance policy or policies protecting FRANCHISEE, BASKIN-ROBBINS and Lessor, their subsidiaries and affiliates, and their respective officers, directors, partners, agents and employees, against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability or expense whatsoever arising or occurring upon the Premises or in connection with the Retail Unit. FRANCHISEE shall promptly notify in writing its insurance carrier and BASKIN-ROBBINS of any claim, demand or legal action in connection with the Retail Unit.

14.2. Such policy or policies shall be written by a responsible carrier or carriers acceptable to BASKIN-ROBBINS, and shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified by BASKIN-ROBBINS from time to time), the following:

14.2.1. Comprehensive General Liability Insurance, including broad form contractual liability, broad form property damage, personal injury, completed operations, and products liability, in the amount of One Million Dollars ($1,000,000) combined single limit;

14.2.2. "All Risks" coverage for the full cost of replacement of the Premises and all other property within or relating to the Retail Unit or Premises in which BASKIN-ROBBINS may have an interest, with no coinsurance clause and with a replacement cost clause attached; and

14.2.3. Employer's Liability, Worker's Compensation, and such other insurance as may be required by statute or rule of the state or locality in which the Retail Unit is located.

14.2.4. FRANCHISEE may, with the prior written consent of BASKIN-ROBBINS, elect to have reasonable deductibles in connection with the coverage required under Section 14.2.

14.3. FRANCHISEE's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by BASKIN-ROBBINS nor shall FRANCHISEE's performance of that obligation relieve it of liability under the indemnity provisions of Section 14.9.

14.4. All public liability and property damage policies shall contain a provision that BASKIN-ROBBINS and Lessor, although named as insureds, shall nevertheless be entitled to recover under said policies on any loss occasioned to any of them or their servants, agents or employees by reason of the negligence of FRANCHISEE or its servants, agents or employees.

14.5. Upon commencement of the term of this Agreement, and thereafter at least thirty (30) days prior to the expiration of any such insurance policy, FRANCHISEE shall deliver to BASKIN-ROBBINS Certificates of Insurance evidencing the proper coverage with limits not less than those required hereunder. Such Certificates, with the exception of Workers' Compensation, shall name BASKIN-ROBBINS and Lessor, their subsidiaries and affiliates, and their respective officers, directors, partners, agents and employees as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by FRANCHISEE of any policy provisions for which such Certificates evidence coverage. Further, all Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given to BASKIN-ROBBINS and Lessor in the event of material alteration to, or cancellation of, the coverage evidenced by such Certificates.

14.6. Should FRANCHISEE for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by BASKIN-ROBBINS shall have the right and authority (without, however, any obligation to do so) immediately to procure such insurance and to charge the cost of same to FRANCHISEE, which charges, together with a reasonable fee for BASKIN-ROBBINS expenses in so acting, shall be payable to BASKIN-ROBBINS immediately upon notice. The foregoing remedies shall be in addition to any other remedies BASKIN-ROBBINS may have.

14.7. Each of the parties hereto hereby waives any and all rights of recovery against the other parties hereto or against the officers, employees, agents, and representatives of the other parties hereto for loss of or damage to such waiving party or its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. FRANCHISEE shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

14.8. Nothing in this Agreement authorizes FRANCHISEE to make any contract, agreement, warranty, or representation on BASKIN-ROBBINS' behalf, or to incur any debt or other obligation in BASKIN-ROBBINS' name; nor shall BASKIN-ROBBINS in any event assume liability for or be deemed liable hereunder as a result of, any such action; be liable by reason of any act or omission of FRANCHISEE in its operation of the Retail Unit or for any claim or judgment arising therefrom against FRANCHISEE.

14.9. The FRANCHISEE shall exonerate and indemnify BASKIN-ROBBINS and B-R Incorporated and each of their respective officers, directors, employees, agents, affiliates, successors and assigns from and against (a) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Retail Unit or Retail Unit premises, the conduct of business thereat, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by the FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of the FRANCHISEE incurred pursuant to any provisions of this Agreement, and (b) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of BASKIN-ROBBINS in the investigation of or defense against any, and all such claims.

## 15. COVENANTS

15.1. FRANCHISEE covenants that, during the term of this Agreement, FRANCHISEE or its designated manager shall devote full time, energy, and best efforts to the management and operation of the Retail Unit.

15.2. FRANCHISEE acknowledges that, pursuant to this Agreement, FRANCHISEE will receive specialized training and trade secrets, including, without limitation, confidential information regarding the operational, sales, promotional and marketing methods and techniques of BASKIN-ROBBINS and the System. FRANCHISEE covenants that, except as otherwise approved in writing by BASKIN-ROBBINS, FRANCHISEE shall not, during the term of this Agreement, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation:

15.2.1. divert or attempt to divert any business or customer of the Retail Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Names and Marks or the System;

15.2.2. employ or seek to employ any person who is at that time employed by BASKIN-ROBBINS or by any other franchisee of BASKIN-ROBBINS, or otherwise directly or indirectly induce such person to leave his or her employment; or

15.2.3. own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Retail Unit. Same or similar shall mean more than five percent (5%) of the gross revenue is derived from the sale of frozen dairy desserts.

15.3. FRANCHISEE further covenants that, except as otherwise approved in writing by BASKIN-ROBBINS, FRANCHISEE shall not, for a continuous and uninterrupted period commencing upon the termination or expiration of this Agreement and continuing for two (2) years thereafter, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership or corporation, own, maintain, operate, engage in, or have any interest in any business which is the same as or similar to the Retail Unit and which is located at the Premises or in the building or group of buildings in which the Premises are located.

15.4. Sections 15.2 and 15.3 shall not apply to ownership by FRANCHISEE as a passive investor of less than a one percent (1%) beneficial interest in the outstanding equity securities of any publicly-held corporation listed on a national stock exchange.

15.5. Each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section 15 is held unreasonable or unenforceable by a court or agency of competent jurisdiction in an unappealed final decision to which BASKIN-ROBBINS is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant subsumed within the terms if such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 15.

15.6. BASKIN-ROBBINS shall have the right to reduce the scope of any covenant set forth in Sections 15.2 and 15.3, or any portion thereof, without FRANCHISEE's consent, effective immediately upon receipt by FRANCHISEE of written notice thereof; and FRANCHISEE shall comply with any covenant as so modified.

15.7. The existence of any claims which FRANCHISEE may have against BASKIN-ROBBINS whether or not arising from this Agreement, shall not constitute a defense to the enforcement of the covenants in this Section 15. FRANCHISEE agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by BASKIN-ROBBINS in connection with the enforcement of this Section 15.

15.8. FRANCHISEE acknowledges that FRANCHISEE's violation of any of the terms of this Section 15 would result in irreparable injury to BASKIN-ROBBINS for which no adequate remedy at law may be available, and FRANCHISEE accordingly consents to the issuance of an injunction prohibiting any conduct by FRANCHISEE in violation of the terms of this Section 15, without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE.

15.9. At BASKIN-ROBBINS' request, FRANCHISEE shall require and obtain execution of covenants similar to those set forth in this Section 15 (including covenants applicable upon the termination of a person's relationship with FRANCHISEE) from any or all of the following persons: (1) all managers of FRANCHISEE; (2) all officers, directors, and holders of a beneficial interest of one percent (1%) or more of the securities of FRANCHISEE, and of any corporation directly or indirectly controlling FRANCHISEE, if FRANCHISEE is a corporation; and (3) the general partners and any limited partners (including any corporation, and the officers, directors, and holders of a beneficial interest of one percent (1%) or more of the securities of any corporation, which controls, directly or indirectly, any general or limited partner), if FRANCHISEE is a partnership. Each covenant required by this Section 15.9 shall be in a form satisfactory to BASKIN-ROBBINS, including, without limitation, specific identification of BASKIN-ROBBINS as a third party beneficiary of such covenants with the independent right to enforce them.



16. **TERMINATION OF FRANCHISE**

16.1. FRANCHISEE shall be deemed to be in default under this Agreement, and all rights granted FRANCHISEE herein shall automatically terminate without notice to FRANCHISEE, if FRANCHISEE is dissolved; or if execution is levied against the Retail Unit and not removed within thirty (30) days; or if suit to foreclose any lien or mortgage against the Premises or its equipment is instituted against FRANCHISEE and not dismissed within thirty (30) days; or if the real or personal property of the Retail Unit shall be sold after levy thereupon by any sheriff, marshal or constable.

16.2. FRANCHISEE agrees to perform and comply with all of the obligations under the Lease and to pay, when due, all rent and other charges payable under the Lease. FRANCHISEE acknowledges that the selection of the Premises as a Retail Unit location is an integral part of the System and that continuation of the Lease is essential to the Franchise. Failure to comply with the provisions of the Lease will, at BASKIN-ROBBINS' election, constitute a breach of this Agreement. If the Lease is terminated for any reason, this Agreement will terminate effective upon termination of the Lease.

16.3. FRANCHISEE shall be deemed to be in default under this Agreement upon the occurrence of any of the following events, BASKIN-ROBBINS may, at its option, terminate this Agreement and all rights granted FRANCHISEE hereunder, without affording FRANCHISEE any opportunity to cure the default, effective immediately upon written notice from BASKIN-ROBBINS.

16.3.1. If FRANCHISEE fails to close and suspend operation of the Retail Unit when required by BASKIN-ROBBINS under the terms of Section 8.4;

16.3.2. If FRANCHISEE at any time ceases to operate or otherwise abandons the Retail Unit (any unapproved closure of 24 hours or more shall be deemed to be an abandonment), or loses the right to possession of the Premises, or otherwise forfeits the right to transact business in the jurisdiction where the Retail Unit is located; provided, however, that if, through no fault of FRANCHISEE, the Premises are damaged or destroyed and repairs or reconstruction cannot be completed within ninety (90) days thereafter, then FRANCHISEE shall have thirty (30) days after such event in which to apply for BASKIN-ROBBINS' approval to relocate and/or reconstruct the Premises, at FRANCHISEE's sole expense, which approval shall not be unreasonably withheld, but may be conditioned upon the payment by FRANCHISEE of an agreed minimum royalty during the period in which the Retail Unit is not in operation;

16.3.3. If FRANCHISEE is convicted of or pleads guilty or pleads nolo contendere to a felony, a crime involving moral turpitude, or any other crime or offense that BASKIN-ROBBINS believes is reasonably likely to have an adverse effect on the System or the Products, the Proprietary Names and Marks, the goodwill associated therewith, or BASKIN-ROBBINS' interest therein;

16.3.4. If FRANCHISEE permits the use of the Retail Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of Products under the Proprietary Names and Marks or other marks of BASKIN-ROBBINS;

16.3.5. If a threat or danger to public health or safety results from the maintenance or operation of the Retail Unit or the Premises;

16.3.6. If FRANCHISEE offers for sale or sells unauthorized Products or services from the Retail Unit;

16.3.7. If FRANCHISEE or any partner or shareholder in FRANCHISEE purports to transfer any rights or obligations under this Agreement or any interest in FRANCHISEE to any party without BASKIN-ROBBINS' prior written consent contrary to the terms of Section 18;

16.3.8. If FRANCHISEE fails to comply with the in-term covenants set forth in Section 15;

16.3.9. If, contrary to the terms of Section 5.4 or Section 11, FRANCHISEE discloses or divulges trade secrets provided to FRANCHISEE by BASKIN-ROBBINS to its material detriment, in its sole discretion;

16.3.10. If an approved transfer is not effected within one (1) year following the death, disability or mental incapacity of a person with an interest referred to in Section 18.1, as required by Section 19, or if an interim manager is not designated within ninety (90) days as required by that Section;

16.3.11. If FRANCHISEE fails to maintain the books and records required under Section 13, knowingly maintains false books or records, or knowingly submits any false reports to BASKIN-ROBBINS;

16.3.12. If FRANCHISEE, after curing an individual event of default pursuant to Section 16.4, commits the same default again, whether or not cured after notice;

16.3.13. If FRANCHISEE repeatedly is in default under Section 16.4 for failure substantially to comply with any of the requirements imposed by this Agreement, whether or not cured after notice;

16.3.14. If any other BASKIN-ROBBINS franchise agreement entered into by FRANCHISEE is terminated by reason of FRANCHISEE's default thereunder; or

16.3.15. If FRANCHISEE fails to pay any fees, invoices or other charges or fails to make contributions for advertising as required under this Agreement for more than five (5) days (or such longer period as applicable law may require) after written notice of such default;

16.4. Except as otherwise provided in this Section 16, upon any default by FRANCHISEE which is susceptible of being cured, BASKIN-ROBBINS may terminate this Agreement only by giving FRANCHISEE written notice of termination stating the nature of such default at least thirty (30) days prior to the effective date of termination; provided, however, that FRANCHISEE may avoid termination by immediately initiating a remedy to cure such default and curing it to BASKIN-ROBBINS' satisfaction within the thirty (30) day period (or within such shorter time period as BASKIN-ROBBINS may reasonably specify), and by promptly providing proof thereof to BASKIN-ROBBINS. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to FRANCHISEE, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require. Defaults which are susceptible of cure hereunder include the following illustrative events:

16.4.1. If FRANCHISEE fails to comply in good faith with any of the requirements imposed upon it by this Agreement or fails to comply with the Standards;

16.4.2. If FRANCHISEE fails, refuses or neglects promptly to submit the financial or other information required by BASKIN-ROBBINS under this Agreement; or denies BASKIN-ROBBINS the right to inspect the Premises or to audit the sales and accounting records of the Retail Unit;

16.4.3. If FRANCHISEE fails, refuses or neglects to obtain any prior written approval or consent as required by this Agreement;

16.4.4. If FRANCHISEE misuses or makes any unauthorized use of the Proprietary Names and Marks, or otherwise impairs the goodwill associated therewith or BASKIN-ROBBINS' rights therein;

16.4.5. If FRANCHISEE engages in any business or markets any service or product under a name or mark which, in BASKIN-ROBBINS' opinion, is confusingly similar to the Proprietary Names and Marks; or

16.4.6. If FRANCHISEE fails to obtain execution of the covenants required under Section 15.9.

16.5. FRANCHISEE recognizes that the Retail Unit is one of a large number of Retail Units within the System selling similar Products and services to the public; hence, FRANCHISEE's failure to comply with the terms of this Agreement would cause irreparable damage to BASKIN-ROBBINS and to the System. Therefore, in the event of a breach or threatened breach by FRANCHISEE of any of the terms of this Agreement, BASKIN-ROBBINS shall forthwith be entitled to an injunction restraining such breach and/or to a decree of specific performance,

without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which BASKIN-ROBBINS might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

16.6. If FRANCHISEE fails to do or perform any thing or act required on its part after thirty (30) days written notice of default, BASKIN-ROBBINS shall also have the right (but shall not be obligated) to cause such thing or act to be done, and FRANCHISEE shall pay all costs incurred by BASKIN-ROBBINS in the performance thereof.

17. OBLIGATIONS UPON EXPIRATION OR TERMINATION

17.1. Upon expiration or termination of this Agreement, all right of FRANCHISEE to use the Proprietary Names and Marks and the System and to operate the Retail Unit within the System or under the Proprietary Names and Marks shall terminate and:

17.1.1. FRANCHISEE shall promptly pay all sums owing to BASKIN-ROBBINS, and its subsidiaries and affiliates. In the event of termination for any default of FRANCHISEE, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by BASKIN-ROBBINS;

17.1.2. FRANCHISEE shall immediately cease to operate the Retail Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of BASKIN-ROBBINS;

17.1.3. FRANCHISEE shall immediately and permanently cease to use, in any manner whatsoever, the System, including, without limitation, methods, procedures and techniques associated therewith, and all Proprietary Names and Marks and distinctive forms, slogans, symbols and devices associated with the System or the Products. In particular, FRANCHISEE shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, and any other articles which display the Proprietary Names and Marks;

17.1.4. FRANCHISEE shall immediately deliver to BASKIN-ROBBINS all manuals, including the Operations Manual; records; files; instructions; correspondence; all materials related to operating the Retail Unit, including, without limitation, brochures, agreements, invoices, signs, flavor strips, flavor lists, display cards, party ice cream books and training films; and any and all other materials relating to the operation of the Retail Unit in FRANCHISEE's possession, and all copies thereof (all of which are acknowledged to be BASKIN-ROBBINS' property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement and of any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law;

17.1.5. FRANCHISEE shall remove from the Premises and from any equipment, fixtures and furnishings not purchased by BASKIN-ROBBINS as provided in Section 17.1.6, and return to BASKIN-ROBBINS, all of the Proprietary Names and Marks or other indicia of BASKIN-ROBBINS, and shall withdraw or terminate, within five (5) days after termination or expiration of this Agreement, any fictitious name registration containing any part of the Proprietary Names and Marks. FRANCHISEE hereby appoints BASKIN-ROBBINS as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this section;

17.1.6. FRANCHISEE shall immediately sell to BASKIN-ROBBINS (who hereby agrees to purchase) all of FRANCHISEE's Products and Supplies bearing the Proprietary Names and Marks, at FRANCHISEE's purchase cost, and shall sell to BASKIN-ROBBINS, at BASKIN-ROBBINS' election, any or all of the equipment, fixtures and furnishings of FRANCHISEE used in connection with the Retail Unit, including exterior and interior signs, at the purchase cost when originally installed in the Retail Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance on its purchase of such equipment, fixtures and furnishings, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE. Any monies due BASKIN-ROBBINS may be offset against the purchase price payable to FRANCHISEE. Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts;

17.1.7. FRANCHISEE shall, at BASKIN-ROBBINS' option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to BASKIN-ROBBINS any interest which FRANCHISEE has in the Lease or any agreement or lease related to the Premises. In the event BASKIN-ROBBINS does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises (including, without limitation, the changing

F:\LEGAL\UFOC\UFOC95-6\EXHIBITS\EXHIB-C     11

of the Retail Unit's telephone number) immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other Retail Units under the System, and shall make such specific

additional changes thereto as BASKIN-ROBBINS may reasonably request for that purpose. In the event FRANCHISEE fails or refuses to comply with the requirements of this Section 17.1.7, BASKIN-ROBBINS shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand;

17.1.8. In the event FRANCHISEE continues to operate or subsequently begins to operate any other business wherever situated, FRANCHISEE shall not use any reproduction, counterfeit, copy or colorable imitation of the Proprietary Names and Marks, in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake or deception, or which is likely to dilute BASKIN-ROBBINS' rights in the Proprietary Names and Marks, and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with BASKIN-ROBBINS whether or not constituting unfair competition;

17.1.9. FRANCHISEE shall pay to BASKIN-ROBBINS all damages, costs and expenses, including reasonable attorney's fees, incurred by them subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this Section 17; and

17.1.10. FRANCHISEE shall comply with the covenants contained in Section 15.3.

18. TRANSFER, RIGHT OF FIRST REFUSAL

18.1. Provided BASKIN-ROBBINS does not, exercise its right of first refusal to purchase Franchisee's interest in this Agreement under Section 18.2. FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that BASKIN-ROBBINS has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE and/or any such person(s). Accordingly, neither FRANCHISEE nor any immediate or remote successor to any part of FRANCHISEE's interest in this Agreement nor any individual, partnership, corporation or other legal entity which directly or indirectly owns any interest in this Agreement or in FRANCHISEE, shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any direct or indirect interest in FRANCHISEE or this Agreement, the transfer of which will have the effect of changing control of FRANCHISEE or ownership of this Agreement, without the prior written consent of BASKIN-ROBBINS. Any such purported assignment or transfer not having the written consent of BASKIN-ROBBINS as required by this Section 18, shall be null and void and shall constitute a material breach of this Agreement, for which BASKIN-ROBBINS may then terminate without opportunity to cure pursuant to Section 15.3.

18.2. Upon a permitted transfer of the Franchise, FRANCHISEE shall pay to BASKIN-ROBBINS a Transfer Fee of Five Thousand Dollars ($5,000.00). FRANCHISEE's principal(s) may transfer its interest(s) without any Transfer Fee (1) to the spouse or children of said principal(s), (2) to other principal(s) of FRANCHISEE, (3) by devise or inheritance as provided in Section 19, or (4) in connection with a change in its form of business (i.e., from corporation to partnership, etc.) where said transferor retains a majority interest in the new entity; provided, however, that all such transfers shall comply with the other requirements of this Section 18, and FRANCHISEE shall pay to BASKIN-ROBBINS a Documentation Fee in the amount of Two Hundred Dollars ($200.00).

18.3. The foregoing provisions of Section 18.1 to the contrary notwithstanding, FRANCHISEE may grant a security interest in any of its assets in connection with a bona fide financing or refinancing of the Retail Unit relating to the acquisition, renovation, repair, replacement or operation of the Retail Unit or the Premises provided that the secured party agrees that, in the event of any default by FRANCHISEE under any documents related to the security interest, BASKIN-ROBBINS shall have the right and option to purchase the indebtedness secured by such security interest at a price equal to the then unpaid balance of such indebtedness. In no event shall FRANCHISEE grant a security interest in this Agreement.

18.4. No person or entity shall succeed to any of the rights of FRANCHISEE under this Agreement by virtue of any voluntary or involuntary proceeding in bankruptcy, receivership, attachment, execution, assignment for the benefit of creditors or other legal process.

18.5 BASKIN-ROBBINS may withhold its consent to transfer of an interest referred to in Section 18.1 arbitrarily and for any reason whatsoever or may condition any consent in their sole discretion. Without limiting the foregoing, BASKIN-ROBBINS may condition its consent on any or all of the following:

18.5.1. All obligations of FRANCHISEE to BASKIN-ROBBINS whether arising under this Agreement or otherwise, must be satisfied at the time of transfer.

18.5.2. The prospective FRANCHISEE must complete and be approved through BASKIN-ROBBINS' standard FRANCHISEE Selection Process, including satisfactory demonstration of ability to meet the financial, character, managerial and equity ownership standards and such other criteria as BASKIN-ROBBINS shall then apply to new franchisees.

18.5.3. The prospective FRANCHISEE or his designated manager shall have satisfactorily completed the BASKIN-ROBBINS Business Management Education Program for new FRANCHISEES as set forth in Section 9.3 of this Agreement.

18.5.4. Review by BASKIN-ROBBINS of any terms and conditions of the contract of sale between FRANCHISEE and the prospective FRANCHISEE which may affect the sufficiency of cash flow from the Retail Unit after payment of debt service necessary for reinvestment to maintain and refurbish the Premises.

18.5.5. Execution by the transferor of a general release of BASKIN-ROBBINS and its officers, directors and employees, in their corporate and individual capacities, in a form satisfactory to BASKIN-ROBBINS.

18.5.6. Repair or replacement of damaged or deteriorated equipment and renovation or refurbishing of the Premises as may reasonably be required by BASKIN-ROBBINS.

18.5.7. Execution by the prospective FRANCHISEE of a written assumption of the FRANCHISEE's obligations under this agreement, or, at BASKIN-ROBBINS' option, execution of a new franchise agreement in the form then being offered by BASKIN-ROBBINS to new FRANCHISEES with a term ending on the expiration date of this Agreement.

18.5.8. Execution by the prospective FRANCHISEE of a written assumption of FRANCHISEE's obligations under the Lease, in a form satisfactory to the Lessor, including any required consent to the Lessor to such assumption.

18.5.9. Written assumption by the prospective FRANCHISEE, in a form satisfactory to BASKIN-ROBBINS, of FRANCHISEE's obligations under all equipment leases pertaining to the Retail Unit.

18.5.10. Payment by the prospective FRANCHISEE of a Retail Unit Grand Opening Fee of $1,000.00 to be applied toward advertising and promotion in connection with the re-opening of the Retail Unit which shall be paid to BASKIN-ROBBINS upon transfer.

18.6 BASKIN-ROBBINS shall have the unconditional right to assign its interest in this Agreement.

18.7. If, at any time during the term hereof, the FRANCHISEE receives a bona fide offer to purchase the Retail Unit, which offer the FRANCHISEE is willing to accept, the FRANCHISEE shall communicate in writing to BASKIN-ROBBINS the full terms of the offer and the name of the offeror. BASKIN-ROBBINS or its designee may elect to purchase or lease the business on the terms set forth in the offer. If BASKIN-ROBBINS or BASKIN-ROBBIN'S designee elects to purchase or lease the business, it shall give the FRANCHISEE written notice of the election within thirty (30) days after BASKIN-ROBBINS receives the communication of the offer. If BASKIN-ROBBINS or BASKIN-ROBBIN'S designee fails to give written notice of election within thirty (30) days, the FRANCHISEE may sell the Retail Unit to the offeror on the terms offered, subject to the provisions hereof relating to the assignment. The sale to the offeror must, however, be completed within sixty (60) days after the termination of the thirty (30) day period during which BASKIN-ROBBINS or BASKIN-ROBBIN'S designee may give written notice of election to purchase; otherwise, an additional notice must be given to BASKIN-ROBBINS and an additional option period must expire prior to any such transfer. If BASKIN-ROBBINS or BASKIN-ROBBIN'S designee elects to purchase the business, it shall have the right to substitute equivalent cash for any noncash consideration included in the bona fide offer to purchase the Retail Unit.

19. TRANSFER UPON DEATH, DISABILITY OR MENTAL INCAPACITY

19.1. Upon the death, disability or mental incapacity of any person with an interest referred to in Section 18.1, the executor, administrator, or personal representative of such person shall transfer his interest to a third party approved by BASKIN-ROBBINS within one (1) year from the date of such death, disability or mental incapacity. Such transfer, including any transfer by devise or inheritance, shall be subject to the terms of Section 18.

19.1.1. If no transfer of the interest shall have been accomplished consistent with the provisions of this Section 19 within one (1) year from the date of death, disability or mental incapacity, BASKIN-ROBBINS shall have the right to terminate this Agreement as provided in Section 16.3.10.

19.1.2. During the interim period until a transfer of the interest subject to this Section 19 has taken place, the legal representative shall operate the Retail Unit, through an individual who shall possess such qualifications for interim management of the Retail Unit as BASKIN-ROBBINS may determine, in its discretion, from time to time. Failure of the FRANCHISEE or the legal representative to designate an individual so qualifying within ninety (90) days after the date of death, disability or mental incapacity of FRANCHISEE shall give BASKIN-ROBBINS the right to terminate this Agreement as provided in Section 16.3.10.

19.1.3. BASKIN-ROBBINS shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of this section. If not furnished with such certified copy of a court order, or in the event of a legal contest, BASKIN-ROBBINS may decline, without liability, to recognize the claim of a party to such interest. BASKIN-ROBBINS shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on BASKIN-ROBBINS.

20. NOTICES

All notices required or permitted under this Agreement shall be in writing, and shall be personally delivered or mailed by certified or registered mail, or by reputable courier service, return receipt requested, to the respective parties at the addresses indicated at page 1 of this Agreement (with notices to FRANCHISEE to be directed to the Premises), unless and until a different address has been designated by written notice to the other parties. Any notice by certified or registered mail or by a reputable courier service which provides written evidence of delivery, shall be deemed to have been given on the third day after such notice is mailed or upon receipt, whichever occurs first.

21. RELATIONSHIP OF PARTIES

It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship or among them, that FRANCHISEE shall be an independent contractor, and that nothing in this Agreement is intended to constitute any party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of any other party, for any purpose whatsoever. FRANCHISEE shall display a sign, approved by BASKIN-ROBBINS, declaring that the Retail Unit is owned and operated by an independent contractor.

22. SEVERABILITY AND CONSTRUCTION

22.1. Except as expressly provided to the contrary herein, each portion, section, part, term, and/or provision of this Agreement shall be considered severable; and if, for any reason, any portion, section, part, term, and/or provision of this Agreement is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having competent jurisdiction, such infirmity shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, and/or provisions of this Agreement as may remain otherwise intelligible and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, and/or provisions shall be deemed not to be a part of this Agreement.

22.2. Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies under or by reason of this Agreement upon any person or legal entity other than the parties to this Agreement; BASKIN-ROBBINS' officers, directors, agents and employees; and such of FRANCHISEE's and BASKIN-ROBBINS' respective successors and assigns as may be contemplated (and, as to FRANCHISEE, permitted) by Sections 18 and 19.

22.3. FRANCHISEE expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law, which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which BASKIN-ROBBINS is a party, or that may result from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

F:\LEGAL\UFOC\UFOC95-6\EXHIBITS\EXHIB-C          13

affect the meaning or construction of any provision hereof.

22.5. All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural, where applicable, and all acknowledgements, promises, covenants, agreements, and obligations herein made or undertaken by FRANCHISEE shall be deemed jointly and severally undertaken by all those executing this Agreement on behalf of FRANCHISEE.

22.6. Subject to the terms of Sections 18 and 19, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective administrators, executors, heirs, successors and assigns.

22.7. This Agreement may be executed in counterpart, and each copy so executed shall be deemed an original.

### 23. APPROVALS AND WAIVERS

23.1. Whenever this Agreement requires the prior approval or consent of BASKIN-ROBBINS, FRANCHISEE shall make a timely written request therefor, and such approval or consent shall be obtained in writing.

23.2. BASKIN-ROBBINS does not make any warranties or guarantees upon which FRANCHISEE may rely, or assumes any liability or obligation to FRANCHISEE, by providing any waiver, approval, consent, or suggestion to FRANCHISEE in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

23.3. No delay, waiver, omission, or forbearance on the part of BASKIN-ROBBINS to exercise any right, option, duty, or power arising out of any breach or default by FRANCHISEE under any of the terms, provisions, covenants, or conditions hereof, shall constitute a waiver by BASKIN-ROBBINS of any such right, option, duty or power as against FRANCHISEE, or as to subsequent breach or default by FRANCHISEE. Subsequent acceptance by BASKIN-ROBBINS of any payments due either of them hereunder shall not be deemed to be a waiver by BASKIN-ROBBINS of any preceding breach by FRANCHISEE of any terms, provisions, covenants, or conditions of this Agreement.

### 24. ENTIRE AGREEMENT

24.1. This Agreement, and the documents referred to herein, constitute the sole agreement between the parties with respect to the subject matter of this Agreement, and supersedes all prior agreements and negotiations. If BASKIN-ROBBINS is Lessor and there is a conflict between the Lease and the provisions herein, the provisions of the Lease will control if more restrictive of FRANCHISEE than the terms of this Agreement. Except for those permitted to be made unilaterally by BASKIN-ROBBINS hereunder, no amendment, change, or variance from this Agreement shall be binding on any party unless mutually agreed to by all parties to this Agreement and executed by their authorized officers or agents in writing.

24.2. In the event that the license and franchise of BASKIN-ROBBINS from B-R Incorporated shall expire or for any reason be terminated, then B-R Incorporated or its nominee shall succeed to all of the rights and assume all of the duties of BASKIN-ROBBINS under this Agreement.

### 25. APPLICABLE LAW

25.1. This Agreement shall be deemed made and entered into and shall be interpreted and construed under the laws of the state in which BASKIN-ROBBINS has its principal place of business; provided, however, that this choice of law shall not include the California Franchise Relations Act or the California Franchise Investment Law, unless such law would otherwise apply, and nothing herein will be deemed to extend or otherwise affect the scope or application of such Acts.

25.2. Any dispute arising under or in connection with this Agreement and any claim affecting its validity, construction, effect, performance or termination (collectively, "Claim") shall be resolved exclusively by the federal or state courts in the judicial district in which BASKIN-ROBBINS has its principal place of business, to the jurisdiction of which the parties hereby irrevocably submit; provided that if BASKIN-ROBBINS is a party to such Claim, the matter shall be resolved exclusively by, as the case may be, (a) the United States District Court, Central District of California or (b) the North Central District, Glendale, of the Los Angeles County Superior Court (or Glendale Judicial District, if the municipal court jurisdictional limits apply), which courts are within the judicial district in which BASKIN-ROBBINS has its principal place of business. Both FRANCHISEE and BASKIN-ROBBINS hereby waive any rights each may have to request a jury trial. Notwithstanding the above, BASKIN-ROBBINS has the right to seek injunctive relief in the county or jurisdiction in which the Retail Unit is located.

25.3. No punitive or exemplary damages shall be awarded against either BASKIN-ROBBINS, or FRANCHISEE, or entities affiliated with any of them, and are hereby waived. Any resolution of a Claim under this Agreement shall not be deemed to have the effect of collateral estoppel on any similar claim or dispute which may be brought by other parties respecting BASKIN-ROBBINS Franchise Agreements other than this Agreement.

25.4. No right or remedy conferred upon or reserved to any party by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

25.5. Nothing herein contained shall bar BASKIN-ROBBINS' right to obtain injunctive relief in any jurisdiction against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions; nor shall the reference to such relief in certain Sections of this Agreement be deemed to imply the unavailability of such relief to enforce rights provided for in other Sections.

25.6. If BASKIN-ROBBINS should bring an action against FRANCHISEE, or if FRANCHISEE should bring an action against BASKIN-ROBBINS, with respect to the subject matter of this Agreement, the prevailing party shall be entitled to recover from the other(s) all of the legal expenses of the prevailing party, including reasonable attorney's fees, and to have the same awarded as a part of the judgment in the proceeding in which such legal expenses and attorney's fees were incurred. In the event that BASKIN-ROBBINS should incur any costs and expenses, including attorney's fees, in enforcing any of the provisions of, or their rights under, this Agreement, they or either of them shall be entitled to recover from FRANCHISEE all such costs and expenses.

### 26. CONTINUING OBLIGATIONS

26.1. If FRANCHISEE is a corporation, it shall comply with the following requirements throughout the term of this Agreement:



26.1.1. FRANCHISEE shall furnish BASKIN-ROBBINS with its Articles of Incorporation, Bylaws, other governing documents, and any other documents BASKIN-ROBBINS may reasonably request, and any amendments thereto.

26.1.2. FRANCHISEE's sole business shall be that of operating the Retail Unit unless otherwise approved in writing by BASKIN-ROBBINS.

26.1.3. Each stock certificate of FRANCHISEE shall at all times have conspicuously endorsed upon its face a statement, in a form satisfactory to BASKIN-ROBBINS, that is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments or transfers by this Agreement, including, without limitation, the restrictions on transfer set forth in Section 18.

26.1.4. FRANCHISEE shall maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to BASKIN-ROBBINS upon request.

26.2. If FRANCHISEE is a partnership, it shall comply with the following requirements throughout the term of this Agreement:

26.2.1. FRANCHISEE shall furnish BASKIN-ROBBINS with its partnership agreement, as well as such other documents as BASKIN-ROBBINS may reasonably request and any amendments thereto, which partnership agreement shall contain provisions restricting transfer of partnership interests comparable to those described in Section 26.1.3.

26.2.2. FRANCHISEE shall prepare and furnish to BASKIN-ROBBINS, upon request, a list of all general and limited partners in FRANCHISEE.

27. LIQUIDATED DAMAGES

THE PARTIES ACKNOWLEDGE THAT A VACATION OR ABANDONMENT AS DESCRIBED IN SECTION 16.3.2. AS AN ACT OF DEFAULT, WILL CAUSE SERIOUS AND SUBSTANTIAL DAMAGE TO BASKIN-ROBBINS, THE ACTUAL AMOUNT OF DAMAGES BEING DIFFICULT TO DETERMINE. FRANCHISEE AGREES THAT IF IT SO VACATES OR ABANDONS IT WILL PAY FORTHWITH TO BASKIN-ROBBINS, ALL MONEYS THEN DUE AND OWING TO SUCH PARTY FOR ANY GOODS AND SERVICES PROVIDED, INCLUDING BUT NOT LIMITED TO OBLIGATIONS INCURRED BY FRANCHISEE UNDER THIS AGREEMENT AND, IN ADDITION, FRANCHISEE WILL, WITHIN THIRTY (30) DAYS AFTER RECEIPT OF A DEMAND FOR PAYMENT FROM BASKIN-ROBBINS, PAY AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY, A SUM CALCULATED UPON THE ROYALTY AND ADVERTISING AND LEASE PAYMENTS WHICH HAVE BEEN PAID OR ACCRUED UNDER THIS AGREEMENT AND THE LEASE FOR THE PRECEDING TWELVE MONTHS AND MULTIPLYING SUCH AMOUNT BY THE FULL AND FRACTIONAL MONTHS REMAINING FROM THE DATE OF VACATION OR ABANDONMENT TO THE DATE OF EXPIRATION OF THE TERM OF THIS AGREEMENT.

28. INTERNAL DISPUTE RESOLUTION AND MEDIATION

28.1. BASKIN-ROBBINS has developed an internal grievance procedure pursuant to which disputes between BASKIN-ROBBINS and FRANCHISEE may be heard.

28.2. Except with respect to matters for which BASKIN-ROBBINS believes it necessary to seek equitable relief, the Franchisee and BASKIN-ROBBINS shall be required to enter into mediation of all disputes (other than collection actions initiated by BASKIN-ROBBINS) involving this Agreement or any aspect of the relationship between them for a minimum of four (4) hours prior to the initiation of any arbitration or other action or proceeding against the other. Upon written notice by either party to the other of the initiating party's desire to mediate, the party receiving the notice shall select an independent entity that regularly provides mediation services to franchisors and franchisees to serve as mediator in the proceeding. If the party receiving the notice of intent to mediate does not provide the name of such an organization within ten (10) business days from the date the notice of intention to mediate is received, or if the designated organization is unwilling to serve as mediator or does not meet the requirements of this subparagraph, then the initiating party may designate such an organization. Once the organization is designated, the organization shall be directed to schedule a mediation proceeding at a time mutually convenient to BASKIN-ROBBINS and the Franchisee. The mediation shall be held within thirty (30) days following receipt by the mediation organization of notification that its service shall be retained. If the parties cannot agree on a date for mediation, then the mediation organization shall select a date it believes is reasonable for the parties, given all of the alleged conflicts in dates. The actual mediator shall either be a retired judge, or a person who has had at least five (5) years of experience as either franchisee or franchisor (or as an officer of such an entity) or in franchise law. The parties shall equally share the cost of the mediator. The mediator shall select the location for the mediation, giving due consideration to the location that will minimize the total expenses of the mediation.

29. BANKRUPTCY OR INSOLVENCY

29.1. In the event that FRANCHISEE becomes a Debtor under Chapter 7, 11, or 13 of the United States Bankruptcy code (a "Debtor"), 11 U.S.C. Sec. 101 et seq. (the "Code"), and the Trustee or FRANCHISEE, as Debtor, elects to assume this Agreement for the purpose of assignment to a third party or otherwise, such election and assignment, if any, may only be made if all the terms and conditions of this Section are satisfied. If the Trustee or FRANCHISEE, as Debtor, fails to elect to assume or reject this Agreement by the sixtieth (60) day after the entry of the Order for Relief in a case under Chapter 7, 11, or 13 of the Code, this Agreement shall thereafter be deemed rejected and terminated in accordance with Section 365(d) (4) of the Code. The acceptance of any payment by BASKIN-ROBBINS after the 60th day shall not be deemed a waiver of BASKIN-ROBBINS' rights herein and under Section 365(d) (4) of the Code, and BASKIN-ROBBINS' right to be compensated for damages in such bankruptcy case shall survive.

29.2. No election of the Trustee or FRANCHISEE, as Debtor, to assume this Agreement, whether under Chapter 7, 11, or 13 of the Code, shall be effective unless each of the following conditions which BASKIN-ROBBINS and FRANCHISEE acknowledge are commercially reasonable in the context of a bankruptcy case of FRANCHISEE, have been satisfied, and BASKIN-ROBBINS has so acknowledged in writing:

29.2.1. This Agreement has not been terminated pursuant to the provisions established herein or under applicable state law, prior to the filing of a case under the Code.

29.2.2. The Trustee or FRANCHISEE, as Debtor, has cured, or has provided BASKIN-ROBBINS adequate assurance that:

29.2.2.1. within ten (10) days from the date of the entry of an order granting the Trustee or FRANCHISEE, as Debtor, authority to assume this Agreement, the Trustee or FRANCHISEE will cure all monetary defaults under this Agreement; and

29.2.2.2. within thirty (30) days from the date of the entry of an order granting Trustee or FRANCHISEE, as Debtor, authority to assume this Agreement, the Trustee or FRANCHISEE will cure all non-monetary defaults under this Agreement.

29.2.3. The Trustee or FRANCHISEE, as Debtor, has compensated or has provided BASKIN-ROBBINS adequate assurance that within ten (10) days from the date of the entry of an order granting authority to assume, BASKIN-ROBBINS will be compensated for any monetary loss incurred by BASKIN-ROBBINS arising from the default of Trustee or FRANCHISEE as recited in BASKIN-ROBBINS' written statement of monetary loss sent to the Trustee or FRANCHISEE.

29.2.4. The Trustee or FRANCHISEE, as Debtor, has provided BASKIN-ROBBINS with adequate assurance of future performance of each of FRANCHISEE'S obligations under this Agreement.

29.2.5. The provisions of this Section concerning the rights of BASKIN-ROBBINS and the obligations of Trustee, FRANCHISEE, Debtor, Receiver, Debtor-In-Possession and Assignee are in addition to such rights and obligations provided by law, including those applicable provisions of the Bankruptcy Code. Nothing contained in this Section shall limit or reduce in any manner whatsoever such rights and obligations which are otherwise provided by law.

30. **LIMITATION OF ACTIONS**

ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE, BASKIN-ROBBINS OR THE FRANCHISEE's OPERATION OF THE RETAIL UNIT, BROUGHT BY ANY PARTY HERETO AGAINST THE OTHER, SHALL BE COMMENCED WITHIN ONE (1) YEAR FROM THE DISCOVERY OF THE FACTS GIVING RISE TO ANY SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR ANY UNPERFORMED FINANCIAL OBLIGATIONS BY FRANCHISEE TO BASKIN-ROBBINS.

31. **ACKNOWLEDGEMENTS**

31.1. FRANCHISEE ACKNOWLEDGES THAT IT HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE RETAIL UNIT, RECOGNIZES THAT THE RETAIL UNIT INVOLVES BUSINESS RISKS, AND ACKNOWLEDGES THAT FRANCHISEE HAS BEEN ADVISED TO SEEK INDEPENDENT LEGAL AND FINANCIAL ADVICE WITH RESPECT TO THIS AGREEMENT. BASKIN-ROBBINS EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED, ANY REPRESENTATION, WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL SALES, INCOME, PROFITS, OR SUCCESS OF THE RETAIL UNIT.

31.2. FRANCHISEE ACKNOWLEDGES THAT IT RECEIVED A COPY OF THIS AGREEMENT, THE ATTACHMENTS THERETO, AND AGREEMENTS RELATING THERETO, IF ANY, AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED. FRANCHISEE FURTHER ACKNOWLEDGES THAT IT RECEIVED THE DISCLOSURE DOCUMENT REQUIRED BY THE TRADE REGULATION RULE OF THE FEDERAL TRADE COMMISSION ENTITLED "DISCLOSURE REQUIREMENTS AND PROHIBITIONS CONCERNING FRANCHISING AND BUSINESS OPPORTUNITY VENTURES" ON THE DATE OF THE FIRST PERSONAL MEETING BETWEEN BASKIN-ROBBINS AND FRANCHISEE AND NOT LESS THAN TEN (10) BUSINESS DAYS PRIOR TO THE DATE OF WHICH THIS AGREEMENT WAS EXECUTED.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

**FRANCHISOR**
BASKIN-ROBBINS USA, CO.,
a California corporation

_____
**AUTHORIZED AGENT**

ATTEST:

BASKIN-ROBBINS USA, CO.,
a California corporation
By: _____
Name:
Title: Assistant Secretary

**FRANCHISEE**
a**  _____

_____
Name:
Title:

_____
Name:
Title:

*insert corporate or partnership name, if any
**insert state of origin and type of entity

**FRANCHISEE**
(Individual)

_____
Name: SUKHRAN GILL

_____
Name: GURMEET GILL

**THIS AGREEMENT IS NOT BINDING UPON BASKIN-ROBBINS UNTIL EXECUTED AND ATTESTED BY ITS AUTHORIZED REPRESENTATIVES.**

F:\LEGAL\UFOC\UFOC95-6\EXHIBITS\EXHIB-C         16