# EXHIBIT 2

BRCEBCH-10/1599

PC No. 361197
Store No. 2354



# FRANCHISE ROYALTY CONVERSION OFFER

## AMENDMENT TO FRANCHISE AGREEMENT

**BASKIN-ROBBINS USA CO.**, a California corporation ("we" or "us") hereby offers the Franchisee below ("you") the opportunity to amend your existing franchise agreement for the Store identified below to incorporate this Offer. The Offer consists of Terms & Conditions, Exhibits I through IV and, if appropriate, Rider "A". This Offer document becomes an amendment to your existing franchise agreement when executed by you and us. It contains an explanation of the mechanics of the Offer, some definitions, descriptions of how your existing franchise agreement will change, and actual contract provisions that will become binding on you or us either when this Offer document is executed, or later, upon the occurrence of specified events.

Franchisee:   **SUKPRAN & GURMEET GILL**

Date          October 21, 1999

---

### CONTRACT OFFER DATA SCHEDULE

A.  Location of the Baskin-Robbins Store:

   4493 CENTURY BLVD        PITTSBURG        CA

B.  This Store is a:      ☑ Solo Baskin-Robbins unit
                          ☐ Combo unit (Baskin-Robbins & Dunkin' Donuts)
   *(check one)*          ☐ Combo unit (Baskin-Robbins & Togo's)
                          ☐ Trombo unit (Baskin-Robbins, Dunkin' Donuts & Togo's)

   If this Store is a Combo or Trombo unit, **Rider "A"** is a part of this Offer

C.  This Store currently has a Site Rating of **NR** and a Trade Area Rating of **B**

   If either Rating entered above is "C", see Section III of the Terms & Conditions of this Offer.
   *(enter "NR" if the Store is not currently rated)*

---

## TERMS AND CONDITIONS OF THE BASKIN-ROBBINS FRANCHISE ROYALTY CONVERSION OFFER

I.  **FRANCHISE ROYALTY CONVERSION OFFER**

We offer you the opportunity (i) to amend your current franchise agreement (the "Existing Contract") on the terms and conditions of this Offer for the remainder of the current term and the renewal period, if any, of the Existing Contract, and (ii) upon your completion of the terms and conditions described in the Offer, to obtain a new franchise agreement (the "New Contract") for a term that incorporates any renewal term you now have available to you under the Existing Contract (but see Section III). Section numbers to the right of each heading refer to sections of the typical Baskin-Robbins franchise agreement that will be modified by this Offer. These references are only intended to help your review, and not to limit applicability of the Offer to any particular section or sections of the Existing Contract, which may vary. By accepting the Offer, you agree to make the following changes to your franchise agreement:

A.  **Royalty Conversion**

*The "Conversion Date" will be a Sunday designated by us in a written "Notice To Commence" that we will send you no less than seven (7) days before the designated Sunday. The following changes will be effective on the Conversion Date:*

1.  **Reporting of Gross Sales**                                    [Section 13.1]

Commencing on the Conversion Date you will submit to us, on or before Thursday of each week, on our standard, approved form, a statement of Gross Sales at the Store for the seven (7) day period ending at the close of business on the preceding Saturday. You will also submit to us, within forty-five (45) days after the close of each of your fiscal months, a profit and loss statement of the Unit for that monthly period, on our standard, approved form. Any standard form may be electronic

1

If the Conversion Date occurs on any day other than the first day of the month, you will timely submit a final monthly sales report for that month, reporting Gross Sales and paying monthly royalty and advertising fees for the portion of month that precedes the Conversion Date.

2.  *Electronics Funds Transfer*                                     [Sections 3.5 & 13.1]

Commencing on the Conversion Date, you will make all payments of continuing franchise and advertising fees by electronic funds transfer ("EFT") based upon your weekly Gross Sales Report. You must complete and deliver to us with this Offer, the authorizations and bank account data necessary to effectuate payment by EFT on the attached **Exhibit I**. You must also complete and deliver to us such other forms as we may from time to time require to effectuate any changes as necessary to maintain EFT capability. We do not, by accepting your payments via EFT, waive any of our rights under the franchise agreement. You agree (a) to give us at least fourteen days written notice (except in the case of emergency) before making any change to your EFT bank account, providing us all information and specimens required for us to change EFT to the new account, (b) to pay us our then-current late fee, plus collection costs and reasonable attorney's fees, if your bank rejects our EFT request because of insufficient funds, and (c) upon our demand, to replace EFT rejected by your bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

3.  *Continuing Franchise Fee*                                       [Section 3.1]

Commencing on the Conversion Date, instead of a monthly royalty rate of one-half percent, or weekly royalty rate of four and nine-tenths percent, or weekly royalty rate of five percent, as applicable, you will pay us weekly continuing franchise fees, in the manner set forth in Section I.A.2 above, (or in such other manner as we may from time to time advise you in writing), on or before Thursday of each week, **five and nine-tenths percent (5.9%)** of the Gross Sales of the Baskin-Robbins Store for the seven (7) day period ending at the close of business on the preceding Saturday.

4.  *Continuing Advertising Fee*                                     [Sections 3.4, 12.1 & 12.2]

Commencing on the Conversion Date, instead of monthly advertising fees to the National Fund and Regional Fund at a total rate of three and one-half percent, you will also pay us weekly continuing advertising fees at the same time, for the same seven (7) day period, in the same manner as the payments provided for under paragraph I.A.3 above, **five percent (5.0%)** of the Gross Sales of the Baskin-Robbins Store, for a Fund for advertising, marketing, promotion and other purposes described in paragraph I.A.5 below. In addition, you will participate in and make additional payments to the Fund with respect to all advertising, marketing, promotion and other programs which from time to time are supported by two-thirds of the Baskin-Robbins stores in the market in which this Store is located with respect to local programs, and in the continental United States, with respect to national programs. Contributions to the Fund in excess of five percent (5.0%) of Gross Sales will be used in accordance with the programs to which they relate.

5.  *New Advertising Fund*                                           [Section 12.1.2]

We have established and now administer a new marketing, advertising and sales promotion fund (the "Fund") for the Baskin-Robbins System and we direct the development of all advertising, marketing and promotional programs for the System. Your payments to this Fund will be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further our public reputation and the public reputation of the System, including activities related to any and all of these endeavors. We have sole discretion over the content of all activities of the Fund, including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities. We are not obligated to make payments from the Fund that are equivalent or proportionate to payments you have paid into the Fund, or to insure that you benefit directly or on a prorata basis from any activities of the Fund. Upon request, we will provide you a statement of receipts and disbursements prepared by an independent public accountant for the most current fiscal year of the Fund.

A portion of your payments to the Fund(s) equal to one percent (1%) of the Gross Sales of the Store will be used, at our discretion, to provide for the administrative expenses of the Fund and for programs designed to increase sales and enhance and further develop our public reputation and image and the public image of the System. The balance, including any interest earned by the Fund, will be used for advertising and related expenses.

6.  *Electronic Reporting and Payment*                               [Sections 3.5 & 13.1]

For each week that you (a) submit a weekly Gross Sales report via our approved electronic form over the Internet, and (b) pay the corresponding weekly continuing franchise and advertising fees by EFT, we will deduct the fees from your bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after we implement an electronic form for reporting weekly sales that is satisfactory to us. To have this benefit available, you must have computer equipment capable of accessing and using the electronic form in the manner required. In our discretion or due to system failure, we may elect to withdraw the electronic form. In any such case, you must immediately return to reporting Gross Sales in the manner originally required.

2

7. *Wholesale Price Reduction* [Section 7.1]

Commencing on the Conversion Date, the methodology for determining the price to franchisees of Baskin-Robbins products containing ice cream and the methodology for determining the price of Baskin-Robbins products that do not contain ice cream are set out on the attached **Exhibit II**. The base price sheet for such products is attached as **Exhibit III**.

8. *Maximum Price Promotional Campaigns* [Section 12]

Commencing on the Conversion Date, we may, in our sole discretion, initiate mandatory Maximum Price Promotional Campaigns for products or services we designate. A material aspect of these campaigns will be our right to establish the maximum price that you can charge customers for the designated product(s) or service(s) during the promotional period. You agree to participate in each such campaign and, for the duration of the promotional period, you will charge your customers no more than the maximum price established by us for the designated product(s) or service(s). You retain the right to charge your customers less than any maximum retail price we may establish.

B. **Obligations To Be Undertaken Before The Conversion Date**

1. *Retail Information System* [Sections 8 & 13]

You must purchase (or lease), install and exclusively use a retail unit information technology system, including computers, printers, cash registers, touch heads, cash drawers, software and other equipment we designate for your Store (hereinafter "RIS"). We will not send you a Notice to Commence for the Conversion Date until you have placed a binding order for RIS. You must bear all costs associated with RIS. You agree at your sole cost to (i) complete, and cause the employees in your Store to complete, such initial and other training as we specify; (ii) maintain RIS in continuous operation at your Store; (iii) purchase an ongoing maintenance and support contract and replace the RIS components as necessary; (iv) upgrade or replace RIS from time to time as we may require (but replacement will not be required sooner than three (3) years after you initially install RIS); (v) permit us immediate access to RIS, electronically or otherwise, at all times without prior notice to you; and (vi) install and maintain telephone or other service we require to permit such access.

The term "RIS" includes, without limitation, all designated hardware and software and the data stored by you. You agree to use RIS solely in connection with the operation of your Store in the manner we specify from time to time. You agree to comply with our requirements regarding maintenance, storage and safeguarding of data, records, reports and other matters related to RIS.

We make no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS.

2. *Store Upgrades* [Section 8]

Before the Conversion Date, you must complete the following upgrades to your Store in accordance with our standards and procedures for this Offer as we deem applicable to the Store: (a) new signs or awnings to replace existing signs or awnings on the Store's exterior, (b) new menu boards to replace the existing menu board in the Store, (c) new lights for the new menu boards, (d) a new seating package to replace the existing seating in the Store, (e) refurbish existing dipping cabinets and POS station, (f) replace existing ceiling tiles, and (g) replace existing wallpaper and/or freshly paint the Store's interior. We will not require you to spend more than twenty thousand dollars ($20,000.00) in total for RIS (one touch head) and these upgrades. **Furthermore, if you deliver to us a completely signed Offer or before December 1st, 1999, and if you then complete your obligations under this section I.B.2, we will pay you the sum of six hundred thirty six dollars ($636.00) on or about December 1st 2000, and again on December 1st of each year thereafter, through 2004, provided your franchise agreement remains in full force and effect (a total of $3,180.00).** We may apply any such payment against outstanding amounts you then owe us, not in dispute, if any.

We will not send you a Notice to Commence for the Conversion Date until you have placed a binding order to purchase all of the required upgrade components. You must comply with all laws, codes and ordinances applicable to this Store upgrade, including the Americans With Disabilities Act. Nothing in this Offer alters or diminishes your obligation to repair and maintain the Store set forth in your Existing Contract and lease.

3. *Operations Certification* [Sections 5 & 6]

Within ninety (90) days after you sign this Offer, you must obtain our certification that your Store is in compliance with our standards for (i) store maintenance and appearance, (ii) hospitality and service, (iii) cakes and merchandising, (iv) product quality and preparation and (v) food safety and sanitation ("Operations Certification"). We will waive your Operations Certification requirement if you have received no written notice of a deficiency in standards at your Store between July 1, 1999, and the date sixty (60) days after the date you sign this Offer. For any Store that has received such a notice, we will re-inspect the Store no later than ninety (90) days after you sign this Offer to determine if the Store is then in compliance with our standards. We may also require you to take one or more training courses to provide you the opportunity to improve one or more of the Store's standards described above.

3

For purposes of this Offer, Operations Certification must be obtained within one (1) year of the date you sign the Offer. Until such time as you obtain Operations Certification (or the same is considered to be waived), you will not be offered the New Contract, as described in Section I.C. below, or receive the Notice to Commence for royalty conversion. Such failure will also be a continuing breach of the Existing Contract and a material factor in our decision whether to renew your Existing Contract at the end of the current term.

4. *Lease Option for Franchisee Owned or Controlled Real Estate*  [Section 4]

For any Store where the real estate is owned by you or leased by you from a third-party, you must provide us our standard form Lease Option Agreement (if you have not already done so) covering the full term of the New Contract. In our sole discretion, we may waive this requirement if we determine that a Lease Option is unattainable.

C. **New Franchise Agreement**  [Section 4]

Upon your timely completion of the obligations set forth in Section B above, and provided that you are not in default of any agreement with us, including your amended Existing Contract, we and you will promptly and concurrently execute and deliver our standard form agreement to terminate the Existing Contract and a new franchise agreement for the Store in the same form as the attached **Exhibit IV** (the "New Contract"). The New Contract will be for a term that includes the five (5) year renewal term, if any, contained in the Existing Contract, except that adding such renewal term will not have the effect of causing the resulting term of the New Contract to exceed a total of ten (10) years. If you fail to sign and return the New Contract to us within thirty (30) days after you receive it, provided that you are not otherwise in default, the Existing Contract will remain in effect until expiration of the current term. However, such failure will be a material factor in our decision whether or not to renew your Existing Contract at the end of the current term.

II. **RENEWAL OF YOUR STORE'S LEASE**  [Section 4]

If you lease or sublease the Store from us or one of our affiliated companies, and if you sign the New Contract in accordance with this Offer, we will extend your Store's lease for a like term, subject to the following:

A. **Our Rights Under Our Underlying Lease**

1. If we have an underlying lease, renewal of your Store's sublease is contingent upon our having the right to extend or renew the underlying ("prime") lease for a like term. We will not be obligated to exercise renewal options under our prime lease until our deadline to renew, as specified in the prime lease. You agree to hold us harmless from any action or inaction of yours that causes us to lose any benefit of our right to renew the term of the prime lease.

2. Renewal of our prime lease and your Store's sublease for additional term is subject to our making the decision to retain our real estate interest at the Store for the additional term. If we decide to renew your franchise for the Store, but do not wish to retain our real estate interest for the renewal term, we will notify you no later than six (6) months before the prime lease expiration date and you may then negotiate directly with our landlord. But if the Store is located on a "C"-rated site, or in a "C"-rated trade area, you must refer to Section III below.

B. **Pass-Through of Prime Lease Rent Increases**

If we renew our prime lease and are obligated to pay higher rent to the prime landlord (even if an increase began during the current term as a result of re-negotiation of the prime lease), the rental payable under your sublease will be increased by the same increase in rent and other charges required by the prime landlord.

III. **RELOCATION OF THE STORE**  [Section 4]

If your Store is located on a site or in a trade area that does not meet our then-current qualifications for renewal (a "C" Site Rating or a "C" Trade Area Rating subject to the limitations of paragraph 4.11 of our standard "Addendum J"), you may nevertheless obtain renewal if you relocate your Store according to the following:

*"You will close the Store as of the end of the current term of the Existing Contract and relocate the franchise to a new Store of the same type at a location to be approved by us. You must not be in default under any agreement with us and you must be in compliance with all of our Store operational standards. Relocation of the Store may not cause a conflict with any contract we have with any third party. The new Store (a) must be developed by you in accordance with our requirements at that time, (b) must be approved at least six (6) months before expiration of the Store's lease, and (c) must open within six (6) months after the date the Store closes. Before opening the new Store, you must execute the then-current franchise agreement for the new Store, plus any standard related agreements (e.g. lease option agreement). The new franchise agreement for the new Store will include the renewal term of the Existing Contract, and you may purchase, at then-current rates, extended term up to a maximum total of twenty (20) years. You will not be in default of these relocation provisions if you are unable through no fault of your own, either to obtain control of a relocation site that meets our standards or to reopen a new Store in a timely manner. In either case, however, we may elect not to renew the franchise agreement for the existing Store."*

4

## IV. MISCELLANEOUS PROVISIONS

1. **Late Fee, Interest and Costs.** If any payment required under the Existing Contract is not paid when due, you must pay us, in addition to the unpaid amount, our then-current late fee for each unpaid invoice. In addition, all amounts which remain unpaid after the same is due will bear interest from the date due until the date paid, at the monthly rate of one and one-half percent (1.5%) or at the maximum rate permitted by law, whichever is less. We are entitled to such interest in addition to any other remedies we may have. Our receipt of a check, draft or other commercial paper will not constitute payment until we collect the funds from the same. You will pay all collection charges, including reasonable attorney's fees, on dishonored checks or rejected EFT. Within five (5) days after our demand, you must replace dishonored checks and/or rejected EFT with a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

2. **Modification of Development Agreements.** If you are a party to any Store Development Agreement (JCSDA or SDA) with us, the provisions of this Offer will also apply to any stores that you develop under that agreement after you sign this Offer and each such Store Development Agreement is hereby so amended.

3. **Effect of Accelerating Conversion Date.** If we elect to send you a Notice to Commence before you have completed any requirement that must precede Royalty Conversion, you are still required to complete such requirement as expeditiously as possible, and no requirements are waived by our election.

4. **Disclosure of Consequences of Rejecting this Offer.** If you decide to reject this Offer, your existing franchise agreement will stay in place for the balance of the current term. You will not receive the benefits of the pricing mechanism described in Exhibits II and III. Rather, you will continue to pay for Baskin-Robbins products in accordance with current pricing practices, as we may adjust them from time to time in our sole discretion. In the event that we elect to designate one or more exclusive suppliers of any of the Baskin-Robbins products, you will continue to pay for Baskin-Robbins products in accordance with current pricing practices, as charged and adjusted from time to time by the exclusive supplier. In that case we will no longer set the price for such products. However, the exclusive supplier may agree to pay us from revenues received from you, to compensate us for Product revenues we would have received instead of continuing franchise and advertising fees, had you accepted this Offer.

Franchisees who reject this Offer will not be eligible to receive the Franchise Renewal Offer that we intend to make within fifteen (15) months to selected qualified franchisees. If you have the right to renew and wish to renew the Existing Contract at the end of the current term, we will review your qualifications for renewal at that time. Your renewal franchise agreement, if offered, would be on then-current terms, including fees.

5. **Disclaimer.** This Offer and the documents referred to herein are the entire, full and complete amendment to the Existing Contract. You agree that no other representations have induced you to execute this amendment. There are no representations, inducements, promises or agreements, oral or otherwise, not embodied in this amendment, which have any force or effect with reference to the Existing Contract or otherwise. Without limitation, we make no representation or warranty as to the sales or profits, if any, which may result from your acceptance of this Offer.

6. **Existing Contract.** Once both you and we sign this Offer, it becomes an amendment that changes both your and our rights and obligations under the Existing Contract, but only to the extent expressly stated in the Offer. If there is any conflict between the terms of the amendment and any other terms of the Existing Contract, the terms of the amendment will control. The Existing Contract remains in full force and effect, as changed by the amendment.

7. **Applicable Law.** This amendment will be deemed to have been made in, and the amended Existing Contract will be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. You acknowledge that the Existing Contract is to be performed in part through services rendered to you in Massachusetts.

## V. GENERAL RELEASE

Each of you, the undersigned Franchisee(s), hereby releases, remises and forever discharges Baskin-Robbins Incorporated and Baskin-Robbins USA, Co., their successors, assigns, subsidiaries and affiliated corporations (hereinafter collectively "Baskin-Robbins") and all officers, directors, agents, employees and representatives, past and present, of Baskin-Robbins or any one of them, of and from any and all claims, demands, causes of action, suits, debts, dues, duties, sums of money, accounts, reckonings, covenants, contracts, agreements, promises, damages, judgments, extents, executions, liabilities and obligations, both contingent and fixed, known and unknown, of every kind and nature whatsoever in law or equity, or otherwise, under local, state or federal law, against Baskin-Robbins which you or your predecessor in interest ever had, now have, or which they, their heirs, executors, administrators, successors, or assigns hereafter can, shall, or may have, for, upon or by reason of any matter, cause, or thing whatsoever, to the date of this amendment. However, the foregoing general release will not apply to the executory provisions of any agreements between you and us. Without limiting the generality of the foregoing, but by way of example only, this release shall apply to any and all state or federal antitrust claims or causes of action; state or federal securities law claims or causes of action; state or federal R.I.C.O. law claims or causes of action; breach of contract claims or causes of action, claims or causes of action based on fraud or misrepresentation, breach of fiduciary duty, unfair trade practices (state or federal), and all other claims and causes of action whatsoever.

With respect to the matters released above, you knowingly waive all rights and protection, if any, under Section 1542 of the Civil Code of the State of California, or any similar law of any state or territory of the United States of America. Section 1542 provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him, must have materially affected his settlement with the debtor."

5

You acknowledge that you have carefully read this proposed amendment to your Franchise Agreement in its entirety, including all attachments. To accept this Offer, you must deliver it to us by no later than 5:00pm Pacific Standard Time, on December 15, 1999, completely signed, including all required information and authorizations. *Remember, however, that for you to be entitled to the payments described in paragraph I.B.2 above, you must accept and deliver this Offer to us by December 1st, 1999.* This amendment is not binding upon us until it is executed and attested by our authorized representatives and returned to you. Our execution of this amendment is conditioned upon a sufficient number of franchisees accepting this Offer, as determined by us. Also, we may reject your acceptance of the Offer if you have any overdue amounts owed to us at that time.

We both agree to take such other actions and execute such other documents as may be necessary or desirable to implement this Offer.

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this Agreement in duplicate on the date and year written below.

Dated this  1-9-00
ATTEST: _[signature]_

BASKIN-ROBBINS USA, CO.

By: _[signature]_
SENIOR MARKET EXECUTIVE

Dated this  Nov 29, 1999
ATTEST:

FRANCHISEE
Name of Entity: Baskin-Robbins #2354 (Sole Proprietor)

Print Name: S. Gill
Print Title: Franchisee

By: _[signature]_
Name: GURMEET GILL
Title: FRANCHISEE

_____ witness    Print Name: _____

_____ witness    Print Name: _____

_____ witness    Print Name: _____

_____ witness    Print Name: _____

**If Franchisee is a legal entity other than a natural person, all partners, shareholders, members or trustees, as applicable, must sign the offer, stating the position held.**

### NOTICE REQUIRED BY CALIFORNIA LAW

Above our signature line we have inserted the date we delivered this Offer to you. Above your signature line(s), you must insert the date on which you sign it. We encourage you to consider this Offer for at least ten business days. However, if you choose to sign this Offer and deliver it to us earlier, the Offer will not be binding upon you if you notify us in writing that you rescind your acceptance of the Offer, no later than ten (10) business days after you first received it from us. You may rescind by depositing such a written notice in the mail within the ten business days, postage prepaid, addressed to Baskin-Robbins, P O Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368  Attention: Legal Department.

## Wholesale Pricing Mechanism

The wholesale price to be paid by franchisees for the Baskin-Robbins products listed on the attached Exhibit III at a given time after royalty conversion will be (i) the price for that product as of the date specified on Exhibit III, (ii) periodically adjusted as described below. The wholesale price to be paid by franchisees for Baskin-Robbins products will consist of two component parts: "costs" and a "commercial factor."

I. COSTS

The "cost" component is comprised of the following: manufacturing or acquisition costs, distribution costs and administration costs. More specific definitions appear below. All costs will be recognized in accordance with generally accepted principles of accounting. Wholesale prices may be adjusted periodically, as we determine, resulting from incurred or projected changes in our costs. We will review any adjustments with designated franchisee representatives to communicate the rationale for the adjustment before it takes effect. At the end of the first full fiscal year after the conversion date (September 1, 2000 - August 25, 2001), and for each subsequent fiscal year, Baskin-Robbins franchisees as a group may at their expense conduct a single audit of all cost-based adjustments to the prices of products in the preceding fiscal year (the right to audit third parties can not be assured by Baskin-Robbins). The auditor selected by franchisees must be a certified public accountant experienced in auditing operations involved in the manufacture and distribution of similar products, and must be acceptable to us. If the auditor determines and we agree that any cost adjustment was improper (i.e. not genuine or permitted by generally accepted accounting principles) we will make a wholesale price adjustment on future sales to correct for the audit result and, if the adjustments identified by the audit and accepted by us exceed five percent (5%) of the then-current commercial factor (i.e. for ice cream, 5% of $.37), we will pay for the cost of the audit.

- A. **"Manufacturing Costs"** include but are not limited to all costs associated with raw materials, packaging, and processing described below.
  - Raw Material Costs: milk-fat, sugars, flavors and all raw material costs including shrinkage.
  - Packaging Costs: side-walls, lids, bottoms, and all other packaging, including shrinkage.
  - Processing Costs: direct labor, occupancy and equipment costs including depreciation, indirect labor and overhead, warehousing, storage, load-out costs, manufacturing administration (procuring, processing & paying for manufacturing costs), and all other costs including supplier manufacturing margins.

- B. **"Acquisition Costs"** include but are not limited to all costs associated with purchasing products from manufacturers or other suppliers (including their profit margins) in pre-packaged shipping units, f.o.b. the manufacturer or supplier.

- C. **"Distribution Costs"** include but are not limited to costs associated with warehousing and delivery as defined below.
  - Warehousing costs: the order placement for incoming product, facilitation of inbound freight, receiving, storage, inventory control, order picking, loading, inventory carrying costs, and any management fees directly related.
  - Delivery costs: order processing, transport, store door delivery process, and an adequate level of customer service and management support for handling store level customer service issues.

- D. **"Administration Costs"** include but are not limited to costs associated with invoicing, cash receipts, cash application, collection activities, statement processing, bad debt expense, interest, insurance, regulatory and legal expenses.

II. COMMERCIAL FACTOR

The following "commercial factors" are adjusted only once annually, according to the consumer price index. However, Baskin-Robbins may at its discretion lower a commercial factor at any time without regard to the CPI.

- A. **Ice Cream Products**: The commercial factor for products which contain ice cream is intended to yield an average for all ice cream gallonage of **thirty-seven cents ($0.37) per gallon**, over the course of a fiscal year.

- B. **Non-Ice Cream Products**: The commercial factor for products which do not contain ice cream is intended to yield an average for all non-ice-cream shipping units of **six dollars and seventeen cents ($6.17) per shipping unit**, over the course of a fiscal year.

III. MISCELLANEOUS

A. Product Changes. Additions to and deletions from the Baskin-Robbins product line may be made from time to time at our discretion. Wholesale prices of additional products will be adjusted in accordance with the provisions above.

B. Provision For Outsourcing. Any or all of the manufacturing, distribution, or administration functions may be performed by Baskin-Robbins or a third party, in which case the associated costs would be those of Baskin-Robbins or the prices charged by the third party performing that function. In any event, Baskin-Robbins remains entitled to the described commercial factor.

C. B.R. Flavors, Inc. Profits of B.R. Flavors, Inc. are separate and distinct from the mechanism set forth above

9

Exhibit III

Attach Royalty Conversion Price Sheet

(Attach Exhibit IV - The New Contract)

# VERNON REGION
## Royalty Conversion Price Sheet

|  | CURRENT PRICE | NEW BASE PRICE |
|---|---|---|
| **ICE CREAM:** | | |
| TUBS | $24.29 | $15.48 |
| QUARTS | $17.60 | $12.94 |
| NOVELTIES | $20.25 | $14.04 |
| SOFTSERVE YOGURT | $22.21 | $18.15 |
| | | |
| **CAKES & PIES:** | | |
| 9" ROUND CAKE | $24.46 | $19.47 |
| HEART CAKE | $22.66 | $18.96 |
| SHEET CAKE | $30.52 | $22.91 |
| ROLL CAKE | $28.24 | $25.79 |
| ICE CREAM PIE | $17.65 | $17.65 |
| | | |
| **NON-ICE CREAM:** | | |
| CAPPUCCINO BLAST CONCENTRATE | $51.43 | $38.00 |
| DE-CAF BLAST CONCENTRATE | $51.43 | $38.00 |
| STRAWBERRY CONCENTRATE | $44.15 | $38.00 |
| PINEAPPLE-PASSIONFRUIT CONCENTRATE | $44.15 | $38.00 |
| STRAWBERRY TOPPING | $28.75 | $30.66 |
| ROLL CAKE - CHOCOLATE | $20.55 | $20.83 |
| SHEET - DEVILS FOOD | $18.33 | $18.33 |
| SHEET - WHITE | $18.33 | $18.33 |
| SHEET - BROWNIE | $18.33 | $18.33 |
| 9" ROUND - DEVILS FOOD | $14.27 | $14.27 |
| 9" ROUND - WHITE | $14.27 | $14.27 |
| REAL CREAM | $18.27 | $18.67 |
| PASTRY PRIDE/RICH'S | $16.37 | $18.12 |
| IQF PEACH | $22.58 | $22.58 |
| IQF STRAWBERRY | $20.68 | $20.68 |
| IQF BLUEBERRY | $18.06 | $18.06 |

*All prices are quoted as of 10/15/99. Prices are subject to increase or decrease based on increases and decreases in our costs to manufacture and deliver products to you.*